1

2  UNITED STATES BANKRUPTCY COURT

3  SOUTHERN DISTRICT OF NEW YORK

4  Case No. 12-14300-alg

5  - - - - - - - - - - - - - - - - - - - -x

6  In the Matter of:

7

8  HMX ACQUISITION CORP., et al.,

9

10            Debtors.

11

12  - - - - - - - - - - - - - - - - - - - -x

13

14            United States Bankruptcy Court

15            One Bowling Green

16            New York, New York

17

18            November 20, 2012

19            2:38 PM

20

21  B E F O R E:

22  HON. ALLAN L. GROPPER

23  U.S. BANKRUPTCY JUDGE

24

25

1

2   Hearing RE:  Motion by Debtors authorizing the Debtors' entry

3   into the stalking-horse purchase agreement, authorizing and

4   approving the bidding procedures and breakup fee.

5

6   Hearing RE:  Motion by Debtors authorizing to obtain secured

7   postpetition financing and use cash collateral; granting

8   adequate protection and modifying the automatic stay.

9

10

11

12

13

14

15

16

17

18

19

20   Transcribed by:  Penina Wolicki

21   eScribers, LLC

22   700 West 192nd Street, Suite #607

23   New York, NY 10040

24   (973)406-2250

25   operations@escribers.net

```
 1
 2   A P P E A R A N C E S :
 3   PROSKAUER ROSE LLP
 4        Attorneys for Debtors
 5        Three First National Plaza
 6        70 West Madison
 7        Suite 3800
 8        Chicago, IL 60602
 9
10   BY:   MARK K. THOMAS, ESQ.
11
12
13   PROSKAUER ROSE LLP
14        Attorneys for Debtors
15        Eleven Times Square
16        New York, NY 10036
17
18   BY:   JARED D. ZAJAC, ESQ.
19
20
21
22
23
24
25
```

1

2 UNITED STATES DEPARTMENT OF JUSTICE

3        Office of the United States Trustee

4        33 Whitehall Street

5        21st Floor

6        New York, NY 10004

7

8 BY:   NAZAR KHODOROVSKY, ESQ.

9

10

11 LEONARD, STREET AND DEINARD, P.A.

12        Proposed Counsel for Official Creditors' Committee

13        150 South Fifth Street

14        Suite 2300

15        Minneapolis, MN 55402

16

17 BY:   ROBERT T. KUGLER, ESQ.

18

19

20

21

22

23

24

25

1

2  DLA PIPER LLP (US)

3          Attorneys for Authentic Brands Group

4          203 North LaSalle Street

5          Suite 1900

6          Chicago, IL 60601

7

8  BY:   CHUN I. JANG, ESQ.

9          DANIEL M. SIMON, ESQ. (TELEPHONICALLY)

10

11

12  KENNEDY, JENNIK & MURRAY, P.C.

13          Attorneys for Workers United

14          113 University Place

15          New York, NY 10003

16

17  BY:   SUSAN M. JENNIK, ESQ.

18

19

20

21

22

23

24

25

1

2  GREENBERG TRAURIG, LLP

3         Attorneys for Salus Capital Partners LLC

4         200 Park Avenue

5         Florham Park, NJ 07932

6

7  BY:   JEFFREY M. ROSENTHAL, ESQ.

8

9

10  GREENBERG TRAURIG, LLP

11         Attorneys for Salus Capital Partners LLC

12         333 S.E. 2nd Avenue

13         Suite 4400

14         Miami, FL 33131

15

16  BY:   PAUL J. KEENAN, JR., ESQ.

17

18

19  SCHULTE ROTH & ZABEL LLP

20         Attorneys for Amalgamated Health Fund

21         919 Third Avenue

22         New York, NY 10022

23

24  BY:   LAWRENCE V. GELBER, ESQ.

25

```
 1
 2   HALPERIN BATTAGLIA RAICHT, LLP
 3        Attorneys for Douglas Williams
 4        555 Madison Avenue
 5        9th Floor
 6        New York, NY 10022
 7
 8   BY:   ALAN D. HALPERIN, ESQ.
 9        JULIE D. DYAS, ESQ.
10
11
12   LAZARUS & LAZARUS, P.C.
13        Attorneys for Warren Corporation, Loro Piana, and HMS
14        240 Madison Avenue
15        New York, NY 10016
16
17   BY:   HARLAN M. LAZARUS, ESQ.
18
19
20   ALSO PRESENT:
21        GEOFFREY A. RICHARDS, William Blair & Company
22
23
24
25
```

1                    P R O C E E D I N G S

2              THE COURT:  Please be seated.  May I have appearances

3       in HMX, please?

4              MR. THOMAS:  Good afternoon, Your Honor.  Mark Thomas

5       of Proskauer, with my colleague, Jared Zajac, on behalf of HMX

6       Acquisition and its affiliated debtors and debtors-in-

7       possession.

8              MR. ROSENTHAL:  Do you want podiums Your Honor, or --

9              THE COURT:  No, you can --

10             MR. ROSENTHAL:  Thank you, Your Honor.  Jeffery M.

11      Rosenthal, Greenberg Traurig, on behalf of Salus Capital.  And

12      I believe Mr. Keenan, my colleague, is on the phone as well,

13      Your Honor.

14             THE COURT:  All right.

15             MR. JANG:  Good afternoon, Your Honor.  Chun Jang of

16      DLA Piper, on behalf of Authentic Brands Group, the stalking-

17      horse bidder.

18             MR. KUGLER:  Good afternoon, Your Honor.  Robert T.

19      Kugler from Leonard, Street and Deinard on behalf of the

20      official committee of unsecured creditors.

21             MR. KHODOROVSKY:  Nazar Khodorovsky for the U.S.

22      Trustee.  I wanted to indicate to Your Honor, it's a pleasure

23      to appear before Your Honor in this courthouse again.  Thank

24      you, Your Honor.

25             THE COURT:  Well, how are you doing in terms of an

1 | office?  Has your office reopened?

2 |           MR. KHODOROVSKY:  No, Your Honor.

3 |           THE COURT:  Not yet?

4 |           MR. KHODOROVSKY:  I've been working out of the

5 | Brooklyn office, Your Honor.

6 |           THE COURT:  All right.

7 |           MR. KHODOROVSKY:  Thank you, Your Honor.

8 |           THE COURT:  A lot of people think that's a promotion.

9 |           MR. KHODOROVSKY:  Your Honor, I'd been working in the

10 | Brooklyn office even before the hurricane, as well.  Thank you,

11 | Your Honor.

12 |           MS. JENNIK:  Good afternoon, Your Honor.  Susan Jennik

13 | of Kennedy, Jennik & Murray, for Workers United.

14 |           THE COURT:  All right.  Anybody who wants -- going to

15 | speak, should stay up here.  There are plenty of seats.

16 |           MR. LAZARUS:  Good afternoon, Your Honor.  Harlan

17 | Lazarus, for creditors Warren Corporation, Loro Piana, and HMS.

18 |           THE COURT:  What are their positions in this case?

19 |           MR. LAZARUS:  Creditors -- large creditors.

20 |           THE COURT:  Trade creditors?

21 |           MR. LAZARUS:  Yes, Your Honor.

22 |           THE COURT:  All right.

23 |           MR. HALPERIN:  Good afternoon, Your Honor.  Alan

24 | Halperin, my colleague Julie Dyas, on behalf of Doug Williams.

25 |           THE COURT:  And Mr. Williams is the CEO of the

1  debtors?

2          MR. HALPERIN:  Yes, he is, Your Honor.

3          THE COURT:  And has a lot of other interests too,

4  apparently.  Well, why don't you sit up front.

5          Anyone else going to appear?  Anyone on the telephone

6  wish to note an appearance?

7          All right.  Where shall we start today?

8          MR. THOMAS:  Your Honor, Mark Thomas on behalf of the

9  debtors.  If I may?  We are here basically on the final hearing

10  on the debtor-in-possession financing order and a status

11  hearing on the bid procedures order.  The committee filed two

12  objections late last night.  We have worked diligently with the

13  committee and our senior secured lender since last night to try

14  to resolve all of the objections that were raised.

15          Your Honor, I'm happy to report that the committee,

16  the debtors, and the proposed DIP lenders have reached an

17  agreement on a final DIP financing order that resolves all of

18  the objections that the committee raised last night.  And I

19  would like to, if I could, walk you through a blackline of the

20  order.

21          THE COURT:  All right.  Well, why don't we start,

22  then, with the status conference on the bidding procedures

23  order.

24          MR. THOMAS:  Okay.

25          THE COURT:  And you can tell me where we are and where

1   you hope to get and when.

2           MR. THOMAS:  Certainly, Your Honor.  We have worked

3   with the committee and the stalking-horse bidder's counsel and

4   the proposed DIP lender's counsel in an attempt to resolve all

5   of the objections that the committee raised.  We have addressed

6   many of the objections and have an agreed order that we could

7   tender that addresses the objections.  But there are four

8   outstanding issues that we haven't been able to resolve since

9   last night.

10          And I'll tell you those issues.  And on behalf --

11          THE COURT:  If you think it would be useful, yes,

12  please.  And then I'll tell you -- it may encompass my

13  questions --

14          MR. THOMAS:  All right.

15          THE COURT:  -- because this is really the first time

16  we're meeting face-to-face on any of these issues.

17          MR. THOMAS:  Right.  And with respect to the open

18  issues, as we've discussed with the creditors' committee, the

19  debtors are prepared today, if need be, to put on evidence.

20  We've brought witnesses --

21          THE COURT:  Well, you told me you wanted a status

22  conference.  So I gather we won't need to have evidence.  We're

23  going to put off the final hearing or the hearing until next

24  week, I assume?

25          MR. THOMAS:  Well, Your Honor, this is -- this was

HMX ACQUISITION CORP., ET AL.                          12

1   originally set for status on Friday the 16th of November.  And

2   since the committee had just been appointed, they -- the status

3   was to hear their objections.  They hadn't had time to file

4   objections.

5            THE COURT:  All right.

6            MR. THOMAS:  So I believe this is a continued status

7   hearing on the bid procedures to hear their objections.  Our

8   senior secured lenders had advised us that in the absence of a

9   fully resolved bid procedures order today, that they were in a

10  position to call a default under the interim DIP financing, and

11  cease financing, and therefore admonished --

12           THE COURT:  Well, we might as -- we can go into

13  liquidation immediately if that's what they wish.  If they want

14  to play chicken with the Court and not give the committee an

15  opportunity to do so, and that's how they do business in Miami,

16  we can go into liquidation today.

17           MR. THOMAS:  Which is --

18           THE COURT:  Is that what the DIP lender wants?

19           MR. ROSENTHAL:  Your Honor, no, that's not what we

20  want.  I'm a little con --

21           THE COURT:  All right.  I'm glad to hear that.

22           MR. ROSENTHAL:  Well, I'm a little confused, because I

23  live in New Jersey and practice in New Jersey and New York, not

24  Miami.

25           THE COURT:  All right.  Okay.

1           MR. ROSENTHAL:  Number one.  Number two, we have

2   worked hard with the committee the last three or four days to

3   get a final DIP order in position and ready to go.  We also had

4   understood that everybody was working towards a final bid

5   procedures order for today.  And we've gotten close.  As I

6   understand it, there are three open issues on that order.

7   So --

8           THE COURT:  Well, I'll hear them.  Maybe we're closer

9   than I think we are.

10          MR. ROSENTHAL:  Okay, thank you.

11          THE COURT:  That was my -- maybe it's my mistake.

12          MR. ROSENTHAL:  We've been working with everybody --

13          THE COURT:  But I'm not going to enter an order today

14  because the DIP lender, under circumstances of this case, says

15  you can't have two or three more days.  I want that to be very

16  clear.

17          MR. ROSENTHAL:  We understand that, Your Honor.  We

18  understand that.

19          MR. KEENAN:  Your Honor, if I may?  This is Paul

20  Keenan.  That's not our intention.

21          THE COURT:  Well, that's what I heard from Proskauer.

22          MR. KEENAN:  I understand, Your Honor.

23          THE COURT:  The DIP lender was prepared -- and I

24  quote; was I correct -- am I quoting you correctly -- prepared

25  to call a default today if we don't have an order today.  Is

HMX ACQUISITION CORP., ET AL.                              14

1  that what I heard?

2          MR. THOMAS:  Your Honor, that's what was communicated

3  to me --

4          THE COURT:  Well, I certainly --

5          MR. THOMAS:  -- and that's why I'm here with --

6          THE COURT:  -- would be happy to --

7          MR. THOMAS:  -- four witnesses.

8          THE COURT:  -- hear to the contrary from counsel for

9  the DIP lender.

10          MR. ROSENTHAL:  Your Honor, the documents speak for

11  themselves, in that if we didn't have a bid procedures order

12  today, it would be a default under the loan documents.

13          THE COURT:  You want to call a default, then we're

14  back to a liquidation.

15          MR. ROSENTHAL:  And just because we may notice a

16  default and reserve rights, doesn't mean --

17          THE COURT:  No --

18          MR. ROSENTHAL:  -- we're going to liquidate.

19          THE COURT:  -- no.  You notice a default.  This is

20  supposed to be an ongoing business.  Your client notices a

21  default, it will suffer the consequences.

22          MR. ROSENTHAL:  Understood, Your Honor.

23          THE COURT:  And if you tell the Court and the

24  committee they can't have another day or they can't have until

25  next Tuesday, you can do so.  You can rely on your papers.  But

1  this case will not be off to a very good start.

2          MR. ROSENTHAL:  We understand, Your Honor.

3          THE COURT:  All right.  Let's start over again.

4          MR. THOMAS:  Your Honor, there are four open issues

5  that we have not, since last night, been able to resolve with

6  the committee, although we're confident that with time, we will

7  be able to run those issues to ground.  We just couldn't do it

8  since we received the objection last night.

9          We have addressed numerous other issues.  But let's

10 just talk about the four that haven't been resolved.  The first

11 one is the issue of whether or not the sale procedures, in

12 essence, should be continued seven days; a seven-day extension

13 of the bid deadline and a seven-day extension of the auction.

14 The committee is --

15         THE COURT:  And other than the fact that your DIP

16 lender, your lender, who has bought into this case just a few

17 months ago, tells you it wants it on a certain day, why

18 shouldn't we adjourn seven days?

19         MR. THOMAS:  Your Honor, I think we would have to --

20         THE COURT:  Give me a good business reason why not to

21 adjourn seven days.

22         MR. THOMAS:  The only business reason, Your Honor, is

23 whether or not the company can continue to finance its going-

24 concern operations for an additional seven days.  And we --

25         THE COURT:  We don't even know, as we sit here today,

1   as I read the papers, whether this is a liquidation sale or

2   this is a going-concern sale, do we?

3           MR. THOMAS:  You are correct, Your Honor.  And I

4   believe I --

5           THE COURT:  Now -- and I don't necessarily

6   understand -- the committee may understand better than I do,

7   exactly what's going on here.  Now, maybe -- this is the first

8   time, as I said, I'm asking questions about this particular

9   aspect of the transaction.  You've lived with it longer than I

10  have.  But tell me, exactly what is the interest that your CEO

11  has in the intellectual property of this debtor?  He owns it?

12          MR. THOMAS:  No.  The CEO has no interest, no

13  ownership, in any assets of the debtors' estate.

14          THE COURT:  Then what is this new company he

15  supposedly is going to form and has to get financing for?

16          MR. THOMAS:  Your Honor -- and I believe I had

17  discussed this on the November 5th telephonic hearing, but I

18  might not, and I --

19          THE COURT:  Well, the telephonic hearing is not a very

20  effective way.  It certainly wasn't effective to convey to me

21  some of the aspects of this financing.

22          MR. THOMAS:  Your Honor, and --

23          THE COURT:  Or of this transaction.

24          MR. THOMAS:  Your Honor, so the situation is -- and

25  again, we would -- are able to put on evidence at the

1  appropriate time, and if now's not the appropriate time --

2          THE COURT:  If it is --

3          MR. THOMAS:  -- understood --

4          THE COURT:  -- or it isn't --

5          MR. THOMAS:  -- under --

6          THE COURT:  -- the DIP lender's telling me it's either

7  today or they'll call a default.  That's what I hear.

8          MR. ROSENTHAL:  Your Honor, we've agreed to punt this

9  to next week.

10         THE COURT:  Well --

11         MR. ROSENTHAL:  We have an agreement with the

12 committee on the dates --

13         THE COURT:  Well, then --

14         MR. ROSENTHAL:  -- and how this is --

15         THE COURT:  -- why wasn't I told that?

16         MR. ROSENTHAL:  I'm not --

17         MR. KEENAN:  Your Honor --

18         MR. ROSENTHAL:  -- I'm not running the hearing.

19         MR. KEENAN:  -- this is Paul Keenan.  I'd just

20 disagree with the characterizations by Proskauer on this issue.

21 We're not striving to shut down the company if the order isn't

22 entered today.  We never made that threat.

23         THE COURT:  Well --

24         MR. KEENAN:  We want to push for it to be ordered, but

25 we never said that we would shut the company down --

1          THE COURT:  You've either agreed --

2          MR. KEENAN:  -- and I apologize if --

3          THE COURT:  -- to put this off -- all right.  Maybe

4    the committee can throw some light on this issue.

5          MR. KUGLER:  Let me help.  We have been working very,

6    very hard.  And Mr. Rosenthal is correct that as to the four

7    live issues in the bid procedures motion, we have agreed to put

8    those off until the 29th, which is the date that the other

9    motions have all been continued to, with the full expectation

10   that we're going to be able to work through those issue between

11   now and then.

12         THE COURT:  Well, that's a different -- that's a

13   little bit different -- it sounds a little bit different than

14   what I was just told by counsel for the debtors.  Okay?

15         MR. KUGLER:  That agreement has been -- we reached

16   that --

17         THE COURT:  Are the debtors in the loop?

18         MR. KUGLER:  Yes, they are, Your Honor.

19         MR. THOMAS:  We're in the loop since the last few

20   hours.  That proposal we --

21         THE COURT:  Well, then why are you standing here

22   telling me you're going to push for an order today?

23         MR. THOMAS:  Your Honor, I'm -- because last night

24   when we proposed that this matter be continued to resolve

25   certain issues, we were told, in no uncertain terms, that there

1   would be no agreement, and that's why I flew from Chicago to

2   New York, to be prepared with witnesses.  We wouldn't have

3   flown out here, okay.  And it wasn't until a few hours ago --

4          THE COURT:  Don't tell me about flying to New York.  I

5   don't want to hear about that in the future.  I don't know why

6   this case is being run out of Chicago.  It's one of the many

7   unknown aspects of this case that I don't understand and that

8   confuse me.  So don't -- I want to prevent you from having to

9   fly to New York any more than necessary.  I want to have the

10  hearing today so you can get home and counsel for the committee

11  can get home for Thanksgiving.  But don't tell me about flying

12  to New York.

13         MR. THOMAS:  I won't.

14         THE COURT:  Maybe you can explain at a proper time why

15  this case isn't being run out of New York.  That's for another

16  day.  This is a New York company, isn't it?

17         MR. THOMAS:  The headquarters are in Manhattan.

18         THE COURT:  All right.  That's what I thought.  All

19  right, now go on.  Just --

20         MR. THOMAS:  Back to the -- back to the transaction --

21         THE COURT:  Yes.

22         MR. THOMAS:  -- Your Honor.  We have in court Mr.

23  Douglas Williams, who's the CEO.  I'm not offering any

24  testimony.  I'm just -- I want to answer and let you know who's

25  here.  We have Mr. Michael O'Hara, who's the independent

HMX ACQUISITION CORP., ET AL.                          20

1   director that was appointed August 14th, 2012.  We have Mr.

2   Geoffrey Richards, a managing director of Blair, who has been

3   running a sale process.

4           THE COURT:  All at great expense, when I don't know if

5   we'll need any of that testimony, at least today.  Although,

6   perhaps we should put Mr. O'Hara on the stand so he can tell me

7   who's running this company.  You tell me in the papers that Mr.

8   O'Hara is running the company, at least in terms of plan

9   formulation and other matters.

10          MR. THOMAS:  He is running --

11          THE COURT:  And the reason I ask is that I do not

12  understand -- and let's go back to where we were -- maybe you

13  can explain to me exactly what Mr. Williams' position is in the

14  purchase or sale of the assets of this business?

15          MR. THOMAS:  Your Honor, during the sale process,

16  there was -- all of the assets of the debtors were offered for

17  sale.  There were confidential offering memoranda, there were

18  teaser letters, there was a data room.  Indications of interest

19  came in.  Not a single credible offer was made by a third party

20  to buy the business in its entirety, as a going concern.  There

21  were many liquidators that were interested in putting in

22  liquidation bids.

23          There were several entities that specialize in buying

24  brands and trademarks.  They were willing to buy the trademarks

25  and allow an operating company to continue the operation of the

1  facilities, continue to run the factories, and continue to

2  employ the employees, pursuant to a license agreement, which

3  had not been negotiated.  So the license transaction was the

4  only potential transaction that could preserve the jobs and a

5  going concern.

6          In the months leading up to the filing on October

7  19th, the debtors, with Blair leading a sale process, and Mr.

8  O'Hara, the independent director, being responsible for the

9  decisions and the ultimate decisions on behalf of the board for

10 the sale process, engaged in negotiations with the stalking-

11 horse bidders.  And the stalking-horse bid that is before Your

12 Honor has two potential transactions.  There's a potential

13 going-concern transaction, but there is a noncontingent,

14 certain liquidation bid.

15         And the debtors, with Mr. O'Hara, the independent

16 director, and the investment banker, chose this stalking horse,

17 because it was the only option that could potentially preserve

18 a going-concern bid.  The going-concern option has two major

19 contingencies, which may or may not be fulfilled, both of which

20 involve Mr. Williams, the CEO.

21         The reason -- well, those two contingencies are:

22 whether or not the stalking-horse bidder can reach a license

23 agreement whereby they will own the IP and license it back to

24 an operating entity that will operate the business, design the

25 clothes, manufacture the clothes, and sell the clothes.  The

1   other contingency is whether or not Mr. Williams and that

2   potential operating business will be able to obtain sufficient

3   financing, in the sole discretion of the IP buyer, so that the

4   IP buyer knows that its licensing company is viable and has the

5   wherewithal to manufacture the licensed product that the IP

6   buyer is purchasing.

7          Mr. Williams has reached an agreement on a license

8   agreement with the stalking-horse purchaser, which license

9   agreement was posted in the data room.  Mr. Williams will

10  testify that he's ready, willing, and able to talk to any other

11  bidder that wants to try to do a transaction that preserves the

12  going concern.  And the debtors are still out marketing.  If

13  any bidder is out there that wants to buy the whole company and

14  operate the whole company, that is the result the union wants.

15  That's a result the debtors are completely in favor of.

16         But right now, the only option to avoid a liquidation

17  is a potential bid that splits the intellectual property from

18  the operating assets because the IP buyers -- and there are at

19  least three of them -- do not want to take ownership, title, or

20  control of real estate, manufacturing facilities, and step into

21  union contracts.

22         So Mr. Williams' role is if he can obtain financing

23  and we can obtain an IP buyer that agrees on a license

24  agreement, he hopes to maintain the going concern and preserve

25  the jobs.  Because the liquidators are not going to assume the

1    collective bargaining agreements.

2            Mr. Williams would testify and has told people that if

3    this going-concern option comes to fruition, he intends to

4    assume the collective -- the debtors would assume and assign

5    the collective bargaining agreements.  There would not be a

6    change in the terms of the collective bargaining agreements.

7            He still needs to get his financing.  And he hasn't

8    obtained the financing.  And when he obtains financing, the IP

9    buyer, in its sole discretion, will determine whether it's

10   satisfactory.  So we're not standing here saying we have a

11   going-concern sale.  But Mr. O'Hara and Mr. Blair (sic) and Mr.

12   Williams would testify that the collective judgment and the

13   ultimate decision was the independent director's, Mr. O'Hara.

14   The decision was, it was in the best interests of the debtors,

15   their vendors, their customers, and all of their employees to

16   enter Chapter 11 with a stalking-horse bid that had a potential

17   option for a going-concern transaction, as opposed to picking a

18   stalking-horse bid that was a flat-out liquidation bid.

19           We think in a flat-out liquidation, the senior secured

20   lender would be paid off easily.  But we would be in a case

21   now, thirty days going on sixty days; we have the union already

22   not happy that we haven't found a going-concern buyer.  But we

23   would have been before Your Honor on a liquidation stalking-

24   horse bid.  The damage to the brands, the damage to the going-

25   concern operations, the inability to buy product and service

1    our customers, would have been irreparable, we believe.

2            Now, that is the potential transaction.  It's not an

3    insider transaction, unless and until Mr. Williams obtains

4    financing satisfactory to any third-party IP buyer, in their

5    sole and absolute discretion.  Your Honor, the rug can be

6    yanked out from under the going-concern bid.  It's not within

7    the debtors' or Mr. Williams' control.

8            THE COURT:  I gather, though, that a little bit of

9    extra time would not hurt Mr. Williams' effort to find

10   financing?

11           MR. THOMAS:  That probably is the case, Your Honor.

12   I'm not working on that financing.

13           THE COURT:  We have his counsel here.

14           MR. THOMAS:  Oh, I'm sorry.

15           THE COURT:  Why don't you -- all right.  Why don't you

16   stay back -- you don't have to --

17           MR. HALPERIN:  It's force of habit.

18           THE COURT:  All right.

19           MR. HALPERIN:  It's respect for the Court.  And I

20   apologize.  Alan Halperin; Halperin Battaglia Raicht, on behalf

21   of Mr. Williams.

22           Judge, it goes a little further than that.  First, I

23   just want to make sure this is clear.  Mr. Williams -- and this

24   predates my involvement -- but he stepped up after there were

25   no other options, after there were no other potential going-

1    concern options.  I want that to be clear.  It's not like

2    jumped in and tried to shove someone aside.  He stepped in when

3    there were no other options, to try and keep this thing alive.

4              Now, I'm not going to stand here and --

5              THE COURT:  That's news to me, and I'm glad to hear

6    it.

7              MR. HALPERIN:  Okay.  And I wanted to make sure that

8    got out there.

9              THE COURT:  Assuming, of course, it's the case.

10             MR. HALPERIN:  You've got --

11             THE COURT:  But I'm certainly glad.

12             MR. HALPERIN:  -- an attorney's representation now,

13   and I'm --

14             THE COURT:  It's the first time I've heard it.  Maybe

15   part of the problem is that I wasn't here on first day, and I

16   could have asked some of the questions that I have.

17             MR. HALPERIN:  And, listen, this case didn't start

18   under the easiest of circumstance, given everything that was

19   going on.

20             THE COURT:  So I understand.

21             MR. HALPERIN:  And it's been a -- it's been rough

22   road.

23             THE COURT:  And it's number two.

24             MR. HALPERIN:  But as a practical matter, I'm not

25   going to stand here and profess that he's here as a saint, only

1    looking to do eleemosynary tasks.  He clearly sees this as a

2    potential opportunity for something to work.  But please, let's

3    make sure the record is also clear, he's not looking at this as

4    a cash cow.  He thinks it might work, and he saw no other

5    opportunity to keep the going-concern going.  And he agreed to

6    step up and try to put an operation -- and OpCo piece together,

7    to pair with the IPCo, the IP pieces, of the bids --

8              THE COURT:  All right.

9              MR. HALPERIN:  -- there were available.

10             The debtor selected a stalking horse.  Mr. Williams

11    agreed that he would be willing to work with them if he could

12    get his side together, meaning work out an agreeable license

13    agreement and work out his own financing.  He's working very

14    hard at that right now.

15             The license agreement was posted to a data room.  I

16    just want to be clear; I don't think it's a hundred percent

17    lock-down, solid, final.  It's close.  The material terms are

18    done.  But I think there was some noodling around the edges

19    that we still have to do, yet we wanted to make sure that

20    something that was close got into the data room, so other

21    people that were looking could look at it if they wanted to

22    work with him.

23             The other thing, and the thing that I thought was

24    really important, is that if a bidder comes in tomorrow and

25    says I don't want to work with Mr. Williams, I want to just do

1   a liquidation bid and I'm going to throw a gazillion dollars,

2   and the estate says that's the right thing to do, God bless;

3   they can do that.  That's within their discretion, and he has

4   no part in the decision-making process.  If someone else comes

5   in and says --

6         THE COURT:  That's news to me, too.

7         MR. HALPERIN:  If someone else comes in and says I

8   want to do an OpCo, and I've got my own operator, and I think

9   my guy is the greatest thing since sliced bread; see ya, Doug.

10  God bless.  They can do that, too.  This is purely to put

11  optionality in and to preserve a business that we think works

12  if it had proper financing, meaning it had enough.  It didn't

13  have enough.  Things never got out of the gate right, from what

14  I understand from the prior bankruptcy.

15        He thinks he can do it right.  If he does it right, he

16  saves jobs.  Mr. Thomas --

17        THE COURT:  What is, as you understand it, SKNL?  Does

18  Mr. Williams have any interest in SKNL?

19        MR. HALPERIN:  I don't know what it is, but I'm told

20  no.

21        UNIDENTIFIED SPEAKER:  No, Your Honor.

22        MR. HALPERIN:  None.

23        THE COURT:  All right.

24        MR. HALPERIN:  And so just so this is clear, he's

25  talking about taking as much of the business, as is, without

1    harming anybody, taking the union contracts, taking them as is.

2    He's not looking for modifications.  There's a health and

3    welfare plan which I was talking with counsel earlier, maybe

4    it's underfunded, maybe it's not; it's a multiemployer plan.

5    He doesn't care.  He's taking that in place and leaving it as

6    is and assuming that at the NewCo.  He's trying to make this as

7    seamless as possible and keep the business together.  The

8    estate has full optionality.  He's out of the decision-making

9    process.  Whatever is going to happen is going to happen.  And

10   he's putting tremendous amount of his personal effort into

11   trying to make this happen.  And that's all it is.

12            THE COURT:  All right.

13            MR. THOMAS:  Your Honor, SKNL is an Indian publicly

14   traded company.  And in 2009, the predecessor to this company

15   had its own Chapter 11, and SKNL put together the entity that

16   bought the assets out of bankruptcy.  After their purchase,

17   they did a search and found Mr. Williams and brought Mr.

18   Williams in as the CEO of this debtor entity.  He doesn't have

19   an equity interest.  SKNL is the ultimate owner of ninety-five

20   percent of the equity of the debtors' ultimate parent company.

21            The business plan -- and Mr. Williams could testify --

22   the business plan, when SKNL bought this company in 2009, was

23   to infuse forty-five million dollars of equity into the entity

24   so it could grow and invest and be successful.  That money

25   wasn't infused.  Ultimately, maybe less than half of that money

1   came in as subordinated debt.  And our first-day declaration

2   reflects the subordinated debt that the equity holder put into

3   the company.

4         They are not here in the courtroom.  And when we

5   defaulted in July of 2012, because we didn't do a refinancing

6   and we didn't take out Wells Fargo Bank and JPMorgan Chase, who

7   are original senior secured lenders, we defaulted because we

8   had a third-party lender, Salus, who's now our DIP lender, who

9   was ready, willing, and able to provide the financing.  And a

10  condition of the financing, in July 2012, was that SKNL infuse

11  another fifteen million dollars.  So they were going to infuse

12  equity.  We were going to get third-party debt.  We were going

13  to pay off Wells Fargo.  And we would have ample liquidity from

14  that equity infusion.

15        That equity infusion, notwithstanding written evidence

16  of funds, did not occur.  We went into default in July of 2012.

17  And Wells Fargo seriously constrained our liquidity and was

18  pushing us towards a liquidation.  And Salus then came in in

19  August 14th and bought out Wells' position and stepped into

20  their shoes, provided us additional liquidity, provided SKNL an

21  additional eight or so days -- so they'd gone from July 15th to

22  August 22nd to make the equity infusion; gave them more time to

23  make the equity infusion.  Again, the equity infusion didn't

24  come in.

25        Salus required, when they came in -- because they knew

1   this story; they had been looking at this company since the

2   spring -- they required the debtors to retain an independent

3   director who would have sole control over all decisions

4   regarding a sale or a bankruptcy.  And the reason was, the

5   debtors' board was controlled by SKNL.  And the new lender did

6   not want to give them the opportunity to control governance and

7   to keep stifling what was going on with the company.

8        So the independent director requirement was a

9   requirement of Salus, who took out Wells and provided us

10  additional liquidity.  They also provided that there would be

11  sale milestones, but that if the SKNL promised funds came in,

12  the sale would stop and the independent director would go away.

13  Since the money didn't come in, the sale proceeded -- the

14  process proceeded on August 15th, over three months ago.

15       And the debtors, with William Blair, the investment

16  banker, with the assistance of Mr. O'Hara, the independent

17  director, have done a -- we think, a very thorough marketing

18  process.  The committee isn't there yet, because they've only

19  been around for three days.  We --

20       THE COURT:  I know that.  And that certainly is the

21  source of many of my comments.  Tell me what -- you said there

22  were four issues --

23       MR. THOMAS:  Yes.  Your Hon --

24       THE COURT:  -- that were still open.  One is a --

25       MR. THOMAS:  Extension.

1          THE COURT:  -- seven-day extension.

2          MR. THOMAS:  Correct.

3          THE COURT:  All right.

4          MR. THOMAS:  Yes, Your Honor.

5          THE COURT:  The second issue?

6          MR. THOMAS:  The second issue is the committee is

7    objecting to the breakup fee awarded to the stalking-horse

8    bidder; has commenced discussions with the stalking-horse

9    bidder.  The way I read the objection is, I think, they were

10   saying the breakup fee plus expense reimbursement should not

11   exceed three percent of the purchase price.  But that issue is

12   open and has not been resolved.

13         THE COURT:  All right.

14         MR. THOMAS:  I believe that if we have some time and

15   negotiate in good faith, we will resolve that issue, because

16   the parties aren't that far apart.

17         THE COURT:  Let me only say this about the breakup

18   fee.  I make no comment about its size or whether there are

19   particular reasons for a breakup fee that exceeds three

20   percent, which is sometimes used as a rule of thumb, but not

21   invariably.  As I understand it, this breakup fee is a

22   permanent credit for the benefit of the stalking-horse bidder.

23   Even if the stalking-horse bidder takes the property at the end

24   of bidding, if the stalking-horse bidder outbids other

25   competing bidders who come in and bid up the amount from the

1  current amount to some higher amount, the stalking-horse bidder

2  is still entitled to the breakup fee.  Is that correct?

3              MR. THOMAS:  No, Your Honor.

4              THE COURT:  It's not?  Okay.

5              MR. THOMAS:  That is not --

6              THE COURT:  Because there was some language in some of

7  the papers that confused me.  And you said on the telephone --

8  and again, it's very hard to fully follow the arguments on the

9  telephone, at least for me.

10              MR. THOMAS:  Me, too.

11              THE COURT:  It seemed to be that there was some kind

12  of a credit that you were talking about for the benefit of the

13  stalking-horse bidder.

14              MR. THOMAS:  Your Honor, I put the language regarding

15  a -- the breakup fee would be credited against the stalking-

16  horse bid, because the local rules apparently require that

17  language to go in.  And honestly, I don't -- I don't really

18  believe in that language --

19              THE COURT:  I don't either.  You'll have to --

20              MR. THOMAS:  But I thought I had to abide by --

21              THE COURT:  -- you'll have to give me the cite --

22              MR. THOMAS:  -- the local rules.

23              THE COURT:  -- and we ought to look at it.  But --

24              MR. THOMAS:  Okay.

25              THE COURT:  -- thank you for doing that.  It may be

1    that lawyers from Chicago are the only people who ever look at

2    local rules.  I'm sure Mr. Halperin will tell me --

3              MR. HALPERIN:  I think --

4              THE COURT:  -- he hasn't read them in years.

5              MR. HALPERIN:  I haven't.  But I think the ref --

6    fortunately I have very smart people that I work with that keep

7    me out of trouble.  But I think the reference is because when

8    you're going back and forth, you give the stalking-horse bidder

9    credit for the amount of the breakup fee, because if a

10   successful bidder outbid them, that amount would have to go out

11   the door to them.

12             THE COURT:  Yes.

13             MR. HALPERIN:  So it's only in the back-and-forth.

14             MR. THOMAS:  That is --

15             THE COURT:  I think what it means is that the

16   stalking-horse breakup fee is paid out of the cash that comes

17   in from the opposing bidder.  I think that's all it means.  I

18   know in this case, you're giving the stalking-horse bidder a

19   superpriority claim as well.  And that's really a question, it

20   seems to me, for the DIP lender.  And if the DIP lender wants

21   to do that, it's more evidence of the fact that they are,

22   contrary to some of my initial, perhaps unfair remarks, a

23   gentleman and scholars.

24             MR. THOMAS:  Your Honor --

25             MR. ROSENTHAL:  I'll take the gentlemen -- I'll take

 1  the gentleman, Your Honor.  Let's not go too far.

 2          MR. THOMAS:  Your Honor, the breakup fee is only

 3  earned upon closing or consummation of an alternative

 4  transaction.

 5          THE COURT:  Right.

 6          MR. THOMAS:  So therefore --

 7          THE COURT:  Okay.  That's my quest --

 8          MR. THOMAS:  Right.

 9          THE COURT:  -- so you've answered that question.

10  Okay.  So the committee's concerned about the size of the

11  breakup fee.

12          MR. KUGLER:  Yes.

13          THE COURT:  And number three?

14          MR. THOMAS:  Number three, Your Honor, is in the

15  stalking-horse agreement, I told you earlier, there were two

16  conditions to the potential going-concern transaction with Mr.

17  Williams as CEO setting up a new operating company.  Condition

18  one -- actually, both conditions had the same time line.  The

19  conditions were that three business days prior to the auction,

20  that Mr. -- the new OpCo would have entered into a license

21  agreement acceptable to the IP buyer, and also three business

22  days prior to the auction, the new OpCo would have provided

23  financing satisfactory to the IP buyer.

24          We believe that the license agreement provision has

25  been satisfied.  We posted it.  I guess there's still a few

1  moving pieces, but when I -- that happened -- that negotiation

2  took place between Mr. Williams and the stalking-horse bidder.

3  And it's completed well before the deadline.  The financing is

4  still being worked on.

5       On the existing bid deadlines of December 6th for a

6  bid deadline, December 19th for an auction, the financing would

7  have to be satisfied on December 5th, the day before the bid

8  deadline.  The committee has raised an issue in their objection

9  where they think the financing should be satisfied fourteen

10  business days before the auction, which would be this coming

11  Monday.

12       We are talking about that.  We believe that in

13  auctions, and in 363 sales, Your Honor, it's ordinary and

14  customary that qualified bidders have their financial

15  wherewithal qualified on the bid deadline.  And by trying to

16  potentially force a qualification a couple weeks in advance of

17  the bid deadline, we may lose a potential qualified bidder just

18  because of the timing.  That's an issue.

19       We talked about it today.  The committee and its newly

20  hired, although not technically engaged by the Court, financial

21  advisor, would like to sit down with Mr. Williams to discuss

22  the status of his financing.  We're here.  We will do so after

23  court.  And Mr. Williams, again, has said, if I get that

24  financing, I'll make that financing available to any other

25  bidder that wants to preserve the going concern and wants to do

1    the structure of the going-concern bid in the Authentic Brands

2    stalking-horse purchase agreement.  So that's an issue we

3    haven't resolved.

4            THE COURT:  Mr. Halperin wishes to put in a few words.

5            MR. HALPERIN:  I'm sorry, Your Honor.  I do need to

6    qualify this.  Mr. Williams is not agreeing in advance to work

7    with anybody.  He's going to talk to anybody that's interested,

8    make sure it's someone that he can work with going forward.

9    That I want to be clear on.  But once he gets his piece

10   together, he's happy to talk to anybody that wants to talk with

11   him.  And if someone doesn't want to talk to him, like I said

12   before, God bless.

13           THE COURT:  All right.  All right, number four?

14           MR. THOMAS:  And --

15           THE COURT:  Issue number four?

16           MR. THOMAS:  -- to be clear, also, Mr. Williams does

17   not have any exclusivity agreement, no lock-up agreement.  He

18   is not locked up with anybody.  So that goes to -- number four,

19   Your Honor, is the committee raised an issue and they sought

20   clarification of whether or not -- and it's on page 9, bullet 1

21   of their objection -- whether or not there is a "discount"

22   available for the stalking-horse purchaser.

23           We're going to work on providing that clarification.

24   We do not believe that there's any discount available for the

25   stalking-horse purchaser.  We don't believe that there's any

1    discount that would be available for the benefit of the

2    stalking-horse purchaser that wouldn't be available for any

3    other potential bidder.

4            THE COURT:  Discount against what?  Now, that may have

5    been also why --

6            MR. THOMAS:  Yes.

7            THE COURT:  -- I felt that you were giving some kind

8    of a credit to the stalking-horse bidder with regard to the

9    breakup fee.  But you told me that that is not correct.  So I

10   don't -- perhaps the committee can tell me what -- where they

11   find the discount.

12           MR. KUGLER:  Boy, that's an excellent question, Your

13   Honor.  And I wish I could tell you.  That really is part of

14   the problem.  We've asked the question now five times, and

15   we've heard very good explanations, but they don't always tie

16   out.  And then upon arrival at court today, I heard another

17   explanation which didn't tie out whatsoever.  So we have some

18   work to do on this issue in terms of clarity.  And frankly,

19   that's the -- the committee wants to have the clarity.  And

20   it's important for other bidders to understand exactly what

21   they're getting into and what they can bid on and what the

22   rules of the game will be.

23           So as I stand here, I can't tell you exactly what the

24   issue is.  And that's why we've agreed on the extension.

25           MR. ROSENTHAL:  Your Honor?

1          THE COURT:  Counsel for the lender.

2          MR. ROSENTHAL:  Thank you, Your Honor.  Jeff Rosenthal

3   on behalf of Salus Capital.  I understand there's some dispute

4   about this at the current time, because apparently the side

5   letter may not be as clear.  But the side letter was filed with

6   the Court as part of the docket.

7          When Salus bought this loan, we received -- we bought

8   it at a discount from Wells Fargo and the other lenders.  As

9   part of the -- in order to encourage a transaction and in order

10  to benefit, we thought, the estate -- and I understand there's

11  an ob -- ABG may have a different view of this -- that we would

12  give them a three million dollar discount off the payoff

13  when -- at the time of the closing, if it closed at the

14  stalking-horse bid.

15         For every dollar over the original stalking-horse bid

16  plus the expense reimbursement and the breakup fee, for every

17  dollar above that, we share that, fifty cents each, between the

18  estates and Salus, so that if we get to six million dollars,

19  Salus has paid the three million dollar discount, and the

20  debtor gets the three million dollars.  So -- but on day one,

21  we're -- our intention was that the debtors' estates got an

22  extra three million dollars from this transaction.  And they

23  realized our discount, not us.  Okay?

24         MR. JANG:  Your Honor, just -- Chun Jang of DLA Piper

25  on behalf of Authentic Brands.  I don't want to remain silent

1   to -- so that my silence is somehow understood as being

2   acquiescence.  But I think Mr. Thomas' point, the second part,

3   we didn't anticipate this being an exclusive discount to the

4   stalking-horse bidder.  But we did expect that the discount --

5   and originally, this was actually in the APA.  For whatever

6   reason, it got reduced to a side letter.  But we completely

7   understood the discount to apply to the purchase price.  And

8   then going forward, additional overbids from that point, the

9   increments above the initial bid, it would be split fifty-fifty

10  to Salus and the debtors.

11          THE COURT:  It doesn't really matter to you where your

12  money goes, as long as you get clean title.

13          MR. JANG:  Correct, Your Honor.

14          THE COURT:  All right.

15          MR. THOMAS:  Right.  And, Your Honor, we did file this

16  letter.  It was docket number 114.  And we're going to have to

17  get a meeting of the minds as to whether there's any ambiguity.

18          THE COURT:  I --

19          MR. THOMAS:  But it's not the --

20          THE COURT:  I don't -- from what I just heard, I don't

21  know that there's any lack of common understanding as to the

22  intent.  And let's just be sure that the documents so provide.

23          MR. THOMAS:  And that's what we will be working

24  towards between now and the next hearing on bid procedures, so

25  we can resolve these four issues that the committee --

1          THE COURT:  Now --

2          MR. THOMAS:  -- has raised.

3          THE COURT:  -- now, the parties talked, perhaps

4  without commitment, to putting this off until our hearing next

5  Thursday.  Is that correct?

6          MR. ROSENTHAL:  That's correct, Your Honor.

7          THE COURT:  Is that the date that makes sense?

8          MR. ROSENTHAL:  Yes, Your Honor.  Our agreement was

9  these four issues would remain open, but the bid procedures

10  order would be entered as marked up with the items that we

11  could agree to.

12         THE COURT:  All right.

13         MR. ROSENTHAL:  I guess we should make clear that the

14  29th would not be a status conference but would actually be, I

15  guess, a --

16         THE COURT:  Final.

17         MR. ROSENTHAL:  -- continued hear -- or a final

18  hearing with regard to that.

19         THE COURT:  I think counsel has explained, there was

20  an order.  This is an opening of issues for the committee

21  because of the hurricane.  And I remember you telling me what

22  happened to your house in New Jersey.

23         MR. ROSENTHAL:  Demolition started today.

24         THE COURT:  I remember that very clearly.  So maybe we

25  should turn, at this point, to the financing order.  And

1    although perhaps it would be useful to look at the sale order

2    and I can tell you if I had any other questions.  Because

3    obviously, I was under some misapprehension under all the

4    circumstances.

5              I can also take testimony if everyone's here.  But I

6    don't know that it would necessarily advance the issues.

7              MR. THOMAS:  Your Honor, I've conferred with the

8    committee and counsel for the DIP lender.  They don't believe

9    testimony --

10             THE COURT:  I'd rather -- they don't believe testimony

11   is necessary.

12             MR. THOMAS:  They don't believe testimony is necessary

13   to advance the issues today.

14             THE COURT:  I would be happy to give you a conference

15   room as well.  But I'm sure you can find a more comfortable one

16   to use while you're all here in New York.

17             MR. THOMAS:  And, Your Honor, with respect to the

18   bidding procedures order, I'd be happy to tender to you a

19   blackline reflecting the changes --

20             THE COURT:  All right.

21             MR. THOMAS:  -- that we've all agreed upon, and then

22   address any other questions or issues you might have.

23             THE COURT:  That would be fine.

24             MR. THOMAS:  May I approach?

25             THE COURT:  Thank you.

1          MR. THOMAS:  Your Honor, should we flip pages?  Is --

2          THE COURT:  Well, I see a lot of -- many pages are --

3     many provisions are deleted.

4          MR. THOMAS:  Yes, Your Honor, because what we have

5     provided -- it's on the bottom of page 2 -- is that -- on the

6     top of page 2 -- that this order is amending certain provisions

7     of the prior order --

8          THE COURT:  All right.

9          MR. THOMAS:  -- which is docket number 104.  And

10    provisions not amended shall remain in full force and effect.

11    So we deleted a lot of provisions that required us to take

12    actions, which we've taken, within a certain amount of business

13    days after docket number 104 was entered.

14         THE COURT:  All right.  Whatever is easier to

15    understand for the stalking-horse bidder and any other

16    prospective bidders who don't have counsel, so at least

17    everyone can understand what is --

18         MR. THOMAS:  Your Honor, I think I can --

19         THE COURT:  -- what's going on.

20         MR. THOMAS:  -- walk you through the substantive

21    provisions of the blackline.  I think the first substantive

22    provision is on page 10.

23         THE COURT:  All right.

24         MR. THOMAS:  And that is a provision that we agreed

25    upon with the committee that, in essence, any bidder will have

1   to determine, prior to the conclusion of the auction, whether

2   or not they are going to exclude contracts.  So they have to

3   come in a few days earlier with their list of assumed

4   contracts.  But we all need to know before the auction is over

5   what every bidder's final list of assumed and excluded

6   contracts are, because that impacts the size of the unsecured

7   creditor pool.

8            THE COURT:  Okay.

9            MR. THOMAS:  And, Your Honor, starting on page 11, we

10  just make it clear that the debtors' rights are after

11  consultation with the committee.  So debtors' rights to amend

12  or modify procedures, rules, et cetera, are after consultation

13  with the committee.  Those are the changes to the order,

14  although we will, Your Honor, at the conclusion of this

15  hearing, change paragraph 1 to provide that this will be

16  continued to the next hearing date.  And we are going to

17  identify the four remaining issues that will be at issue.

18            Your Honor, the bidding proc --

19            THE COURT:  Now, can you tell me anything about the

20  status of other parties' interest in the assets and access to a

21  data room and so forth?

22            MR. THOMAS:  Your Honor, I can.  And again, we have

23  Mr. Richards of Blair.  But -- he will correct me if I'm

24  wrong -- Your Honor, since the no-shop provision expired on

25  November 5th, the debtors have published notice of the sale.

 1   We've given notice to 6,000 creditors.  We've also reached out

 2   to approximately 200 potential parties that had potentially

 3   been interested.

 4        We have ten -- not less than ten parties that have

 5   expressed a renewed interest, including several parties that

 6   had been interested prior to the filing, who had not been

 7   chosen as the stalking horse.

 8        We have the data room up and running.  We are

 9   refreshing it on a daily basis.  Whenever a bidder has a

10   diligence question, we put that information in the data room

11   and all bidders get notice that there's been an addition to the

12   data room.

13        The debtors, with William Blair, have had site visits.

14   And we have a calendar back here somewhere where potential

15   bidders have been able to visit the Rochester facility, the Des

16   Plaines, Illinois facility, and the headquarters facility, and

17   have met with senior management to discuss issues relating to

18   their bids, questions that they have.  And it's an ongoing,

19   daily process.  We worked all weekend with a bidder to provide

20   additional intellectual property diligence and to provide

21   additional diligence regarding contracts, accounts receivable,

22   and inventory.

23        So the debtors -- and I should back up.  The person

24   that has the final say in this process is the independent

25   director.  Mr. Williams is the CEO.  If people want to talk to

1   him, they can talk to him.  But he does not have the corporate

2   governance authority to determine diligence issues, sale

3   process issues, or bankruptcy issues.  And everyone thinks

4   that's the appropriate way to go, given the potentiality of a

5   going-concern bid.

6           THE COURT:  All right.

7           Yes, sir?  If you wish to talk to counsel, that's

8   fine, or if you --

9           MR. RICHARDS:  This is --

10          THE COURT:  -- wish to make a statement, just state

11  your name for the record.

12          MR. RICHARDS:  Geoffrey Richards, Your Honor, the

13  company's proposed investment banker.

14          THE COURT:  Does that get picked upon the machine?

15          If you'd just come forward?  You can speak from the

16  table or from the podium, whatever.

17          MR. RICHARDS:  Thank you, Your Honor.

18          THE COURT:  Just get a little closer to the

19  microphone.

20          MR. RICHARDS:  Thank you, Your Honor.  Geoffrey

21  Richards, again, from William Blair, the company's proposed

22  investment banker.  In addition to the comments that Mr. Thomas

23  made, some additional data points that may be helpful.

24          We have an online data room that contains more than

25  560 different documents.  That online data room has been live

1  since the "exclusivity" was lifted, in conjunction with the
2  designation of the stalking-horse bid.
3          We have been in contact with all -- as Mr. Thomas
4  indicated -- 187 parties who were part of our initial process.
5  In addition to those parties, there have been roughly another
6  two to three dozen other parties that we have contacted or have
7  contacted us, who have signed up NDAs and are actively engaged
8  in the process, both in terms of on-site diligence meetings,
9  multiple telephone conferences that are taking place, multiple
10 site visits.
11         In fact, there's some taking place today and some will
12 be taking place tomorrow, being chaperoned by several of my
13 colleagues from our firm, in an effort to ensure that maximum
14 bidder interest is stimulated, in an effort to drive to as many
15 possible bids as we could get coming up to the -- what right
16 now is the proposed bid deadline.
17         So I wanted to amplify the comments that Mr. Thomas
18 had made to help provide Your Honor a little more color
19 regarding the efforts that are being undertaken, really, seven
20 days a week, almost twenty-four hours a day, with the different
21 parties who previously had expressed interest and additional
22 parties that have come in as a consequence of the company being
23 inside Chapter 11.
24         THE COURT:  Do you think another week would be useful?
25         MR. RICHARDS:  I think, Your Honor, another week may

1   be helpful to the process.  We certainly haven't heard from any

2   of the bidders who have been part of the process that they

3   would need additional time.  And to the extent that we had

4   heard that, we certainly would have communicated that to

5   company counsel as well as the independent director.  So we

6   haven't heard that so far from any of the parties.

7         To the extent that we would, we of course would convey

8   that to the extent the parties felt that they needed that

9   additional time to participate in a robust way at the auction.

10  But we have not yet heard that from potential bidders.

11        THE COURT:  Thank you.

12        MR. RICHARDS:  You're welcome.

13        MR. THOMAS:  And, Your Honor, so in the actual bidding

14  procedures which were Exhibit A to the amended order, we added

15  language requested by the committee.  We've had it cleared by

16  counsel for the DIP lender and counsel for the stalking-horse

17  bidder.  Consultation rights, we also made it clear that the

18  purchased assets constitute all the assets required to purchase

19  the debtors' business as a going concern.  There was a concern

20  that we're not marketing and selling the business as a going

21  concern.  We are.  And we specifically talk about the

22  categories of assets that constitute the going concern:

23  intellectual property assets, working capital assets, operating

24  assets, and other assets.

25        THE COURT:  All right.

1          MR. THOMAS:  That is, I think, the conclusion on the

2     proposed amended bid procedures order.

3          THE COURT:  All right.  Shall we turn -- does anyone

4     wish to be heard with regard to the bid procedures?

5          All right.  We should then turn to the DIP financing

6     order.

7          MR. THOMAS:  Sure.  Your Honor, I think the Office of

8     the U.S. Trustee wanted us to make a statement on the record

9     regarding the privacy policy.

10          THE COURT:  All right.

11          MR. THOMAS:  The debtors have reviewed their privacy

12     policies, have shared those policies with the Office of the

13     U.S. Trustee, and have concluded that there is no need for a

14     privacy ombudsman in this matter.

15          THE COURT:  All right.  Thank you.

16          MR. KHODOROVSKY:  Your Honor, if I may briefly respond

17     to what Mr. Thomas just said?

18          THE COURT:  Go ahead.

19          MR. KHODOROVSKY:  I'll be extremely brief, Your Honor.

20     I agree with what Mr. Thomas said.  The U.S. Trustee had an

21     opportunity to review the policy.  It appears that the policy,

22     as currently exists, permits the sharing of personal

23     information upon a sale of corporate assets.  So at this point,

24     it appears that an ombudsman would not be necessary.

25     However -- and this is not for today, Your Honor -- the U.S.

1    Trustee would insist that any potential purchaser of the

2    company agree to abide by the privacy policy on a current

3    basis.  Thank you, Your Honor.

4           THE COURT:  All right.  All right.

5           MR. THOMAS:  Your Honor, with respect to the final

6    debtor-in-possession financing order, if I may approach, I can

7    provide you a blackline against the final order that was filed

8    as docket number 140.

9           THE COURT:  Okay.  Thank you.

10          MR. THOMAS:  And, Your Honor, there are -- the

11   changes, which really start at page 6, are changes that address

12   each and every objection that the committee has.  Page 6, it

13   just makes clear that the validity and priority stipulation is

14   subject to the challenge period that the committee has.  And

15   the challenge period is set forth in paragraph 13.

16          THE COURT:  Right.

17          MR. THOMAS:  Next is on page 10.  And the committee

18   negotiated a provision with respect to the payment of the

19   collateral monitoring fee.

20          THE COURT:  But not the --

21          MR. THOMAS:  They actually did get some --

22          THE COURT:  -- the other fee?

23          MR. THOMAS:  -- they did -- there is a provision, Your

24   Honor, on page 12.

25          THE COURT:  All right.  And while we're on page 10,

 1  I'm looking at -- my notes are on the blackline version of

 2  docket 140.  So you have to bear with me for a moment.  Going

 3  back to page 9, what are the dates set forth in termination

 4  date are extended to December 19 and November 19?  How does

 5  that work?  And I'm not sure that any of this works against my

 6  version of the ratif -- is there an amended ratification and

 7  amended agreement on file?

 8           MR. THOMAS:  No, Your Honor.  The order purports --

 9           THE COURT:  All right.

10           MR. THOMAS:  -- to change the dates that are in the

11  ratification agreement.  And really, the November 19th date

12  relates to the sale of the Coppley assets.

13           UNIDENTIFIED SPEAKER:  Correct, Your Honor.

14           MR. THOMAS:  And Your Honor, that was approved, we

15  believe --

16           THE COURT:  Right, no, I was there.

17           MR. THOMAS:  -- that's clo -- we believe that's

18  closing tomorrow.

19           THE COURT:  All right.

20           MR. THOMAS:  December 19th, right now, is sort of the

21  outside termination date of the DIP facility, which is

22  triggered off of our existing dates on a bid deadline auction

23  and sale hearing, which are December 6, 10, and 13,

24  respectively.

25           THE COURT:  All right.  Well, I will assume that there

1  will be some sort of a resolution of the committee's request

2  for a one-week extension, that the dates in here are going to

3  be consistent with that, and the parties are going to work in

4  good faith and reasonably to try to get an appropriate period.

5  And it seems to me critical, not only to give Mr. Williams

6  enough time to get financing, but to get information to the

7  marketplace.

8          Yes, sir?

9          MR. ROSENTHAL:  Your Honor, at the bottom of page 10

10 in the redline --

11         THE COURT:  Yes.

12         MR. ROSENTHAL:  -- that's exactly what that sentence

13 does that we added, was to punt the dates in here --

14         THE COURT:  Oh, that's exactly what I was looking for.

15         MR. ROSENTHAL:  There you go.

16         THE COURT:  Thank you.

17         MR. THOMAS:  Your Honor, the other fee that the

18 committee objected to, sort of I'd say the commitment fee, is

19 addressed on page 12, where in essence, it would be reduced by

20 100,000 dollars.

21         MR. ROSENTHAL:  Your Honor, for accounting purposes,

22 the way we did this was upon the closing or a refinancing of

23 the Salus loan, we would agree to give the estate a 100,000-

24 dollar discount or payment, however we work it out.  But

25 basically we're giving them back 100,000 dollars of the

HMX ACQUISITION CORP., ET AL.                                    52

1  original fee --

2          THE COURT:  All right.

3          MR. ROSENTHAL:  -- for the DIP loan.

4          THE COURT:  All right.  Now, it seems to me that your

5  proviso on page 11, limiting the rights of landlords to some

6  specific landlords who objected, has to be broader.  I can't --

7  as far as I'm concerned, I can't override lease agreements

8  contrary to their provisions or contrary to applicable law.  So

9  I've never done that.  I always take that out of DIP orders.

10         Marshall Huebner has told me that I can do it, and he

11 has a memo that says I can do it.  But I've never seen the

12 memo.  I'd just as soon not see the memo.  I don't think I can

13 do it.  So I'd just like to make that "all landlords" on the

14 bottom of page 11.

15         You can get a lien on proceeds, but --

16         MR. ROSENTHAL:  Okay.

17         THE COURT:  -- not on the lease.

18         MR. ROSENTHAL:  Okay.

19         THE COURT:  All right, thank you.  Page -- all right.

20         MR. THOMAS:  Your Honor, the committee and the DIP

21 lender agreed at the end of -- on my blackline that I tendered,

22 on page 13, the end of paragraph 5, to provide a dollar amount

23 to be used for investigation into potential claims.

24         THE COURT:  All right.  But certainly the committee

25 can go further if it wishes.  But it has to do so on its own

1    nickel or on property that's not subject to the lien.

2           MR. THOMAS:  Right.  Your Honor, on page 14 of the

3    blackline, on paragraph 6, the committee also has a veto, as it

4    were, into the payment of any critical vendors.

5           THE COURT:  All right.  I can assure parties that it

6    will be very hard to get the Court to approve critical vendor

7    payments.  On the other hand, if you set up a working group

8    made up of a representative of the debtors, the DIP lender, the

9    committee, and perhaps the U.S. Trustee -- if the U.S. Trustee

10   wishes to be involved -- I'll certainly consider it.  But this

11   case is moving so quickly that it seems to me that if they're

12   truly critical vendors, they may get satisfied soon enough,

13   hopefully, in a going-concern sale.  Maybe not.  But we will

14   see.

15          There is a reference in paragraph 6 to material

16   deviations in the budget.  I assume that there have been none

17   so far.  Is that correct?

18          MR. THOMAS:  None so far, to my knowledge.

19          MR. ROSENTHAL:  None that I'm aware of.

20          THE COURT:  Okay.  All right.

21          MR. ROSENTHAL:  Your Honor, the reason is, the first

22   test period is November 16th.  So we just finished --

23          THE COURT:  All right.

24          MR. ROSENTHAL:  -- the first.  I don't even know that

25   we've gotten the deviation report yet.

1          THE COURT:  Well, let us hope that there are none.

2          MR. THOMAS:  Yes, let's hope we're not reporting on

3   the 29th.  Your Honor --

4          THE COURT:  We are not granting a lien in causes of

5   action arising under Chapter 5 of the Bankruptcy Code.

6          MR. THOMAS:  Correct.  That has been given up.

7          THE COURT:  All right.  Thank you.

8          MR. THOMAS:  Your Honor, on our blackline, again, on

9   page 18 it reflects the carve-out for the investigation.

10          THE COURT:  All right.

11          MR. THOMAS:  And on page 19, provides with sort of

12   notice and an opportunity to object to the payment of fees of

13   DIP lender's counsel.

14          THE COURT:  All right.  I certainly don't think that

15   the information provided need include confidential information,

16   but it should include some information on hourly work done.

17   All right?

18          MR. THOMAS:  Your Honor, there's an addition on the

19   bottom of page 20 going to page 21, where there's a limit of

20   the lender's liability.  It makes it clear that that is still

21   subject to the challenge period.  So the committee has its

22   right to investigate and challenge, including this agreement.

23          THE COURT:  All right.

24          MR. THOMAS:  I believe that on paragraph 13 it was

25   just made a little bit clearer that the debtors and the lenders

1  agree that the committee has standing to assert any challenges

2  that it uncovers during the challenge period.

3          THE COURT:  That's certainly --

4          MR. ROSENTHAL:  We went a little further, Your Honor.

5  We actually waived any ability to protest that they don't have

6  standing to challenge their standing.

7          THE COURT:  All right.  Thank you.  That's certainly a

8  good way to proceed.  I wish everyone would proceed that way.

9          MR. THOMAS:  Your Honor, and that is the extent of the

10 agreed revisions that resolves the objection of the committee

11 which was at docket number 153.

12         MR. ROSENTHAL:  There's one more provision, Your

13 Honor, that I don't think was highlighted but is in here that,

14 as part of the original loan, we did not take any liens on real

15 estate.  It was all encumbered.  We didn't think there was any

16 equity in it.  As part of the DIP loan and the DIP order, we

17 did get a blanket lien on all assets, including anything that

18 we didn't encumber before.  So pursuant to the DIP order --

19         THE COURT:  But junior to existing liens.

20         MR. ROSENTHAL:  Junior to existing liens.  So we got

21 a -- we sort of got a wraparound on all the real estate.  We've

22 agreed to dial back our collateral and give back the real

23 estate as -- at least from our lien will not attach to the real

24 estate that's owned by the debtor.

25         THE COURT:  All right.  Thank you.

1        Now, there seems -- if I recall correctly, there's
2   some release language in the ratification and amendment
3   agreement.  The debtor can properly stipulate to perfection and
4   nonavaila -- nonavoidable and the like.  But I don't think they
5   can release -- and I'm looking at paragraph 12 as -- pardon me,
6   paragraph 20 on page 27.  And it seems to me that even subject
7   to paragraph 13, I'm not comfortable with the release language.
8        MR. ROSENTHAL:  Your Honor, these were releases that
9   were given all along by the debtor, pre-petition, and again in
10  the ratification agreement, which are sort of standard releases
11  given to a lender who's extending new money to a borrower.  We
12  should at least get releases that we're not going to get sued
13  by the person we just gave money to.
14        THE COURT:  Certainly -- that's fine with regard to
15  the post-petition financing.  Does this include the pre-
16  petition financing as well?
17        MR. ROSENTHAL:  Well, we have releases in those
18  documents up to the last amendment.
19        THE COURT:  I have no problem with a -- I just don't
20  know what a "release" means.  Now, if a release doesn't do any
21  more than is provided for in the stipulations included in here,
22  I have no problem with it.  It's just that a release is a very
23  broad thing.  And that's my concern.  But if the parties aren't
24  concerned and don't believe the release goes any further than
25  the stipulations already in the document, I'll leave it alone.

1   All right?  If that's understood.

2           I do think -- and this comes up in paragraph 21.  And
3   I think we need to strike the words "without the requirement or
4   need to file a proof of claim".  I think the secured lender
5   should file a proof of claim.  It can file one against all the
6   debtors, or all your borrowers.  But I invariably seek --

7           MR. ROSENTHAL:  We're happy to do so, Your Honor.

8           THE COURT:  All right.  Paragraph 24 is a pretty broad
9   statement with regard to 364(e).  It seems to me we should say,
10  in the first few words of paragraph 24, "Pursuant and subject
11  to".  In other words, all we're doing is ratifying Section
12  364(e).  This language goes a little bit further.  And those
13  were my very few comments.

14          MR. THOMAS:  I believe that is it on the --

15          THE COURT:  All right.

16          MR. THOMAS:  -- final DIP financing, Your Honor.

17          THE COURT:  Anything from any party?

18          All right.  I find that the final financing order is
19  reasonable under the circumstances, and that the financing is
20  necessary and appropriate, and in the best interests of the
21  debtor.  And I'll sign an order as stated on the record.

22          MR. THOMAS:  Thank you, Your Honor.  We will submit to
23  your chambers two amended orders to reflect the changes we've
24  been discussing today.

25          THE COURT:  All right.  And we'll then continue,

 1  hopefully, to a final sale order next Thursday.

 2          MR. THOMAS:  Final bid procedures --

 3          THE COURT:  Bid procedures order.

 4          MR. THOMAS:  -- order, Your Honor, on Thursday.  I

 5  believe we're set at 10 a.m.

 6          THE COURT:  Okay.  Anything further that we ought to

 7  accomplish today?

 8          MR. THOMAS:  I think from the debtors, that's

 9  sufficient.

10          THE COURT:  All right.  Thank you very much.

11          MR. THOMAS:  Thank you, Your Honor.  Have a happy

12  Thanksgiving.

13          THE COURT:  Same to all present and those on the

14  telephone as well.

15      (Whereupon these proceedings were concluded at 3:50 PM)

16

17

18

19

20

21

22

23

24

25

1

2                          I N D E X

3

4                          RULINGS

5                                          Page        Line

6    Debtors' financing motion is approved as      57          21

7    amended on the record.

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1

2                               C E R T I F I C A T I O N

3

4       I, Penina Wolicki, certify that the foregoing transcript is a

5       true and accurate record of the proceedings.

6

7

8

9

10

11       _____

PENINA WOLICKI

12
AAERT Certified Electronic Transcriber CET**D-569

13

14

eScribers

15
700 West 192nd Street, Suite #607

16
New York, NY 10040

17

18

Date:  November 26, 2012

19

20

21

22

23

24

25