1

1

2  UNITED STATES BANKRUPTCY COURT

3  SOUTHERN DISTRICT OF NEW YORK

4  Case No. 12-14300-alg

5  - - - - - - - - - - - - - - - - - - - -x

6  In the Matter of:

7

8  HMX ACQUISITION CORP., et al.,

9

10            Debtors.

11

12  - - - - - - - - - - - - - - - - - - - -x

13

14            United States Bankruptcy Court

15            One Bowling Green

16            New York, New York

17

18            November 29, 2012

19            10:10 AM

20

21  B E F O R E:

22  HON. ALLAN L. GROPPER

23  U.S. BANKRUPTCY JUDGE

24

25

1

2    Final Hearing RE:  Motion by Debtors authorizing to maintain

3    prepetition insurance policies; enter into new insurance

4    policies; and maintain prepetition premium financing

5    agreements.

6

7    Final Hearing RE:  Motion by Debtors authorizing to pay

8    prepetition taxes and regulatory fees; and directing financial

9    institutions to honor and process checks related to prepetition

10   taxes and regulatory fees.

11

12   Final Hearing RE:  Motion by Debtors authorizing maintenance of

13   existing bank accounts, continued use of existing business

14   forms, continued use of existing cash management system and for

15   related relief.

16

17   Final Hearing RE:  Motion by Debtors authorizing to maintain

18   and administer customer programs and honor related prepetition

19   obligations to customers.

20

21   Motion by Debtors establishing procedures for the assertion,

22   resolution, allowance and satisfaction of unpaid claims

23   asserted.

24

25

1

2  Motion by Debtors authorizing the retention and compensation of

3  certain professionals utilized in the ordinary course of

4  business.

5

6  Final Hearing RE:  Motion by Debtors directing to pay certain

7  accrued prepetition wages.

8

9  Motion by Debtors establishing procedures for interim

10  compensation and reimbursement of expenses for professionals.

11

12  Motion by Debtors authorizing employment of CDG Group, LLC as

13  financial advisor for the debtors nunc pro tunc.

14

15  Motion by Debtors for authority to employ and retain Epiq

16  Bankruptcy Solutions, LLC as administrative agent nunc pro

17  tunc.

18

19  Final Hearing RE: Motion by Debtors to pay prepetition claims

20  of shippers, warehousers, processors and lien claimants and

21  certain customs duties and similar incidental prepetition

22  import expenses; and authorizing, but not directing, all

23  financial institutions to honor all related payment requests.

24

25

1

2   Motion by Debtors authorizing rejection of certain unexpired

3   leases of nonresidential real property.

4

5   Status Conference RE:  Motion by Debtors authorizing the

6   Debtors' entry into the stalking-horse purchase agreement,

7   authorizing and approving the bidding procedures and break-up

8   fee.

9

10  Motion by Debtors authorizing employment of William Blair &

11  Company, LLC as investment banker for the Debtors nunc pro

12  tunc.

13

14  Motion authorizing employment of Proskauer Rose, LLP as counsel

15  for the Debtors nunc pro tunc.

16

17

18

19

20  Transcribed by:  Penina Wolicki

21  eScribers, LLC

22  700 West 192nd Street, Suite #607

23  New York, NY 10040

24  (973)406-2250

25  operations@escribers.net

```
 1
 2    A P P E A R A N C E S :
 3    PROSKAUER ROSE LLP
 4          Attorneys for Debtors
 5          Three First National Plaza
 6          70 West Madison
 7          Suite 3800
 8          Chicago, IL 60602
 9
10    BY:   MARK K. THOMAS, ESQ.
11          PETER J. YOUNG, ESQ.
12
13
14    PROSKAUER ROSE LLP
15          Attorneys for Debtors
16          Eleven Times Square
17          New York, NY 10036
18
19    BY:   JARED D. ZAJAC, ESQ.
20
21
22
23
24
25
```

1

2  UNITED STATES DEPARTMENT OF JUSTICE

3        Office of the United States Trustee

4        33 Whitehall Street

5        21st Floor

6        New York, NY 10004

7

8  BY:   NAZAR KHODOROVSKY, ESQ.

9

10

11  LEONARD, STREET AND DEINARD, P.A.

12        Attorneys for Official Creditors' Committee

13        150 South Fifth Street

14        Suite 2300

15        Minneapolis, MN 55402

16

17  BY:   ROBERT T. KUGLER, ESQ.

18

19  DLA PIPER LLP (US)

20        Attorneys for Authentic Brands Group

21        203 North LaSalle Street

22        Suite 1900

23        Chicago, IL 60601

24

25  BY:   RICHARD A. CHESLEY, ESQ.

```
 1
 2   KENNEDY, JENNIK & MURRAY, P.C.
 3          Attorneys for Workers United
 4          113 University Place
 5          New York, NY 10003
 6
 7   BY:   THOMAS M. KENNEDY, ESQ.
 8
 9
10   GREENBERG TRAURIG, LLP
11          Attorneys for Salus Capital Partners LLC
12          333 S.E. 2nd Avenue
13          Suite 4400
14          Miami, FL 33131
15
16   BY:   PAUL J. KEENAN, JR., ESQ.
17
18
19   SCHULTE ROTH & ZABEL LLP
20          Attorneys for Amalgamated Health Fund
21          919 Third Avenue
22          New York, NY 10022
23
24   BY:   LAWRENCE V. GELBER, ESQ.
25
```

1

2   HALPERIN BATTAGLIA RAICHT, LLP

3           Attorneys for Douglas Williams

4           555 Madison Avenue

5           9th Floor

6           New York, NY 10022

7

8   BY:   ALAN D. HALPERIN, ESQ.

9

10  JONES DAY

11          Attorneys for Carlyle Group & Bluestar Alliance

12          222 East 41st Street

13          New York, NY 10017

14

15  BY:   LISA LAUKITIS, ESQ.

16

17

18

19

20

21

22

23

24

25

1                    P R O C E E D I N G S

2              THE COURT:  We're now going to take HMX Acquisition

3    Corp.  Do we have parties in HMX on the phone today:

4              OPERATOR:  Yes, Your Honor.

5              THE COURT:  We do.  All right.  Then I'll keep the

6    phone line open.

7              May I have appearances in HMX, please?

8              MR. KUGLER:  Good morning, Your Honor.  Robert Kugler

9    on behalf of the unsecured creditors' committee.

10             MR. KHODOROVSKY:  Nazar Khodorovsky for the U.S.

11   Trustee.

12             MR. KEENAN:  Paul Keenan on behalf of Salus Capital.

13             MS. LAUKITIS:  Lisa Laukitis from Jones Day, on behalf

14   of the Carlyle Group and Bluestar Alliance.

15             MR. CHESLEY:  Richard Chesley, DLA Piper, on behalf of

16   ABG HMX, the stalking-horse bidder.

17             MR. GELBER:  Lawrence Gelber of Schulte, Roth & Zabel,

18   on behalf of the Amalgamated Health Fund.

19             MR. KENNEDY:  Thomas Kennedy, Your Honor, of Kennedy,

20   Jennik & Murray, on behalf of Workers United.

21             MR. THOMAS:  Good morning, Your Honor.  Mark Thomas of

22   Proskauer, on behalf of the debtors and debtors-in-possession,

23   with my colleagues Mr. Peter Young and Mr. Jared Zajac.

24             THE COURT:  Does anyone else wish to appear?

25             MR. HALPERIN:  Good morning, Your Honor.  Alan

1  Halperin, Halperin Battaglia Raicht, on behalf of Douglas

2  Williams.

3        THE COURT:  Anyone on the telephone wish to note an

4  appearance for the record?

5        All right.  Counsel, please proceed.

6        MR. THOMAS:  Thank you, Your Honor.  Mark Thomas, on

7  behalf of the debtors.  Your Honor, I'm pleased to report that

8  all matters that are on the agenda have been resolved, and all

9  objections filed by the committee have been resolved.  And we

10  will go through the agenda, which was docket number 181.

11        And we have not been able to file in advance of the

12  hearing the resolved orders, but we will be able to file them

13  after the hearing.  We had meetings over the last day with the

14  committee, with the stalking-horse bidder, with the DIP lender,

15  and have a consensual resolution of everything on today's call.

16        THE COURT:  Well, I'm delighted that the matters

17  appear to consensual.  I'll hear from anyone, obviously, who

18  wishes to be heard.  I will, for the record, and without in any

19  way attempting to rain on your parade or the committee's

20  parade, suggest that in the future, perhaps some of the issues

21  that the committee raised vis-a-vis the orders, could be raised

22  by an informal meeting between the parties, and a few trees

23  could be saved.  And more important, frankly, a few dollars,

24  perhaps could be saved.

25        And -- but I'm glad that there is a resolution.  I'm

 1  not surprised, due to the professionalism of the parties
 2  involved and the parties' recognition that we are dealing with
 3  a debtor in Chapter 11.  Please go ahead.  Where shall we
 4  start?
 5          MR. THOMAS:  Thank you, Your Honor.  I believe the
 6  first matter we should start with is the status conference.
 7  And the status conference was set originally on November 7th,
 8  as part of the order approving bid procedures, which was docket
 9  number 104.  Your Honor, that followed a telephonic hearing
10  that we had in the wake of the hurricane, and the committee had
11  not yet been appointed.  So there was a status conference set
12  with the anticipation and hope that the bidding procedures
13  order would be final, but for any objections of a statutory
14  committee.
15          We were back before Your Honor thereafter.  The
16  committee had just been formed.  They filed objections to the
17  bidding procedures order, which was docket number 104.  We were
18  able to resolve certain of those objections.  And that resulted
19  in docket number 169, which was a revised bid procedures order
20  which was entered by Your Honor on November 21st.
21          There were four reserved objections that were set over
22  for further status today.  And, Your Honor, each and every one
23  of those objections has been resolved, and we will be
24  tendering, after court, an order.  I can walk you through a
25  blackline, if you wish.

1        THE COURT:  I think that would be useful, so that

2    everyone here has an opportunity to hear what the resolutions

3    are.  Why don't we start with the four open issues relating to

4    the sale order.  I think that's the most important order or

5    matter that's not been closed.

6        MR. THOMAS:  Certainly, Your Honor.  And what I'll do

7    is I'll just highlight those four issues before I actually

8    tender the blackline to Your Honor.

9        The four principal issues that were reserved were the

10   committee's objection number 1, to the timing of the sale

11   process.

12       THE COURT:  No, I remember.  I -- okay, number 2?

13       MR. THOMAS:  Number 2 was the amount of the break-up

14   fee that the stalking-horse purchaser would obtain in certain

15   situations.

16       THE COURT:  Number 3?

17       MR. THOMAS:  Number 3 was the timing for the potential

18   financing to be provided by the licensing new -- I'm sorry --

19   the licensee, which is the new OpCo, which may be created by

20   the CEO of the company, Mr. Douglas Williams.

21       THE COURT:  And 4?

22       MR. THOMAS:  Number 4 was clarification regarding

23   what's known as the Salus claim discount.  And that is a letter

24   agreement between the pre-petition and DIP lender, Salus, and

25   the debtors-in-possession, which was filed as docket number

1   114.  And the committee wanted clarification on how that would

2   impact or work in the auction and bidding procedures.

3              THE COURT:  Okay.  All right.  And the resolution?

4              MR. THOMAS:  Your Honor, the resolution is:  with

5   respect to the sale dates and process, the parties have agreed

6   to basically push back everything by one week.  And when we

7   initially filed these cases, Your Honor, we were actually

8   seeking a much rapider process, but events intervened.

9              On November 7th, docket number 104 provided for a bid

10  deadline of December 6th, an auction of December 10, and a sale

11  hearing on December 13th.  And the parties have now agreed that

12  the bid deadline will be December 12th -- that's not a seven-

13  day extension, it's a six-day extension.  I can explain why.

14  The auction --

15             THE COURT:  I don't think you need to.

16             MR. THOMAS:  Thank you.  The auction --

17             THE COURT:  So bids 12/13?

18             MR. THOMAS:  Bids 12/12.

19             THE COURT:  12/12.  All right.

20             MR. THOMAS:  Auction 12/17.  And, Your Honor, we had

21  contacted your chambers to see your potential availability for

22  a sale hearing the week of the 17th.  We had requested two

23  days, in the event that perhaps the auction drags on and takes

24  longer than a day, and we'd have to go to the second day, or in

25  the event that the sale hearing continued.

1        We were told by chambers that subject to today --

2   hearing us today, that you might be available on the 19th at

3   2:30.  And then a continue date, if needed, of the 20th.  And I

4   believe that was at 10 a.m.

5        THE COURT:  All right.  Let's -- I'll check those

6   numbers.  I'll give them to you, unless somebody else has

7   already got the time, and it appears inevitable that that time

8   will be taken up.  All right.

9        And the committee is on board.  Does anyone wish to be

10  heard about these dates?  I assume your investment bankers

11  believe that the universe of interested bidders will be able to

12  get notice of these extended dates and will be able to conform

13  their actions accordingly?

14        MR. THOMAS:  Your Honor, the debtors' investment

15  banker believes so.  And we have been working diligently and

16  cooperatively with the committee's proposed financial advisor

17  and proposed counsel since they were appointed over a week ago,

18  to provide them information on a daily basis, whether by

19  telephone or in-person meetings.  So we're doing our best to

20  keep them in the loop and completely up to speed.

21        THE COURT:  Does anyone wish to be heard with regard

22  to the dates?

23        All right, issue number 2:  the break-up fee?

24        MR. THOMAS:  Your Honor, on the break-up fee, the

25  committee had no objection to the approved break-up fee, in the

1   event that there is what we call the option A bid.  The option

2   A bid is the going concern bid, which has two major

3   contingencies.  One is that a license agreement be reached, and

4   the other is that financing be obtained.  They did have an

5   objection that the break-up fee should not apply if there was

6   as B bid, which is sort of the liquidation bid, if the two

7   contingencies are not met.

8           After negotiations with the stalking-horse purchaser,

9   the committee and the stalking-horse purchaser agreed that if

10  there is a B bid that's the winning bid, and the stalking-horse

11  purchaser obtains a break-up fee, that break-up fee would be

12  2.1 million dollars, which is a slight reduction of the going-

13  concern breakup fee.

14          THE COURT:  And what percentage of that?

15          MR. THOMAS:  It will be less than three percent of the

16  floor of the stalking-horse liquidation bid.

17          THE COURT:  All right.  Does anyone wish to be heard

18  about this resolution?

19          All right, the date for the financing of the -- I

20  gather of what we call the licensing agreement.

21          MR. THOMAS:  Yes, Your Honor.  The purchase agreement

22  with the stalking horse bidder provides that that financing

23  must be provided three business days in advance of the auction.

24  The committee had initially, in their objection, thought that

25  that financing should be completed fourteen business days in

1    advance of the auction, which would be --

2              THE COURT:  Wednesday.

3              MR. THOMAS:  -- yes, it would have been in the past.

4    And what happened is, the committee and its professionals and

5    its financial advisors spent time meeting with the DIP lender,

6    which is the proposed exit finance facility -- Salus is

7    proposing a term sheet to provide potential exit financing to

8    the licensee operating company -- and they met with Mr.

9    Williams.  And I believe, based on those meetings and

10   discussions, they've agreed to, in effect, withdraw that

11   objection; that there's no reason, really, to disqualify a

12   potential bid so far in advance of a bid deadline.

13             Our bid deadline is the 12th.  And that's normally

14   when we would vet and qualify the financial wherewithal of a

15   potential bidder to determine whether or not they are qualified

16   bidders.

17             THE COURT:  And so that would also be the deadline for

18   financing relating to the possible -- possibility of an A

19   transaction?

20             MR. THOMAS:  Yes.  Because that is three business days

21   in advance of the auction.

22             THE COURT:  So if someone other than the -- I see.  So

23   parties will have between the 12th and the 17th to try to

24   adjust their bids to the possibility of an A versus a B

25   transaction.

1          MR. THOMAS:  That is correct, Your Honor.

2          THE COURT:  And some -- and parties, as I understand

3   it, at the auction, can come in and bid on a B or bid on a B or

4   an A or both?

5          MR. THOMAS:  Or both, if they are qualified bidders.

6   And of course, the debtor, in consultation with the committee,

7   from the bid deadline of the 12th, through the commencement of

8   the auction, will be communicating and working with all the

9   bidders, so we have an understanding of what they might have to

10  do to qualify.  And, Your Honor --

11         THE COURT:  And with the licensee?

12         MR. THOMAS:  With the licensee.  Your Honor, it is

13  important to note, though, that the debtors and their advisors

14  have informed all the potential bidders that are interested in

15  a going-concern A-type bid, that they should engage in

16  discussions with the proposed exit financer, Salus, to make

17  sure that the financing can be made available to a bidder

18  that -- other than the stalking-horse bidder.

19         And those discussions will be ensuing, we hope.  We

20  encourage everyone to have those discussions, as well as any

21  discussions -- and there have been -- discussions with Mr.

22  Williams.  So since -- over the last few weeks, since the no-

23  shop provision was terminated on November 5th, the debtors, Mr.

24  Williams, our advisors, have been meeting with various parties-

25  in-interest.  We've been giving site visits.  We've been

1 updating the data room on a daily basis and responding to

2 diligence requests.

3         So we're doing all of that.  But we would prefer a

4 going-concern bid.  We would prefer to keep 1,300 employees

5 employed.  And therefore it's important that these bidders

6 engage with both Mr. Williams as a proposed licensee over the

7 terms of a license agreement, and with Salus as the proposed

8 exit financer --

9         THE COURT:  Well --

10         MR. THOMAS:  -- over the exit financing.

11         THE COURT:  -- maybe we should use a term other than

12 exit -- it's not exit financing for this debtor, but it's exit

13 financing -- it's financing for the license transaction.

14         MR. THOMAS:  It is.  It's acquisition financing for

15 the license transaction.

16         THE COURT:  All right.  All right, does anyone wish to

17 be heard with regard to the timing?  Yes, sir?

18         MR. KEENAN:  Your Honor, this is Paul Keenan on behalf

19 of Salus Capital.  I just wanted to clarify one issue with

20 regard to what we're calling -- I'll call it the acquisition

21 financing.  Indeed, at least one bidder has contacted us as

22 early as this morning to talk to us about the possibility of

23 providing financing to them in a going-concern bid; and we're

24 meeting with them at 12:30 today.

25         But I just want to make clear that bidders shouldn't

HMX ACQUISITION CORP., ET AL.                    19

1  consider Salus to be the sole source of possible asset

2  acquisition financing here.  I just want to avoid a situation

3  where people expect that Salus will provide financing to

4  whatever bidder comes to the table.  And obviously, that

5  couldn't be the case.  Bidders should not only, if they want to

6  talk to us about possible financing, but should talk to all the

7  other lenders that are out there, so that they come to the

8  auction prepared with financing in place, if they indeed need

9  financing.

10         THE COURT:  Thank you.

11         MR. HALPERIN:  Good morning, Your Honor.  Alan

12  Halperin on behalf of Doug Williams.  Everything I heard is

13  perfectly accurate.  I just want to elaborate a little more to

14  make sure the record is clear.

15         Mr. Williams is not only talking to Salus himself,

16  he's talking to other lenders too.  But there's a limitation of

17  time; there's bringing people up to speed; there's the cost of

18  engaging other lenders.  And he's making his decisions as he

19  goes along based upon time and his own personal resources.

20  Right now, I don't think anybody's going to be shocked by this,

21  obviously Salus is a logical target to talk to, given that they

22  are fully integrated and invested in this company, and they are

23  the farthest along.

24         To the extent -- and as has been made very clear --

25  people can talk to Mr. Williams if they want to try and pair

1  with him, or they can go anywhere else and not use him, either

2  on a going concern or a liquidation bid.  That's their option.

3  They can talk to any lender they want to.  If they have

4  interest in trying to do something with Mr. Williams, and this

5  is the lender that we are farthest along with, and it's likely

6  that we are going to be coming to the table with that lender,

7  obviously the lender has to be comfortable with whoever it is

8  we would be paired up with if we're there, because we can't

9  force them to lend to us if our -- effectively our partner --

10  although they're not partners -- are someone they're not

11  comfortable with.

12         But it's not as if anybody's trying to force someone

13  to one lender or another; trying to force someone to Mr.

14  Williams or not to Mr. Williams.  It's just how things are

15  breaking.  And I just wanted to make sure that was clear on the

16  record.

17         THE COURT:  In your view, can a third party make a

18  type-A bid without Mr. Williams' involvement?

19         MR. HALPERIN:  Of course.  Absolutely.

20         THE COURT:  All right.  I'm not nearly as close to the

21  matter day in and day out as the parties are.

22         MR. HALPERIN:  I mean, obviously I represent Mr.

23  Williams.  I have my own views as to how successful they may be

24  without him.  But that's neither here nor there.  If they have

25  the money, and they're willing to step up, and they put the

1  highest number on the table, and they say they're going to go

2  forward, and the estate looks at it and says hey, that's great,

3  that's the highest number, like I said last hearing:  god

4  bless.

5          THE COURT:  All right.  Now, let me say this.  I think

6  in our telephone conversation I took the view that the debtor

7  would not be, at this point, authorized to reimburse Mr.

8  Williams for any of his expenses in connection with this.  That

9  was eliminated from the approval, and I'm not in any way

10 suggesting that should be changed.

11         I was not fully informed as to the nature of the

12 transaction.  I shouldn't say I wasn't fully informed.  I

13 didn't understand the entire nature of the transaction in that

14 phone call.  Very difficult to get up to speed on a case where

15 I hadn't taken first-day orders, although I'd read all of them

16 and I'd read a report of the transcript of the first-day

17 hearings.

18         So let me just say this -- and we now have a

19 committee, and the committee certainly will be heard.  But at

20 some appropriate time in the case, I would not want to preclude

21 the parties from coming back and seeking reimbursement of

22 expenses incurred in good faith.  And I didn't -- I had no

23 intention of excluding that.

24         It seemed to me, that in terms of preliminary

25 approval, without a committee and with the transaction in the

1   very preliminary stages that it was, that it simply didn't

2   appear appropriate for the debtor to pay expenses of its CEO.

3              MR. HALPERIN:  I can understand that.  I mean, in a

4   vacuum, look, given where --

5              THE COURT:  And that's the way we're proceeding.  I'll

6   just make that comment for the record.

7              MR. HALPERIN:  It's appreciated.

8              THE COURT:  And we'll -- if we have to deal with it in

9   the future, we may, we may not.  And parties obviously reserve

10  their positions, whatever those positions may be.

11             MR. HALPERIN:  Thank you, Your Honor.

12             THE COURT:  And I'm not -- I'm not indicating any view

13  on the merits of the transaction.

14             MR. HALPERIN:  Understood.  And as a practical matter,

15  obviously, that's something that we were thinking about in one

16  form or another at some point, depending upon how the

17  transaction in the case breaks, having a further discussion on

18  this.

19             Mr. Williams is an individual.  He's not a large

20  corporation.  He doesn't have the funding that a lot of the

21  other parties around do.  And this has been very rough on him

22  on a personal basis, in terms of the money he's had to expend.

23  And it's made it more difficult, because it has limited his

24  options as to where he could go, what he could do, because he

25  doesn't have the resources.  You know, a hundred grand here, a

1    hundred grand there, some people it's not quite so significant.

2    To Mr. Williams, it's actually very material.

3            THE COURT:  I can understand that.

4            MR. HALPERIN:  Thank you, Your Honor.

5            MS. LAUKITIS:  Lisa Laukitis from Jones Day on behalf

6    of the Carlyle Group and Bluestar Alliance.  We do not think

7    that the timing works with respect to the auction.

8            THE COURT:  Tell me what their position is in this

9    case?

10           MS. LAUKITIS:  We are a potential bidder on the

11   assets.  And we've been engaging -- attempting to engage with

12   the debtor and with Mr. Williams, to put together bids by the

13   requested deadline.

14           To have this information come in only three days prior

15   to the auction is insufficient when bidders are being asked to

16   provide binding bids with no financing out.  We need detail on

17   what the Salus financing is going to look like, so we know

18   whether OpCo is a viable bidder.  We need to understand whether

19   Salus is going to give the same deal to all IPCo bidders, and

20   if not, what is that decision going to be based on.

21           And it's easy to say we could go out to other lenders

22   to try to financing OpCo on our own.  But without knowing

23   exactly what OpCo's obligations are under the stalking-horse

24   bid, are they contributing twenty million dollars, are they

25   contributing one dollar, you know, is that deal -- we've been

1    told it would be offered to other IPCo bidders, but it's not

2    clear what the obligations are and whether they would apply

3    equally to all bidders.  So it's really putting bidders at a

4    disadvantage to get that information so late in the game.

5            But it also raises a concern we have about the overall

6    process.  When we came to you at the first bidding procedures

7    hearing, we expressed concern that the process was vague,

8    bidders weren't really clear on what they needed to do to be in

9    the game here.  The example at that hearing was not knowing how

10   the debtors were valuing an A bid or a going-concern bid,

11   versus a B or liquidation bid.  And Your Honor rightly said,

12   you hoped the information would be forthcoming after the no-

13   shop was lifted and parties were able to sign CAs.

14           So we sat down, we waited, we signed a CA, we got the

15   information from the debtors, and we asked that question.  And

16   we were told minimum A bid is just under seventy-three million

17   dollars, minimum B bid is just under seventy-seven million

18   dollars.

19           But then that raises the question, well, if you get

20   one for each, how do you value those against each other.  And

21   the answer we got was the A bid is preferable to the debtors.

22   And we asked well, how much would a B bid have to bid an A bid

23   in order to be seen as the higher and better offer; and no

24   matter how many times we have asked the question, we're not

25   getting the answer.

1          So everybody's pushing us --

2          THE COURT:  Do you think there is -- do you think

3    there is an answer to that question?

4          MS. LAUKITIS:  Well, there has to be some value.

5    They're going to have to decide eventually.  The debtor has

6    discretion and the Court has discretion, but someone is

7    eventually going to have to decide.

8          THE COURT:  Somebody's going to have to take a

9    position, yes.

10          MS. LAUKITIS:  And take a position.  And it makes it

11    very hard for people to participate in this process without

12    having more clarity on that.  So then we're trying to play

13    along.  We say, okay, then we'll take a look at having an A

14    bid.  And yet, all this information that would enable us to

15    compete on a fair basis with the stalking horse is not made

16    available to us.

17          So it really appears, at least to us, that the process

18    is being managed to ensure that the stalking-horse wins.  And

19    we're missing critical information that we need to participate.

20          THE COURT:  Anyone else?

21          MR. KEENAN:  Your Honor, that was actually the

22    reason -- I'm sorry, for the record, this is Paul Kennan on

23    behalf of Salus Capital Partners.  One of the comments that

24    Jones Day made was precisely the reason why I made the

25    observations that I did earlier.  It should be clear that Salus

HMX ACQUISITION CORP., ET AL.                                    26

1  has spent hundreds of hours working on this current IPCo/OpCo

2  structure to develop comfort with the parties, comfort with the

3  credit risk, and comfort with everything else that a lender

4  typically considers when extending credit.

5          I can almost categorically state that Salus will not

6  simply offer the same credit on the same terms to any party

7  that shows up.  And I daresay no lender would do that in any

8  scenario.  Having said that, we actually plan a meeting with

9  the Carlyle Group this afternoon at 12:30.  And we're very

10 happy to discuss with them possible financing options.

11         But again, bidders should come with cash -- their own

12 financing arrangements, if they're not able to reach one with

13 Salus beforehand.  And I just want to make sure that everyone's

14 just clear on that issue.

15         MR. CHESLEY:  Your Honor, Richard Chesley, just

16 briefly to comment on --

17         THE COURT:  Who do you represent?

18         MR. CHESLEY:  I represent the stalking-horse bidder,

19 ABG HMX.  And I just rise very briefly to dispel the notion

20 that this is being run to the benefit solely of the stalking

21 horse.  While Salus has spent hundreds of hours, our group has

22 spent probably thousands of hours to put structures in place.

23         We have all of our financing ready, willing, and able

24 to proceed with this transaction.  We have worked with the

25 debtors and all constituencies to see if we can get a going-

1  concern transaction on the table to save these jobs and save

2  these businesses.  Unfortunately, that's the position where we

3  are today.

4       Nothing is being done to manage this to diffuse any

5  open bidding.  In fact, all of our conversations, all of our

6  discussions with every stakeholder here, is to make sure that

7  this is an open process, that we are ready, willing, and able

8  to participate in.

9       There's a limit, though, to resources and time.  And

10  that's what we're trying to manage through today.  So I just

11  wanted to comment on the point that this is being done solely

12  to benefit the stalking horse.  Thank you.

13       MS. LAUKITIS:  Your Honor, Lisa Laukitis, again, from

14  Jones Day.  If it's not being run to benefit the stalking

15  horse, and parties are really able to partner with Mr. Williams

16  to create a competing OpCo bid, which the debtors and everyone

17  has said is what their preference is, then we need the

18  information necessary to compete in that bid.  What are OpCo's

19  obligations?  What's the financing that it would have?  Is the

20  entity viable as financed?  And whether or not that financing

21  is available to anyone else.

22       Once we have those, if we get those answers, you know,

23  we would then be in a position to participate.  But as it

24  stands now, it's not a level playing field.

25       THE COURT:  Now, when do you need that information, in

1    your view?

2              MS. LAUKITIS:  The sooner the better.  And the time

3    having been pushed out a week, certainly helps.  But I would

4    say certainly the stalking horse and Mr. Williams know what

5    their agreement is amongst themselves now.  They cut a deal to

6    have an OpCo/IPCo structure, and they each know what they're

7    contributing to that.  That's something that could be shared

8    immediately.

9              THE COURT:  That doesn't appear to me to be obvious

10   from the record that I have.

11             MS. LAUKITIS:  It's not.

12             THE COURT:  But -- that they know what the situation

13   is.

14             MS. LAUKITIS:  Well, I --

15             THE COURT:  The question is --

16             MS. LAUKITIS:  -- we've been told they have --

17             THE COURT:  -- how long will it be before that comes

18   together.

19             MR. HALPERIN:  I guess this is the first time I'm not

20   rising to say all is wonderful.  Mr. Williams is happy to talk

21   to the Carlyle Group and Bluestar, their company that is

22   participating, and in fact, has had conversation with them.

23             But I would suggest that as I also explained to the

24   Court at an earlier hearing, Mr. Williams himself is also going

25   to be looking at who wants to pair up with him, just as Salus

1   is.  Because he's got to live with someone going forward on a

2   basis.  And he's going to be negotiating with anybody that

3   talks to him.  And just because he offers X to one party,

4   doesn't necessarily mean it has to be X to every party.

5        It's going to be a commercial negotiation, as it has

6   been all along.  I think personally, the conversations that may

7   or may not have taken place between Mr. Williams and ABG as to

8   you'll put in X I'll put in Y to get to Z, isn't really

9   appropriate or fair to give to another interested bidder.

10  Because Mr. Williams, quite frankly, he said, I'll speak to

11  anybody; I'll consider anybody, for real.  And he is.  But he's

12  obviously -- and I said this too -- he's not here solely as a

13  charitable endeavor.

14       He'd like to see the companies continue.  He'd like to

15  see the jobs saved.  But he's the one that's got to live with

16  OpCo going forward.  And he wants to try to cut a deal that he

17  thinks gives him the best opportunity, the best stability going

18  forward, to make this company work.

19       So -- I mean, I'm making up numbers.  If the bid is

20  seventy-seven million dollars on a going concern and ABG is

21  putting in sixty and he's putting in seventeen, that doesn't

22  mean that it's going to be the same spread with another bidder

23  or that it necessarily should.  He's going to be making his own

24  risk evaluation, risk determination for negotiations.  And I

25  think if we had come to Your Honor and said Mr. Williams is the

1    only game in town, you can only do this with Mr. Williams, you

2    have no alternative, that would be grossly unfair. But it's

3    not.

4            Anybody is free to come in with any operator. Anybody

5    is free to make a bid for this or not. I think very highly of

6    Mr. Williams and his abilities, but I'm not so foolish as to

7    say he's the only operator of a well-known brand in the

8    country, much less well-known suits.

9            THE COURT: Well, let me see if I understand. Mr.

10   Williams is attempting to put together an A transaction. A

11   transaction --

12           MR. HALPERIN: Small "a" yes.

13           THE COURT: A versus B.

14           MR. HALPERIN: Not option A.

15           THE COURT: Option A. And in order to do that, he

16   needs financing.

17           MR. HALPERIN: Correct.

18           THE COURT: And he's been working on this for some

19   time.

20           MR. HALPERIN: Correct.

21           THE COURT: And he's working, at the moment, with

22   Salus?

23           MR. HALPERIN: Among others, but yes. He's furthest

24   along.

25           THE COURT: And maybe among others, but Salus has been

1  in this company for a long, long time, or at least for several

2  months, and has done quite a bit of due diligence.

3          MR. HALPERIN:  Correct.

4          THE COURT:  And I was just told that that's important

5  in the scheme of things, which I understand and respect.  I

6  guess the -- and the only question I think before me is when

7  that deal on financing is going to come together.

8          MR. HALPERIN:  If it were up to me it would -- I'm

9  sorry.

10          THE COURT:  And if it was up to you, it would have

11  come together a week ago.

12          MR. HALPERIN:  Absolutely.

13          THE COURT:  And I obviously can't tell the parties it

14  should be done on any particular date.  I'd want to give the

15  parties as much time as possible.  But it does seem to me that

16  we're now delaying everything very substantially.

17          MR. HALPERIN:  I would --

18          THE COURT:  And I don't want to tell Mr. Williams that

19  you have less time than you think you need in order to get your

20  financing in place, so that the market knows what the situation

21  is.  But it does seem to me, three days, may be a little bit

22  short -- unnecessarily short.

23          MR. HALPERIN:  I would -- I beg to differ on the

24  following basis.  I will tell you first that Mr. Williams

25  himself and all the other parties that are involved, I don't

1   think that anybody is trying to delay this to play games.

2           THE COURT:  No, no.  Nobody's trying to delay.

3           MR. HALPERIN:  Okay, no --

4           THE COURT:  I don't believe that would be the case.

5           MR. HALPERIN:  I certainly didn't get that impression

6   from Your Honor, but I wanted to put it on the record.  That's

7   the first thing.

8           The second thing is if we can get closure on terms of

9   a financing going forward, you can be sure that we're going to

10  announce to the world, hurray, we have financing, as quickly as

11  we can.  Beyond that, to the extent somebody comes to Salus and

12  says -- Mr. Keenan can talk about this himself -- but if

13  someone comes to Salus and says I want to do something with Mr.

14  Williams and I'd like to talk to you about the package you put

15  together with him because I want to make sure you're

16  comfortable with me being his licensor as well, I mean, Salus

17  is going to have a conversation with them and make their own

18  credit risk.  Mr. Williams is having conversations with people

19  and will make his own determination.

20          In terms of the timing, I think it's a little bit

21  disingenuous -- not wholly, but a little disingenuous for some

22  folks to say we don't know what to do, because frankly,

23  although -- maybe this unfair for me to say -- but I think the

24  parties that are here talking, quite frankly, if they wanted

25  to, had the ability to write a check for this entire thing, and

 1   they could underwrite Mr. Williams and say we'll make you a

 2   loan, and it wouldn't be an issue.  But nobody wants to do

 3   that; and I understand that.

 4           Maybe that's not in their own commercial interest, but

 5   it's not as if someone's sitting here, oh, woe is me, I don't

 6   have the ability to do this.  It's a tough situation.  If --

 7   and I'll be frank.  We would have been thrilled if we could

 8   have gotten bridge financing from any one of the parties that

 9   was willing to be here so that we weren't under this time

10   pressure.  But it hasn't been offered up.  So we're dealing

11   with the situation we've got.

12           In terms of the details, I don't know that it's really

13   right that every detail of his financing should be vomited out

14   onto the record.

15           THE COURT:  I bet you could find a better word than

16   that.

17           MR. HALPERIN:  Beautifully displayed on an elegant

18   platter --

19           THE COURT:  Displayed.

20           MR. HALPERIN:  -- with garnish all around.

21           THE COURT:  Displayed is better.

22           MR. HALPERIN:  What's relevant to the bidders, as far

23   as I can tell, is the fact that you know what the bids are, you

24   know what you're being asked to do.  If you'd like to work with

25   Mr. Williams, he's talking to people; he has an open mind and

1  he's talking to people.  And --

2         THE COURT:  So let me just clarify the situation.  The

3  proposal -- debtors' proposal that the committee has agreed to

4  is that financing would be required three days before the

5  auction?

6         MR. HALPERIN:  Correct.

7         THE COURT:  Is that right?  But that doesn't put it

8  before the bids.  Does it make sense to say all right, three

9  days before the bids?

10        MR. HALPERIN:  Your Honor, at the end of the day, I

11 would say no, because if we can get it done by then, we're

12 going to.  But if we can't get it done by then -- and that's

13 the thing that's really concerning me.  We're trying and we're

14 pushing.  If we can't, then at least --

15        THE COURT:  I think you ought to try.  And if you

16 can't, you ought to explain why you can't.

17        MR. HALPERIN:  I just don't --

18        THE COURT:  Is that impossible to live with?  This is

19 longer, by the way, than you originally proposed, because we're

20 putting everything out a week.

21        MR. HALPERIN:  We are, Your Honor.  And if Your Honor

22 will remember, you asked the question, and I conspicuously

23 avoided giving you a direct answer to the question at the last

24 hearing, and I was grateful you didn't push me when you said

25 I'm sure that the Mr. Williams entity would be grateful to have

1 | another week, because quite frankly, I didn't want to roil the
2 | negotiations that were going on.
3 |        THE COURT:  Well, I'm not saying that you're
4 | precluded.  I'm just saying, you ought to have a reason why it
5 | can't be done.
6 |        MR. HALPERIN:  I guess I'm just having a hard time
7 | understanding why whether Mr. Williams has reached financing or
8 | not that far in advance is going to matter.  I would sug - -
9 | what I would suggest is we ought to flip it a little bit.  What
10 | we ought to do is say that if somebody else wants to come in
11 | and put in an, I think it's option B bid, with Mr. Williams or
12 | with anybody else, they ought to be able to have until the same
13 | three days before to say that they have the same financing and
14 | that it's option A or option B, as opposed to taking Mr.
15 | Williams and rushing up his time frame, when he's doing
16 | everything he can to try and push this over the goal line.  I
17 | mean, it's --
18 |        THE COURT:  I don't want to deter him in the
19 | slightest.
20 |        MR. HALPERIN:  So I would rather flip it the other way
21 | and say if someone else comes in with a B bid, which is the
22 | going-concern bid, that they have the --
23 |        THE COURT:  No, that's the A bid, I'm sorry.  I think.
24 |        MR. HALPERIN:  I'm sorry.  I had it backwards --
25 |        THE COURT:  That's the A bid.

1          MR. HALPERIN:  -- the A bid, that they have the same

2     ability --

3          THE COURT:  They have the ability.

4          MR. HALPERIN:  -- to say we have until that time.

5          THE COURT:  They don't have to make their bid until

6     the 12th.

7          MR. HALPERIN:  But if we're giving our --

8          THE COURT:  But --

9          MR. HALPERIN:  -- three days before the auction would

10    be the 14th.  If they can get their bid in by the 12th --

11         THE COURT:  -- if you can get -- the 12th is a --

12         UNIDENTIFIED SPEAKER:  Wednesday.

13         THE COURT:  -- Wednesday.  If you can get your

14    financing together by the 7th, you ought to put it on the

15    table.  If you can't, you ought to just give a reason why.

16         Yes, let me hear from Salus.

17         MR. KEENAN:  Your Honor, I was just conferring with

18    our client.  And what we just mentioned was that it looks like

19    the 9th is definitely feasible.  I can go back and talk about

20    the 7th, but --

21         THE COURT:  That's Sunday.

22         MR. KEENAN:  That's Sunday.  That is a Sunday.  So

23    maybe we'll need the weekend.  But I think what we could do is

24    we could -- we can agree to make absolute best efforts to have

25    something in place by the 9th.

1          THE COURT:  Your client doesn't want to work on the

2     weekend.  Neither -- you may, but your client doesn't want to

3     work --

4          MR. KEENAN:  I often do.

5          THE COURT:  Why don't we -- all right.  Let me hear

6     from the debtor.

7          MR. KEENAN:  Sure.

8          MR. THOMAS:  Thank you, Your Honor.  Mark Thomas on

9     behalf of the debtors.  Until we came here today to agree to an

10    extension with the committee, I believe the debtors thought and

11    the stalking-horse bidder thought, and Mr. Williams thought,

12    that we were going to have an auction on the 10th, Monday, and

13    that the financing would be required on Thursday, December 6th.

14         From the debtors' standpoint, the sooner the better.

15    And if the financing can be finalized by December 6th, that is

16    a very important step.  It is one of the conditions to a going-

17    concern bid, and we would love for that to happen so we could

18    post that and people would know it.

19         If, for whatever reason, it can't be finalized and

20    closed by the 6th, maybe we could report.  But this is a

21    company -- Salus has only been in from August, but it's been a

22    long time since August.  It seems like we've been in it for a

23    very, very long time.  So from the debtors' standpoint -- and

24    we don't represent Mr. Williams, we're not negotiating that

25    financing; we don't represent Salus, we're not negotiating the

1  financing; we don't represent Authentic Brands, the stalking-
2  horse purchase, we're not negotiating the license agreement --
3  from the estates' standpoint, sooner is better.

4          And sometimes when there's an earlier deadline, people
5  focus and they work a little harder and they get things done.
6  So we're in favor of that.

7          With respect to -- if I may, with respect to
8  Carlyle -- counsel for Carlyle and Bluestar?  Last night at 10
9  o'clock we had a conversation with them that went for over an
10 hour.  I was on the phone along with the debtors' investment
11 banker, Mr. Richards of Blair.  Unfortunately, it was the first
12 time I had talked to them since over a week prior to the
13 petition date.

14         Bluestar has been involved in the pre-petition
15 marketing.  They wanted to be the stalking-horse purchaser.  I
16 think my last discussions with them were October 12th or
17 October 15th, pre-filing.  I haven't talked to them since --
18 until last night.

19         With respect to them and any other bidder, we, the
20 debtors, have been consistent:  What do you want?  What do you
21 need?  When do you want it?  Who have you asked?  And we will
22 do everything in our power to produce what we have and what we
23 control.  And the things that we don't have and we don't
24 control, things from the stalking-horse purchaser or things
25 from Salus, we are doing everything in our power to press them

1  to finish up that work.

2          We will continue to do everything in our power to

3  bring Carlyle and Bluestar across the finish line.  Carlyle is

4  a very big, sophisticated institution.  They know how to do

5  this.  Thirty-two years ago, when I started clerking for a

6  bankruptcy judge, I was taught two thing about buying companies

7  out of bankruptcy.  It's the M&M rule.  You need money and you

8  need management.  If you don't have money and you don't have

9  management, you can't buy the company.

10          So hopefully all the bidders out there know the M&M

11  rule.  And if they're listening in now, pay attention and let's

12  get moving.

13          THE COURT:  All right, thank you.

14          MR. KUGLER:  Your Honor.  Rob Kugler on behalf of the

15  committee.  I've been conspicuously quiet, because I'm kind of

16  caught between rock and a hard place, which seems to be my lot

17  in this case.

18          I agree with Your Honor -- not to be obsequious -- but

19  that an aspirational deadline that is not necessarily tethered

20  to whether Mr. Williams is a qualified bidder or not, is a good

21  thing.  And I think that the timing that you were talking

22  about, Friday the 7th, makes great sense -- or if you want to

23  go with Thursday the 6th, that makes great sense as well.

24          What we don't want to do, though, is lose Mr. Williams

25  as a qualified bidder; and the financing is a precondition to

1   him being a qualified bidder.  And I think that's why you're

2   seeing some consternation to my right.

3           And so I think what Your Honor has suggested is the

4   perfect solution.  Get the financing in place by that date, and

5   if you can't tell us why not.  I mean, presumably, there should

6   be a good reason.  There's no enormous hurdles to getting that

7   in place by them.  So that's the committee's position.

8           MR. HALPERIN:  As long as the parties are going to --

9   I have to speak to my client about this.  But as long as the

10  parties are going to say that if we don't have it in by that

11  date, it doesn't mean he's not a qualified bidder, I mean, what

12  am I going to say?  We're trying to do it earlier than that --

13          THE COURT:  That's --

14          MR. HALPERIN:  -- but let's be frank.  I'm going to

15  come in and say because we haven't reached agreement on all the

16  terms.  I mean, I can tell you that now, that's what I'm going

17  to say if I come in on the 7th and we're not done.

18          THE COURT:  You don't have to come in.  You just have

19  to -- you have to explain why.  I gather the 9th works.  The

20  9th is --

21          MR. HALPERIN:  To whom am I explaining?  That would be

22  helpful.

23          THE COURT:  The world.

24          MR. HALPERIN:  Tell me what the website is I'm going

25  to be posting on.

1         THE COURT:  The world; the world.  And what the

2    penalty is, I don't know.  But having a deadline does focus

3    attention.  Matters can get done.  If we were at -- if this was

4    Christmas Eve, it would get done.  So I am certain the parties

5    will do the best they can.  I'm sure nobody wants to work --

6    they'll be working over the weekend on other things.  And this

7    will give other bidders enough information to perhaps make a

8    bid for the A transaction, which seems to be what everybody

9    wants.

10        MR. HALPERIN:  Which is --

11        THE COURT:  And Salus has been -- I don't mean to put

12   any pressure on Salus whatsoever -- but they've been quite

13   cooperative since the first day of this case.

14        MR. HALPERIN:  True.

15        THE COURT:  And I'm not suggesting that they should or

16   they shouldn't be.  I'm sure you can -- if it doesn't work, you

17   can tell me why.

18        MR. HALPERIN:  That's okay.

19        THE COURT:  So we'll move on to the next issue.

20        MR. HALPERIN:  Just so we're clear, though, I hear

21   what you're saying; I understand the deadline.  We're going to

22   do our darndest to get it done before that.

23        THE COURT:  You have --

24        MR. HALPERIN:  And if not we'll explain.  I don't have

25   the intention of then afterwards telling people, by the way,

1   here's my deal with ABG about how much I'm putting into this

2   deal.  Because that's forcing me to do the same deal with

3   someone else that I may not be as comfortable with or

4   otherwise.

5        I have my financing; it's in place.  Let's negotiate a

6   deal that you can live with.  And you know that I have my

7   financing.  If you want to finance me otherwise or if you want

8   to talk to Salus, god bless.  And as we're all saying, talk to

9   Salus now.  That would be helpful.

10        THE COURT:  Yes.  But this is a free and open auction.

11        MR. HALPERIN:  Absolutely.

12        THE COURT:  And hopefully it will go forward smoothly.

13   But that's what I -- I may have to sort it out.

14        MR. HALPERIN:  Understood.

15        THE COURT:  All right, thank you.

16        MR. HALPERIN:  Thank you.

17        MS. LAUKITIS:  Your Honor, just a point of

18   clarification.  I believe the licensing agreement was

19   required -- was one of the documents that was required to be

20   provided three days before the auction previously.  Now Mr.

21   Halperin is suggesting he's not going to provide it and will

22   only provide details on the financing.

23        THE COURT:  No, I don't think he was suggesting that.

24        MR. CHESLEY:  No, Your Honor.  The license agreement

25   was posted, at the Court's request, I think two weeks ago.

 1  There are two minor clarification edits that will be -- that

 2  are being signed off on today.  So that agreement has been done

 3  for quite some time.

 4          THE COURT:  All right.  The fourth issue?

 5          MR. THOMAS:  Your Honor the --

 6          THE COURT:  I hope it's a simpler issue.

 7          MR. THOMAS:  It's going to be much simpler, Your

 8  Honor.  It is the Salus claim discount issue, which is a letter

 9  agreement that was entered pre-petition between the debtors and

10  Salus, and filed as docket number 114.  It's going to be easy

11  because the committee wasn't sure how that might impact

12  bidding.  And we've worked out how it would impact bidding, and

13  we put it in the bid procedures order.

14          And it basically provides that to be a qualified

15  minimum bid, the A bid has to have a cash -- sort of opening

16  purchase price of 72,795,000 dollars.  And that's based on

17  building up the amount that's owed to Salus, plus the ABG offer

18  to the estate, plus the break-up fee, plus the expense

19  reimbursement, plus the minimum overbid.  And that comes up to

20  72,795,000 dollars.  And that is the floor cash purchase price

21  for a qualified bidder to qualify for the auction.

22          And for the B bid, it's the same build-up, but it

23  becomes 76,975,000 dollars, because the stalking-horse purchase

24  agreement provides for a 9.1 million dollar payment to the

25  estate under the B bid, as opposed to a 5.1 million dollar

1   payment to the estate under the A bid.  So the bidders will

2   know where they have to bid at.  And we've resolved it and

3   clarified it to the -- and the committee agrees.

4            THE COURT:  All right.  Does anyone wish to be heard?

5            MR. KUGLER:  Your Honor, just by way of disclosure to

6   the Court.  There is a dispute between the debtor and Salus on

7   the one side and Authentic Brands on the other side, as to what

8   happens in certain circumstances to the three million dollar

9   discount.  We've agreed to put that off until a later date,

10  because we're all very hopeful and even maybe a little bit

11  optimistic that the result of the auction will obviate the need

12  to litigate that issue.  But I don't want that to get lost in

13  the shuffle here, that that is out there and we've agreed to

14  set it aside.

15           THE COURT:  All right.

16           MR. THOMAS:  Yes.  Yes, that is.

17           THE COURT:  Well, then --

18           MR. THOMAS:  We're reserving all rights.  There's a --

19  we think there's a very low, low likelihood that there might be

20  a dispute between the stalking-horse purchaser and the estate.

21  But based on the interest of other parties, we think that's not

22  going to happen.

23           THE COURT:  All right.  Then you'll provide me with an

24  appropriate order closing these four issues with regard to the

25  sale, setting the dates; and I will check immediately after

1  this hearing to be sure that I can give you the time.

2           MR. THOMAS:  Thank you.

3           THE COURT:  I'm quite sure I can on the afternoon of

4  the 19th.  We can certainly proceed on the 20th or the 21st if

5  we need to, but let's not be pessimistic.

6           MR. THOMAS:  We're hoping for the best, but preparing

7  for the worst, Your Honor.  I will then pass this on to Mr. --

8  my colleague, Mr. Pete Young, who will take care of the rest of

9  the agenda.

10          THE COURT:  The rest of the agenda.  All right.

11          MR. CHESLEY:  Your Honor, before moving on, may I be

12 excused.  Our presence is not necessary for the rest of the

13 agenda.

14          THE COURT:  Very good.

15          MR. CHESLEY:  Thank you.

16          MR. YOUNG:  Thank you, Your Honor.  Peter Young,

17 Proskauer Rose for the debtors.  Your Honor, the remaining

18 items on the agenda, many of which are first-day items, though

19 we're quite a ways from the first day, as Your Honor knows, we

20 have set forth on the agenda, at docket number 181 --

21          THE COURT:  All right.  Why don't we go through them

22 quickly?

23          MR. YOUNG:  Absolutely.  And we've resolved, Your

24 Honor, all of the issues of the committee and the --

25          THE COURT:  All right.  Tell me --

1          MR. YOUNG:  -- U.S. Trustee.

2          THE COURT:  -- are.  I've read the objections.

3          MR. YOUNG:  The resolutions, Your Honor, on the -- and

4    let me say generally.  The resolutions generally were about

5    committee consultation.  But in the final order on wages, for

6    example, Your Honor, number 3 --

7          THE COURT:  Well, let's go through it.  Final order on

8    wages.

9          MR. YOUNG:  Sure.

10         THE COURT:  The committee had some objections.  What

11   are the resolutions?

12         MR. YOUNG:  The resolutions, Your Honor, are that we

13   added a sentence saying "absent further court order, no pre-

14   petition amount may be paid to any third-party non-employee

15   entity, where such entity has an obligation to continue

16   providing services to the debtors, notwithstanding the pre-

17   petition amount outstanding; and such entity has no right,

18   either by order of the court or otherwise, to be paid before

19   other similarly situated creditors."

20         That is the substantive revision that we made to that

21   order on account of the committee's objection.

22         THE COURT:  Does anyone wish to be heard?

23         All right.  Item 4, procedures for 503(b)(9) claims.

24         MR. YOUNG:  Your Honor, the primary objection of the

25   committee was that they wanted to be provided notice, and they

1  wanted the right to, along with the debtors, object to

2  503(b)(9) claims.  We gave them those rights and integrated

3  into this order the notice to the committee of objections, and

4  the right to consultation on settlement of 503(b)(9) claims.

5          THE COURT:  All right.  It does seem to me that some

6  of these orders should probably be -- or some of these issues

7  should certainly be postponed until after the sale.  Things

8  will look different at that time.  I don't know that the debtor

9  should be paying 503(b)(9) claims at this point.

10         MR. YOUNG:  We are not paying them, Your Honor.  This

11  is a --

12         THE COURT:  You're not paying them.  And --

13         MR. YOUNG:  -- process by which to channel the claims,

14  because the company's been getting a lot of inquiries from

15  potential claimants about how to do it and when to submit them.

16  And this is a just a procedural order.

17         THE COURT:  All right.  I also recall, I believe, that

18  the debtors' counsel has assured me that the sale does not

19  contemplate the business remaining being administratively

20  insolvent.

21         MR. YOUNG:  That's right, Your Honor.

22         THE COURT:  The sale as proposed to the stalking-horse

23  bidder does not leave the debtors in Chapter 11 without the

24  ability to pay its administrative and priority claims.

25         MR. YOUNG:  That's right, Your Honor.  The formula in

 1   both the A and B bids contemplate an amount that the debtors

 2   have estimated would cover all of those claims.

 3            THE COURT:  All right.  Okay, item 5?

 4            MR. YOUNG:  Item 5, Your Honor, is the taxes motion.

 5   The one substantive change that we made in response to the

 6   committee's objection was to give the committee consultation

 7   rights with respect to any proposed payment of taxes and

 8   regulatory fees, and only in the event that the committee

 9   objects, to seek further order of the court to pay such taxes

10   and fees.

11            THE COURT:  All right.  Does anyone wish to be heard?

12            Okay.  Item 6?

13            MR. YOUNG:  Your Honor, item 6, the committee asked

14   for a couple of revisions:  one to cap the amount of the

15   prospective payments to shippers and customs, in accordance

16   with what we requested in the motion, which we've now added to

17   the order, and again, give the committee consultation rights

18   with respect to expenditures under this order, with the caveat

19   that we will seek court authority in the event that the

20   committee would object to any of those payments.

21            THE COURT:  Very well.  Does anyone wish to be heard?

22            All right.  Item 7?

23            MR. YOUNG:  Again, Your Honor, this is the insurance

24   motion.  With respect to the committee's objection, we have

25   added that we will not spend greater than the cap that was set

1   forth in the motion, subject to further order of the court, and
2   again, giving the committee consultation rights, in this case,
3   with respect to not only new policies into which the debtors
4   may propose to enter, but also with respect to any life
5   insurance policies that the debtors make payments on account
6   of.  The committee asked that they have consultation rights,
7   specifically, with respect to those life insurance policies.
8           THE COURT:  Does anyone wish to be heard?
9           All right.
10           MR. YOUNG:  Your Honor, on ordinary course
11   professionals, we made substantive changes to the proposed
12   order based on the comments of Mr. Khodorovsky and the United
13   States Trustee, to make sure that this applied only to counsel
14   that the company engages, and not other professionals who are
15   engaged in the ordinary course.  We also substantially revised
16   the declaration of disinterestedness form to comply with the
17   United States Trustee's wishes.  Those changes then obviated
18   the need to make additional changes as requested by the
19   committee.
20           THE COURT:  All right.  Does anyone wish to be heard?
21           All right.  I'm not sure you need the order at all,
22   but since you spent so much time and effort on it.
23           MR. YOUNG:  Thank you, Your Honor.
24           THE COURT:  If the sale goes through, certainly if the
25   A sale goes through, I don't know whether you'll need it at

HMX ACQUISITION CORP., ET AL.                          50

 1  all.  But --
 2          MR. YOUNG:  That very well may be true.
 3          THE COURT:  -- having it doesn't mean you have to hire
 4  anybody.
 5          MR. YOUNG:  Exactly right, Your Honor.  We appreciate
 6  that.
 7          THE COURT:  All right.
 8          MR. YOUNG:  Your Honor, with respect to the balance of
 9  the motions, at number 9 through 14 -- I'm sorry, through 16 --
10  there were no objections from the committee.  There were
11  comments given by the United States Trustee.  And in each case
12  we have integrated those comments.  We made sure to pick up any
13  comments that the United States Trustee provided to us that
14  were integrated into interim orders, so that as we pursue final
15  orders, those comments have been baked in to the extent that
16  they could be.
17          THE COURT:  All right.  Well, these are important
18  motions.  I'm simply going to go through them.
19          MR. YOUNG:  Sure.
20          THE COURT:  First is a motion of the debtors for entry
21  of a final order authorizing bank -- use of existing bank
22  accounts, business forms, and more important, the existing cash
23  management system.
24          Item 10 is a motion for an order authorizing the
25  debtors to maintain and administer customer programs and honor

1   related pre-petition obligations to customers.  It's on a final

2   basis.

3           11:  procedures for interim compensation and

4   reimbursement of expenses.  12:  rejection of unexpired leases

5   of nonresidential real property.  13:  employment and retention

6   of Proskauer Rose as counsel for the debtors.  14:  retention

7   of William Blair & Company as investment banker, with

8   appropriate revisions requested by the U.S. Trustee, I assume?

9           MR. KHODOROVSKY:  Your Honor, Nazar Khodorovsky for

10  the U.S. Trustee.  In light of the supplemental declaration of

11  Mr. Richards and the revisions to the proposed order made by

12  the debtors and William Blair, the U.S.T. has no objection.

13          I have been informed, Your Honor, right before the

14  hearing, that there'd been additional revisions to the order

15  made at the request of the creditors' committee.  And I

16  think -- and these are extensive revisions to the compensation

17  structure.  I think it may be useful, maybe for committee

18  counsel to go through them.  These did not originate with the

19  U.S. Trustee's Office.  Thank you, Your Honor.

20          THE COURT:  All right, I think --

21          MR. YOUNG:  Your Honor, Mr. Khodorovsky --

22          THE COURT:  -- they should be.

23          MR. YOUNG:  -- is correct.  In response to an informal

24  objection by the committee to the order approving the Blair

25  retention, we made a number of revisions including to the

1  compensation structure payable to Blair.

2        THE COURT:  I looked at the compensation structure

3  myself last night.  Tell me what those revisions are.

4        MR. YOUNG:  Those revisions specifically, Your Honor,

5  are to delete the forbearance fee and credit facility

6  transaction fee from the Blair engagement letter; a credit of a

7  hundred percent of the post-petition monthly fees against the

8  M&A or financing fee; and a reduction, Your Honor, in the

9  incremental aggregate consideration level payments on the

10 transaction fee, to the extent that 15.d of the engagement

11 letter is revised -- and I can read it into the record for Your

12 Honor's benefit; but it will be in the proposed order that

13 we'll submit.

14        Up to and including fifty million dollars of aggregate

15 consideration, the Blair fee is 1.85 percent.  More than fifty

16 million up to but not including sixty-five million, the

17 increased fee is 2.4 percent.  Sixty-five million up to and not

18 including eighty, is 3.25 percent.  Eighty and up to but not

19 including one hundred is 4 percent.  And one hundred million

20 and up is 5 percent.  Those are the rates to which the

21 committee and Blair have agreed, and the debtors support.

22        THE COURT:  Does anyone wish to be heard?

23        MR. KHODOROVSKY:  Your Honor, the U.S.T. has no

24 objection to this revised compensation structure and including

25 the other revisions made, the U.S.T. has no objection.  Thank

 1 | you, Your Honor.
 2 |          THE COURT:  Well, these are important amendments, and
 3 | I appreciate the parties' willingness to resolve the issues.
 4 |          MR. YOUNG:  Sure.
 5 |          THE COURT:  All right.  Item 15?
 6 |          MR. YOUNG:  Item 15, Your Honor, is a retention under
 7 | 327(a) of Epiq Bankruptcy Solutions.  Epiq was retained as the
 8 | debtors' claims and notice agent under 156(c).  But this, Your
 9 | Honor, gives them the authority to engage in not only preparing
10 | schedules and statements, but also to engage in balloting and
11 | tabulating and other procedural stuff that's not covered under
12 | 156(c).
13 |          THE COURT:  Does anyone wish to be heard?
14 |          All right, we'll enter an appropriate order.  And
15 | number 16, finally?
16 |          MR. YOUNG:  There were no comments from the committee,
17 | Your Honor, on the engagement of CDG.  There were comments by
18 | the United States Trustee, all of which we took and integrated
19 | into the proposed order.
20 |          THE COURT:  Very good.  Does anyone wish to be heard?
21 |          All right.  Then we'll enter an appropriate order.
22 | And there is no success fee --
23 |          MR. YOUNG:  Correct.
24 |          THE COURT:  -- or transaction fee for the CDG Group?
25 |          MR. YOUNG:  Correct, Your Honor.  To clean up the

1    record and the Court's docket, we have withdrawn two motions,

2    one of which is the motion for entry of an order establishing

3    notice, case management, administrative procedures.  Given the

4    pace at which this case has moved, we didn't think that we were

5    going to be able to stay within the confines of what we had set

6    forth in the proposed order, so we've withdrawn it.

7            And at the direction of Your Honor, we have withdrawn

8    the motion to pay critical vendors, to the extent not

9    heretofore granted, in very limited capacity, which Your Honor

10   gave us at one of the telephonic hearings during the -- I guess

11   it was right post storm, I think it was.

12           THE COURT:  Does anyone wish to be heard on any of the

13   issues?

14           Very good.  Well, I appreciate very much your being

15   able to get us here today.  Tell me when is our -- our next

16   hearing, is that the sale hearing on the 19th?

17           MR. YOUNG:  That's correct, Your Honor.

18           THE COURT:  We'll use that as the --

19           MR. YOUNG:  Yes, if you're available that date --

20           THE COURT:  -- date for the initial case conference

21   then.

22           MR. YOUNG:  Yes.  We'll also probably file a few

23   additional procedural things to be heard on that date well, and

24   notice them up.

25           THE COURT:  All right.  Anything else?

1          Thank you very much.

2          IN UNISON:  Thank you, Your Honor.

3     (Whereupon these proceedings were concluded at 11:12 AM)

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1

2                                    **I N D E X**

3

4                                     RULINGS

5                                                          Page        Line

6   Debtors' bidding procedures motion will be       44          23

7   approved upon receipt.

8   Debtors' final wage motion, granted.             46          23

9   Debtors 503(b)(9) procedures motion is           48          3

10  granted.

11  Debtors' tax motion is granted.                  48          12

12  Debtors' final shipper and warehouser motion     48          22

13  is granted.

14  Debtors' insurance motion is granted.            49          9

15  Debtors' ordinary course professionals motion    49          21

16  is granted.

17  Debtors' cash management order is granted.       50          20

18  Debtors' customer program motion is granted.     50          24

19  Debtors' interim compensation motion is          51          3

20  granted.

21  Debtors' motion to reject certain leases is      51          4

22  granted.

23  Debtors' motion to retain Proskauer Rose is      51          5

24  granted.

25

1

2                                   RULINGS

3                                                     Page        Line

4    Debtors' motion to retain William Blair &        53          5

5    Co., granted

6    Debtors' motion to retain Epiq under 327(a)       53          14

7    granted

8    Debtors' motion to retain CDG Group is            53          21

9    granted.

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1

2                    C E R T I F I C A T I O N

3

4    I, Penina Wolicki, certify that the foregoing transcript is a

5    true and accurate record of the proceedings.

6

7

8

9

10

_____

11

PENINA WOLICKI

12

AAERT Certified Electronic Transcriber CET**D-569

13

14

eScribers

15

700 West 192nd Street, Suite #607

16

New York, NY 10040

17

18

Date:  December 4, 2012

19

20

21

22

23

24

25