Mark K. Thomas
Peter J. Young
PROSKAUER ROSE LLP
Three First National Plaza
70 West Madison, Suite 3800
Chicago, Illinois 60602
Tel: (312) 962-3550
Fax: (312) 962-3551

- and -

Jared D. Zajac
PROSKAUER ROSE LLP
Eleven Times Square
New York, New York 10036
Tel: (212) 969-3000
Fax: (212) 969-2900

*Counsel for the Debtors and Debtors in Possession*

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| HMX ACQUISITION CORP., *et al.*,[1] | ) | Case No. 12-14300 (ALG) |
| | ) | |
| Debtors. | ) | (Jointly Administered) |

## DEBTORS' OMNIBUS RESPONSE TO OBJECTIONS TO PROPOSED SALE OF SUBSTANTIALLY ALL OF THEIR ASSETS TO AUTHENTIC BRANDS GROUP, LLC

The above-captioned debtors and debtors in possession (collectively, the "Debtors"), by and through their undersigned counsel, file this omnibus response (the "Response") to objections to the Debtors' motion for an order approving the sale of substantially all of their assets, filed October 21, 2012 [Docket No. 21] (the "Sale Motion"), to Authentic Brands Group, LLC ("ABG") upon terms set forth in the asset purchase agreement, dated as of October 16, 2012, between ABG and certain Debtors and their subsidiaries (the "Sellers"), which agreement is

---

[1] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, to the extent applicable, are: HMX Acquisition Corp. (9861); HMX Poland Sp. z o. o.; HMX, LLC (8971); Quartet Real Estate, LLC (8973); and HMX, DTC Co. (0162).

attached as Exhibit A to the Sale Motion (as amended, the "<u>Stalking Horse Agreement</u>"), and respectfully represent:

<b><u>Preliminary Statement</u></b>

1.        The Debtors have received only one qualified bid – the bid submitted by ABG under the Stalking Horse Agreement – and they seek this Court's approval for the going concern sale of substantially all of their assets to ABG.   The result of the Debtors' sale process exemplifies that "Money" and "Management" are the critical components necessary to any successful purchaser of a business pursuant to section 363 of title 11 of the United States Code (the "<u>Bankruptcy Code</u>").   The buyer's "Money" either can be financing from a new debt or equity source, or financing from debt and equity sources already in the debtor's capital structure. The buyer's "Management" either can be new management that the buyer recruits, or old management that managed the selling debtor prior to the chapter 11 proceeding.  In section 363 sales, however, a selling debtor cannot force buyers to: (i) make their "Money" or their "Management" available to other bidders; or (ii) make their confidential and proprietary business plans and models available to other bidders.  But this is the gist of the objection of the official committee of unsecured creditors (the "<u>Committee</u>").

2.        The Committee complains that ABG and Douglas L. Williams, the Debtors' CEO (who would license certain rights from ABG), did not disclose (i) how they would finance their acquisition, (ii) how they would allocate purchased assets and assumed liabilities among themselves, or (iii) their business plans or models for running the business if they were the successful bidder.  The Committee's complaint is surprising since its own proposed financial advisor, Zolfo Cooper, is believed to have had at least four (4) detailed meetings with ABG regarding the sale and the terms of its bid.  Nonetheless, the information above is not required for

a bidder with "Money" and "Management" to decide what assets to buy, what liabilities to assume, and how much to pay. And, as discussed in detail below, the Committee's allegations are just that – allegations. In fact, the key terms of the Licensing Agreement (as defined below) between ABG and Mr. Williams (which was executed on December 11, 2012) were disclosed in an exhibit to the Sale Motion *on October 21, 2012*, and various iterations of it (prior to its being finalized) were posted in the Debtors' electronic data room. Similarly, Mr. Williams met with bidders and discussed, in detail, his proposed business plan and model for operating the "OpCo" business if Mr. Williams reached agreement with ABG on an "IPCo/OpCo" bid (a firm, non-conditional IPCo/OpCo bid was executed on December 11, 2012 and posted in the Debtors' data room). And, throughout the sale process, the Debtors and Mr. Williams consistently told all bidders he was ready, willing, and able to discuss a form of Licensing Agreement and his business plans with them (whether or not they wanted to retain him as Management). Mr. Michael A. O'Hara, the Debtors' independent director and manager, urged Mr. Williams not to enter into any *exclusive* agreements with any potential bidders, because Mr. O'Hara and the Debtors believed that having Management "locked up" with any single potential bidder would chill bidding. Accordingly, Mr. Williams did not agree to any *exclusive* agreement with ABG or any other bidder (even in the face of threats from one bidder to withdraw from the sale process if Mr. Williams refused to sign an *exclusive* agreement).

3. After extensive marketing efforts commencing in August 2012, the Debtors extended the December 12, 2012 Bid Deadline (as defined below) to December 14 for certain specified bidders, and then further extended the Bid Deadline for one bidder until December 17 at 8:00 a.m. (prevailing Eastern Time). On December 14, 2012, the Debtors received a bid from an entity created by The Carlyle Group and Bluestar Alliance (both of whom have been engaged

in the sale process since September 2012, prior to the commencement of the Debtors' bankruptcy cases) (the "Carlyle/Bluestar Bid"). The Debtors and Mr. O'Hara welcomed the receipt of the Carlyle/Bluestar Bid for several reasons. First, it vindicated the Debtors' decision to insist that all bidders consider the "IPCo/Opco" structure set forth in the Stalking Horse Agreement, because that is the only structure under which the Debtors' business could be sold as a going concern, thereby preserving jobs and employment.[2] Second, it vindicated the decision of the Debtors and Mr. O'Hara to advise Mr. Williams to refuse to execute an *exclusive* agreement with any bidder, because even though Carlyle/Bluestar was the bidder that demanded an *exclusive* agreement and threatened to withdraw from the sale process without one, they went ahead and made a bid without an *exclusive* agreement.[3]

4.      Since the submission of the Carlyle/Bluestar Bid, the Debtors and their professionals engaged in numerous good faith discussions with Carlyle and Bluestar over the weekend. However, on December 17, 2012 at approximately 8:30 a.m. (prevailing Eastern Time), the Debtors were informed by counsel that Carlyle and Bluestar had withdrawn their bid. A copy of the e-mail from their counsel is attached hereto at Exhibit A. Accordingly, the Debtors, not having received any other bids for their assets, cancelled the auction scheduled for December 17, 2012 (the "Auction") and will seek this Court's approval of the sale of substantially all of their assets to ABG pursuant to the Stalking Horse Agreement. The Debtors believe that the bid by ABG represents the highest or otherwise best offer received for the Debtors' assets and will preserve the jobs of over 1,100 employees. No potential bidder was willing to purchase the Debtors as a going concern, with their associated U.S. manufacturing

---

[2] As discussed below, the Debtors never received a credible, acceptable bid to purchase all of their assets and operations as a single going concern sale.

[3] Frankly, Mr. Williams' refusal to acquiesce to threats that he execute an *exclusive* agreement is the best evidence that he acted in the best interests of the Debtors and their estates, as opposed to acting in his best personal interests.

facilities and union workforce. The "IPCo/OpCo" structure simply is the only way to preserve the enterprise and its jobs. As demonstrated below, the sale satisfies all the requirements of section 363 of the Bankruptcy Code, thereby enabling this Court to approve the transaction.

5.      Despite the withdrawal of the Carlyle/Bluestar Bid and the lack of any other bidder (qualified or unqualified), the Debtors chose to promptly file this response so that the record is clear as to why the Debtors cancelled the Auction in advance of the sale hearing so that such proceedings are not tainted with the Committee's inaccurate and inflammatory rhetoric contained in their previously filed objection to the Sale Motion.

6.      Indeed, the Debtors' ability to consummate the sale to ABG is a superior result than what almost occurred only a few months ago. In July 2012, the Debtors were faced with the real possibility of not meeting payroll, ceasing all operations, terminating all their employees, and liquidating their assets. This was because a 2009 secured loan facility had matured and the Debtors' attempted refinancing had failed. The sale that the Debtors now put before this Court for approval was a team effort, which included the hard work and stewardship of Mr. O'Hara, the Debtors' independent director and manager. The Debtors are pleased to seek this Court's approval of the sale of substantially all of their assets to ABG.

<u>**Summary of Objections**</u>

7.      The Debtors have received several objections to approval of the sale. Most of the objections are from creditors with respect to proposed cure amounts, the assumption and assignment of certain contracts, and certain language in the Stalking Horse Agreement and proposed sale order. As set forth on <u>Exhibit B</u> accompanying this Response, the Debtors have resolved or expect to resolve each of the objections raised by those parties.

8.     The Debtors received one substantive objections from the Committee and two from Workers United, SEIU ("<u>Workers United</u>") [Docket Nos. 74, 233, and 234] (the "<u>First Workers United Objection</u>," the "<u>Committee Objection</u>," and the "<u>Second Workers United Objection</u>," respectively).  The foregoing objections overlap and go to the Debtors' ability to consummate the sale to ABG.  Both of these objections are meritless and should be overruled.

9.     The Committee Objection focuses primarily on two issues: (i) that the sale to ABG, a non-insider, should be subject to "heightened scrutiny" because it "involves" Mr. Williams; and (ii) that the sale to ABG has not been proposed in good faith and has been designed to chill bidding.  The fact that Debtors received the Carlyle/Bluestar Bid mandates that the Committee and Workers United Objections be overruled.  The Carlyle/Bluestar Bid rebuts the claim that one bidder needs to see another bidder's financing and business model.  It rebuts the claim that bidders were confused – and perhaps demonstrates that in fact it was the Committee that has been confused.  It rebuts the claim that an insider "managed the entire sale process."   The Committee also attempts to impugn the integrity of Mr. O'Hara, who has independently overseen the entire sale process, which process has been run by the Debtors' retained investment banker, Mr. Geoffrey Richards of William Blair & Company, L.L.C. ("<u>Blair</u>").  The Committee's arguments have no merit and should be summarily overruled.

- Mr. O'Hara, the Debtors' independent director and manager, has been vested with sole decision making authority with respect to the sale process and has exercised that power with complete integrity, fairness, and transparency.  The Committee's allegations to the contrary are false and have no basis in fact.  The Committee should be admonished for making unsubstantiated comments without a single shred of evidence in support of its allegations.

- Although "heightened scrutiny" does not apply to this transaction because an insider is not on both sides of the transaction – Mr. O'Hara is acting independently for the Debtors – the sale to ABG meets the criteria for approval under any standard, including any "heightened scrutiny" standard.

- The Debtors have met the standards necessary to establish that a sound business justification for the sale exists and the sale is within the sound exercise of their business judgment. The Committee has suggested the sale process lacks "good faith" because it was designed to "chill the bidding" by, among other things, the speed of the process, confusing contract terms, and lack of access to information. Not only has the Debtors' sale process been conducted openly, but it has been conducted in accordance with Court-approved bid procedures. None of the Committee's allegations have any factual or legal validity.

10. The Committee argues that a sale process that commenced in August 2012, with an extended Bid Deadline of December 14, 2012, is a "one month timeline" and thus, too fast. The Debtors respond that a four month sale process is not a "one month timeline." The Committee complains about "unclear" and "confusing" sale terms. *See* Committee Objection at 8-9. The facts, however, undermine the Committee's assertions:

- every bidder that read the Stalking Horse Agreement knew that such agreement contained both a going concern, "IPCo/OpCo" bid (set forth at Sections 2.5 and 2.6(a) of such agreement) as well as a "liquidation" bid (set forth at Section 2.6(c) of such agreement), and they knew that the going concern bid was subject to execution of a Licensing Agreement and satisfaction of a Licensee (as defined below) financial wherewithal contingency; moreover, discussions with the Debtors' advisors made the basic bid structure crystal clear;

- the key economic terms of the Licensing Agreement were set forth on Exhibit E to the Stalking Horse Agreement, which was attached to the Sale Motion, and various iterations of the Licensing Agreement (which was finalized on December 11, 2012) were posted in the data room;

- the list of potential assumed contracts and cure costs was Schedule 2.3 to the Stalking Horse Agreement and was attached to the Sale Motion and the cure schedule was Schedule 3.7 to such agreement and was filed with the Court in accordance with the second revised order approving bid procedures in connection with the proposed sale, entered November 29, 2012 [Docket No. 185] (the "Bid Procedures Order");

- the liabilities under Mr. Williams's employment agreement could be ascertained by reviewing that agreement in the Debtors' data room;

- the potential agreements between ABG and Mr. Williams regarding which assets or liabilities would be taken by ABG or the Licensee were not needed in order for a competing bidder to make a bid for some or all of the Debtors' assets;

- the Committee's own proposed financial advisor, Zolfo Cooper, met with ABG on at least four (4) separate occasions and had more than ample opportunity to clarify any remaining questions the Committee may have had;

- both in open Court and in discussions with bidders the Debtors and the proposed Licensee disclosed that any bidder could enter into a Licensing Agreement;

- ABG and the Licensee did not disclose their financing arrangements, because any bidder needs to find its own Money; and

- the Salus Claim Discount (as defined below) issue was resolved, after the Committee raised it, in the Bid Procedures Order, and never impacted the "floor" bid that a competing bidder had to make. In fact, the Committee agreed to a Bid Procedures Order that set a firm minimum purchase price floor.

11. Finally, the Committee's complaints about "lack of information" virtually all contend that one bidder would not disclose its Money, its Management, or its business plans to other bidders. In fact, however, the Debtors, Mr. Williams, and Mr. O'Hara attended meetings with bidders where Money, Management, and prospective business plans were disclosed and discussed. And the proposed "business model" for the Licensee was posted in the data room. Put simply, the uncontested facts belie the Committee's contentions and speculation.

12. The Committee and Workers United both argue that the sale would violate the terms of the Debtors' collective bargaining agreement ("CBA") with Workers United, filed November 5, 2012 [Docket No. 87], the National Labor Relations Act, and section 1113 of the Bankruptcy Code. The Committee and Workers United, however, both apparently support the Carlyle/Bluestar Bid, which has the identical structure to the Stalking Horse Agreement. In any event, the Committee and Workers United simply are wrong on the facts and law. Their arguments easily can be dispensed with, as set forth in more detail below, but may be summarized as follows:

- Under the Stalking Horse Agreement, the CBA with Workers United is being assumed and assigned to the Licensee in its entirety. There are no modifications, adjustments, or changes to its terms, and therefore section 1113 of the Bankruptcy Code is inapplicable. In addition, the CBA does not require any specific business

structure to be maintained by its signatory nor does it require that the Debtors' intellectual property rights be held by the signatory to the CBA.

- The business structure contemplated by the Stalking Horse Agreement is not inconsistent with the "Job Protection" provision of Workers United's CBA, which prohibits the Debtors from manufacturing Hickey Freeman or Hart Schaffner Marx garments in factories that are not under contract with Workers United or an affiliate. There simply is no statutory or contractual impediment to the IPCo/OpCo structure. Moreover, the CBA will still be applicable to the Licensee and, pursuant to the express terms of the Job Protection provision, the Licensee will be prohibited from engaging manufacturers or contractors not under contract with Workers United.

- The concern that the Licensing Agreement requires that the Licensee "overpay" ABG in exchange for intellectual property rights and that the Licensee's payment obligations will disadvantage Workers United and its membership is simply speculation. Moreover, the Debtors are not asking the Court to approve the Licensing Agreement, only the sale of the Debtors' assets. The consideration paid by the parties to the Licensing Agreement is not an issue before this Court.

13.    Finally, the Committee Objection includes numerous allegations that are patently false and inaccurate, including the following: (i) the sale process encompassed a "one month timeline;" (ii) the Debtors refused to extend the Bid Deadline; (iii) Mr. Williams is "manag[ing] the sale process;" (iv) Mr. Williams "executed multiple affidavits;" (v) Mr. O'Hara agreed to reduce his fee after the Debtors filed chapter 11; and (vi) the sale was engineered to favor "Mr. Williams, his preferred lender and his preferred purchaser."

14.    For all the reasons set forth above, below, and in the accompanying declarations, the Debtors respectfully request entry of an order approving the sale of substantially all of their assets to ABG.

**Background**

I.    **The Debtors' Failed Attempt to Refinance Their Prepetition Credit Agreement and the Prepetition Sale Process**

15.    Beginning in 2011, the Debtors sought to refinance their borrowings under the prepetition credit agreement, dated as of August 7, 2009 (as amended, the "Prepetition Credit

Agreement") and, as of July 2012, were on target to consummate a refinancing with SKNL North America B.V., the 95% equity owner of the Debtors' parent company ("SKNL"), through a substantial equity infusion. However, shortly prior to closing, SKNL disclosed it lacked adequate funds to make the required equity infusion, thereby triggering a default under the Prepetition Credit Agreement and acceleration of all obligations thereunder. *See* Declaration of Doug Williams, filed October 21, 2012 [Docket No. 3] (the "Williams Declaration") at ¶¶22-23; Declaration of Geoffrey A. Richards of Blair in Support of the Debtors' Proposed Sale of Substantially All of Their Assets, filed contemporaneously herewith (the "Richards Declaration"), at ¶¶9-10; Declaration of Michael A. O'Hara, Independent Director and Manager of the Debtors, in Support of the Debtors' Proposed Sale of Substantially All of Their Assets, filed contemporaneously herewith (the "O'Hara Declaration"), at ¶¶8-10.

16.     On August 14, 2012, the Debtors entered into Amendment No. 7 to the Prepetition Credit Agreement, which, among other things, (i) appointed Mr. O'Hara as the Debtors' independent director and manager and "irrevocably" granted him the "sole and exclusive power" to make all decisions and execute all documents with respect to a "Sale Process" and a "Bankruptcy Process;" (ii) required that the Debtors retain an investment banker to run a marketing and sale process upon a specified schedule; and (iii) gave SKNL until August 22, 2012 to provide the required equity infusion. *See* Williams Declaration at ¶24; Richards Declaration at ¶11; O'Hara Declaration at ¶11.

17.     Again, SKNL failed to timely make the required equity infusion and the Debtors engaged Blair to pursue a sale of substantially all of their assets on an integrated or disaggregated basis or a recapitalization. *See* Williams Declaration at ¶24; Richards Declaration at ¶11.

18.     Blair immediately began to market the Debtors' assets to potential purchasers. Blair initially compiled a comprehensive list of approximately 200 potential strategic and financial buyers in the United States, Canada, Asia, and Europe.  *See* Richards Declaration at ¶14.  From Blair's buyer list, 150 parties received a "teaser" letter which set forth an overview of the Debtors, pictures of their product portfolio, select sales information, investment highlights, and growth strategies.  *Id*. at ¶15.  By the end of August, Blair had executed 25 confidentiality agreements with potential purchasers.  *Id*.  On or about August 29, 2012, those interested parties bound by confidentiality agreements received a 42-page confidential information memorandum that Blair prepared with input from the Debtors (the "CIM").  *Id*.  Prior to the filing of the chapter 11 cases, the Debtors entered into 62 confidentiality agreements with potential purchasers of the Debtors' assets.  *Id*. at ¶29.

19.     Also on or about August 29, 2012, Blair distributed instructions for the submission of initial indications of interest.  *Id*. at ¶16.  By September 24, 2012, the Debtors had received ten initial indications of interest from nine different parties.  *Id*.  All parties that had submitting initial indications of interest (except for two, which had submitted bids that were too low to warrant further consideration) were invited to conduct due diligence and submit definitive bids by October 8, 2012.  *Id*. at ¶17.  Four parties submitted bid proposals by the October 8, 2012 definitive bid deadline.  *Id*. at ¶18.  Very Best Apparel Corporation ("VBA") submitted a definitive, going concern bid for the Debtors' Canadian business.  *Id*. at ¶19.  Of the bids received for substantially all of the Debtors' remaining assets, ABG's bid was the only going concern  bid that included definitive documentation and credibly provided the opportunity for the Debtors' manufacturing and distribution facilities to remain in operation.  *Id*.  All other proposals failed to commit to this or any other going concern structure.  *Id*.  After considering the bids, the

Debtors, in consultation with their advisors and Mr. O'Hara, entered into negotiations with VBA and ABG. *Id*. at ¶20.

## II.    The Stalking Horse Agreement

20.    Following extensive negotiations with ABG, the Debtors, with the assistance of Blair, their other advisors, and Mr. O'Hara, determined that ABG's proposal was the best offer presented, and as a result the Debtors executed the Stalking Horse Agreement with ABG. *Id*. Pursuant to the Stalking Horse Agreement, ABG's stalking horse bid remained subject to higher or otherwise better bids received by the Debtors in connection with a Court-approved Auction process. The terms by which the Debtors would sell substantially all of their assets to ABG were clearly set forth in the Stalking Horse Agreement. Under Section 2.6(a) of the Stalking Horse Agreement, the Debtors agreed to sell substantially all of their assets to ABG in exchange for a purchase price of approximately $70.1 million, comprised of:

> (i)    the aggregate amount of pre- and post-petition claims (the "Salus Claim") of senior secured creditor and postpetition lender Salus Capital Partners, LLC ("Salus"), which was estimated to be approximately $65 million;
>
> (ii)   $5.1 million in additional cash; and
>
> (iii)  the assumption of certain of Sellers' liabilities, including trade creditor obligations, CBA obligations, and defined contribution plan obligations (together, the "Assumed Liabilities").

21.    The ABG offer was subject to the conditions that: (i) an entity formed by Mr. Williams (the "Licensee") execute a licensing agreement with ABG at least three days prior to the Auction date (the "Licensing Agreement"); and (ii) that the Licensee provide evidence of financial ability to perform. ABG (or its affiliate) would own the Debtors' trademark and other intellectual property assets (the "Trademarks") and the Licensee would continue to manufacture and sell licensed products in exchange for payments as specified in the Licensing Agreement.

Under this structure, the Debtors' business would continue and over 1,100 jobs would be preserved.[4]

22.     On December 11, 2012, the Debtors were informed by ABG that ABG HMX, LLC, an ABG subsidiary formed to hold the Debtors' Trademarks, as licensor, and W Diamond Group Corporation, as Licensee, entered into the Licensing Agreement. *See* Letter to Chambers from Debtors' counsel, filed December 11, 2012 [Docket No. 220].   A copy of the Licensing Agreement was made available to prospective bidders in advance of the bid deadline of December 12, 2012 (the "Bid Deadline").   *Id.*   Pursuant to the Licensing Agreement, the Licensee warranted it is financially capable of satisfying its financial obligations thereunder.

23.     By letter dated October 16, 2012 [Docket No. 114] (the "Letter Agreement"), the Debtors and Salus agreed that Salus would reduce its claim by $3 million if ABG purchased the Debtors' assets as a going concern under Section 2.6(a) of the Stalking Horse Agreement and if no other Qualified Bids (as defined in the Bid Procedures Order) were submitted (the "Salus Claim Discount").   If Qualified Bids were submitted, however, the Salus Claim Discount would be reduced upon terms described therein.   Any ambiguity as to whether the Salus Claim Discount accrued to the benefit of the Debtors or ABG was put to rest by the Bid Procedures Order, which the Committee agreed to.

III.     **The Postpetition Sale Process**

24.     Postpetition, although the Debtors were bound by a "no shop" provision in the Stalking Horse Agreement that ran from October 16, 2012 through November 7, 2012, Blair re-

---

[4] Under Section 2.6(c) of the Stalking Horse Agreement, if a Licensing Agreement was not timely executed, ABG would increase the cash component of its bid to $9.1 million, but would not seek to acquire the Debtors' assets as a going concern.   On December 11, 2012, the Sellers and ABG amended the Stalking Horse Agreement to eliminate ABG's ability to submit a liquidation bid under Section 2.6(c) of such agreement and increased the additional cash component of ABG's going concern bid under Section 2.6(a) of such agreement by $3 million (the "December 11th Amendment").

established contact with all interested parties not later than October 24, 2012 without violating the "no shop" provision in an effort to stimulate maximum bidder interest.  *See* Richards Declaration at ¶27.

25.    On November 7, 2012, this Court entered an initial order approving bid procedures in connection with the Debtors' proposed sale [Docket No. 104].  On November 29, 2012, following an objection by the Committee to the initial order, the Court entered the Bid Procedures Order with dates and deadlines relating to the Debtors' proposed sale that were agreed to by the Committee.

26.    Pursuant to the Bid Procedures Order, the floor for any party wishing to submit a Qualified Bid was abundantly clear:  (i) at least $72.975 million in connection with a going concern sale (exclusive of Assumed Liabilities); or (ii) at least $76.975 million in connection with a liquidation sale (exclusive of Assumed Liabilities).  Bid Procedures Order at ¶3(b).  The Bid Procedures Order includes findings of fact that the Debtors have good and sufficient business reasons to approve such procedures and the related bid protections for ABG.  *Id.* at ¶E. It is important to note that nothing in the Bid Procedures Order limited the structure of any Qualified Bid or otherwise required that a Qualified Bid include Salus as the Money or Mr. Williams as the Management.  In fact, at a hearing on November 29, 2012, counsel for Mr. Williams affirmed that precise point.[5]

---

[5] The transcript of the November 29, 2012 hearing provides, in relevant part, as follows:

> MR. HALPERIN (Mr. Williams's counsel):  But it's not as if anybody's trying to force someone to one lender or another; trying to force someone to Mr. Williams or not to Mr. Williams.  It's just how things are breaking.  And I just wanted to make sure that was clear on the record.

> THE COURT: In your view, can a third party make a type-A [going concern] bid without Mr. Williams' involvement?

> MR: HALPERIN:  Of course.  Absolutely.

27. Following expiration of the "no shop" period, Blair and the Debtors were in frequent, daily contact with potential bidders in an effort to obtain the greatest number of Qualified Bids by the Bid Deadline. *See* Richards Declaration at ¶28. Postpetition, the Debtors entered into an additional 10 confidentiality agreements with new entrants to the process and sixteen parties total had been granted data room access. *Id*. at ¶¶29-30. As of December 12, 2012, the Data Room contained more than 900 files totaling more than 11,000 pages. *Id*. at ¶30. The Debtors and Blair promptly responded to additional diligence requests and hosted more than 200 diligence calls with more than 30 potentially interested parties addressing most aspects of the Debtors' operations and financial performance. *Id*. at ¶¶31-32. Postpetition, Blair and the Debtors also offered active potential bidders the opportunity to visit the Debtors' New York City headquarters and showrooms, the Hickey Freeman facility in Rochester, New York, and the Hart Schaffner Marx facility in Des Plaines, Illinois; these site visits were led by senior employees of the Debtors as well as members of the Blair team. *Id*. at ¶32.

28. Pursuant to the Bid Procedures Order, if Qualified Bids were submitted by the Bid Deadline, an Auction was to be held on December 17, 2012. On December 12, 2012 at 4:11 p.m. (prevailing Eastern Time), at the Committee's request and based upon a direct request from Carlyle, the Debtors extended the Bid Deadline for two potential purchasers for an additional two days to December 14, 2012 at 6:00 p.m. At the request of Carlyle, the Bid Deadline was extended another hour to 7:00 p.m. and the Debtors then received the Carlyle/Bluestar Bid. Ultimately, the Debtors further extended the Bid Deadline for Carlyle and Bluestar until December 17 at 8:00 a.m. (prevailing Eastern Time) to make changes to their bid. However, by e-mail dated December 17, 2012 at approximately 8:30 a.m., counsel for Carlyle and Bluestar

---

Nov. 29, 2012 Hearing Transcript [Docket No. 235] at 20:12-19.

informed the Debtors that the Carlyle/Bluestar Bid had been withdrawn. As such, the Auction was cancelled and the Debtors seek this Court's approval of the sale of substantially all of their assets to ABG pursuant to the terms of the Stalking Horse Agreement.

## Debtors' Response

## I.     The Committee's Flimsy and Fictitious Objections Cannot Derail the Sale Process

29.     Despite providing a survey of objections that have been filed by other parties (and even some that parties did not object), at its core the Committee Objection focuses primarily on two issues: (i) that the sale to ABG, a non-insider, should be subject to "heightened scrutiny" because it "involves" an insider – Mr. Williams – despite the presence of Mr. O'Hara, an independent director and manager with sole and absolute authority to make all decisions with respect to the sale; and (ii) that the sale to ABG has not been proposed in good faith and has been designed to chill bidding because the terms of the sale are too confusing to the Committee, the sale's timeline was too short, and irrelevant terms between private parties have not been disclosed. As part of its argument, the Committee irresponsibly alleges that Mr. O'Hara, an independent director and manager of the Debtors who has "irrevocably" been granted the "sole and exclusive power" to make all decisions and execute all documents with respect to a "Sale Process" and a "Bankruptcy Process," is not truly independent. None of the Committee's arguments have any basis in law or fact and should be summarily overruled.

## II.     Mr. O'Hara Is Independent and Has Acted With the Utmost Integrity and Fairness

30.     Without a single shred of evidence, the Committee irresponsibly and maliciously suggests that Mr. O'Hara has not acted independently with respect to the sale and that Mr. Williams is somehow covertly running the sale process for his own personal benefit. In addition to being personally insulting and baffling to any notion of common sense, the allegations are

untrue. In reality, Mr. O'Hara has acted with complete integrity, fairness, and transparency in connection with this process. Any suggestion to the contrary is simply false.

31. Mr. O'Hara is the founder and managing member of Consensus, an investment banking and financial advisory firm. Since forming Consensus in February 2006, he has advised on a wide array of companies ranging from early stage consumer products companies, to publicly traded retailers, to leading multi-national commercial lenders. *See* O'Hara Declaration at ¶1. Together with the Debtors' investment banker, Blair, Mr. O'Hara has personally overseen the sale process and worked to ensure that all parties were provided with a level playing field. *See generally id.* In fact, when Mr. O'Hara was told by potential bidders that they would not submit a bid unless Mr. Williams agreed to an *exclusive* agreement with such bidder, he determined (in consultation with the Debtors' professionals) that such an arrangement would be detrimental to the bidding process and urged Mr. Williams not to execute any *exclusive* agreement. *Id.* at ¶¶26-27. It is ironic that the potential bidders demanding exclusivity were Carlyle and Bluestar, the bidders that the Committee clearly favor and were seemingly able to provide a bid without Mr. Williams becoming "exclusive."

32. The Committee's only apparent basis for their conclusion that Mr. O'Hara is not independent is their view that he is being paid too much money. Despite the fact that Mr. O'Hara's compensation was disclosed in the Debtors' first day motions, what the Committee fails to state is that Mr. O'Hara is performing a multitude of services well beyond what a typical director would do. *See id.* at ¶¶30-33. And, in fact, Mr. O'Hara does not have the benefit that most directors have: other directors to help. Mr. O'Hara is essentially the only director that is exercising fiduciary duties for the Debtors and is single-handedly performing the jobs that would normally be done by many. *See id.* The Committee also insinuates that Mr. O'Hara reduced his

fee postpeition.  In fact, his original agreement provided for a reduced fee after three months since it was anticipated that his work would be close to conclusion at that point.  It is the Debtors' position that Mr. O'Hara's compensation has been hard-earned and well-deserved.  Any suggestion by the Committee to the contrary is simply disingenuous.

33.     At bottom, the Committee's challenge to Mr. O'Hara's credibility blatantly disregards the facts, irresponsibly and unfairly besmirches the sale process, and only serves to call into question the Committee's own motivation to launch such an unfounded attack.

34.     Similarly, the Committee suggests Mr. Williams "despite his obvious conflicts of interest … has continued to participate in virtually all phases of the Debtors' management, including management of the sale process, while simultaneously negotiating … agreements for himself with financing entities and prospective purchasers."  Committee Objection at 16.  First, the Committee's allegation that Mr. Williams is "managing the sale process" is false and is similarly not supported by any evidence.  As noted above and in the accompanying declarations, Mr. O'Hara and Blair have been managing the sale process for the Debtors since August.  Mr. Williams, of course, manages the Debtors with respect to matters unrelated to the sale process. After all, he is the Debtors' CEO and he has met with numerous bidders *at their express request*. He has been open in all aspects of his meetings with bidders and Blair representatives participated in all such meetings.  Ironically, had Mr. Williams refused to make himself available to other bidders, the Committee would have been up in arms that Mr. Williams was deliberately hiding the details about the Debtors or about the sale.  Apparently the Committee is simply miffed that Mr. Williams refused to sign an exclusive agreement with the Committee's preferred bidder, Carlyle/Bluestar.

### III. __Under Any Level of Scrutiny, the Sale Should Be Approved__

35.     For the past four months the Debtors have run an open and fair process for the sale of their assets which will result in the Debtors' continuation as a going concern and the preservation of over 1,100 workers' jobs.  Under any level of scrutiny, the Court must approve the sale.

36.     However, the Committee argues the sale should be subject to "heightened scrutiny" because, although the sale is to a non-insider (ABG), it "involves" an insider (Mr. Williams) and provides for the disposition of substantially all of the Debtors' assets.  Committee Objection at 6-7.[6]

37.     In any event, the Debtors anticipated and welcome heightened scrutiny.  In August, the Debtors' Board appointed Mr. O'Hara as an independent director and manager and "irrevocably" granted him the "sole and exclusive power" to make all decisions and execute all documents with respect to a "Sale Process" and a "Bankruptcy Process."  Mr. Williams has had absolutely no input on behalf of the Debtors regarding the sale process.  *See* O'Hara Declaration at ¶19.  It is commonplace for companies that wish to exercise "good governance" to create a special committee when a director or group of directors may not be disinterested with respect to a particular transaction.  The purpose of doing so is to preserve the integrity of the process and the company's ability to rely upon its business judgment when approving such a transaction. The Debtors, having done so, are thus entitled to the benefits thereof.  Nonetheless, regardless of the standard applied by the Court, the sale should be approved.

---

[6] Likewise, Workers United argues that heightened scrutiny applies to sales of substantially all assets, which it considers a *sub rosa* plan.  *See* Second Workers United Objection at 4.  It is clear that a section 363 sale is not a *sub rosa* plan unless it actually establishes the term of a plan, for example, by dictating the terms of the ensuing plan, limiting creditors' ability to vote, or seeking to allocate or dictate the distribution of sale proceeds among different creditors.  *In re General Motors Corp.*, 407 B.R. 463, 496 (Bankr. S.D.N.Y. 2009).  The Debtors' proposed sale does none of these things.

**IV.    The Sale Should be Approved Under Section 363 of the Bankruptcy Code**

    **A.    Good Business Reasons Exist for the Sale**

    38.    The Debtors have good business reasons to move forward with the sale of substantially all of their assets to ABG.  Section 363(b) of the Bankruptcy Code provides that after notice and a hearing, a debtor "may use, sell, or lease, other than in the ordinary course of business, property of the estate."  The Second Circuit has held that the sale of a debtor's business is authorized under section 363 of the Bankruptcy Code if such sale is supported by a legitimate business justification.  *See In re Iridium Operating LLC*, 478 F.3d 452, 466 (2d Cir. 2007) (quoting *Comm. of Equity Sec. Holders v. Lionel Corp. (In re Lionel Corp.)*, 722 F.2d 1063, 1071 (2d Cir. 1983)) ("the sale of an asset of the estate under § 363(b) is permissible if the 'judge determining [the] § 363(b) application expressly find[s there is] a good business reason to grant such application"); *In re Motors Liquidation Co.*, 430 B.R. 65, 83 (S.D.N.Y. 2010) (citing *Lionel*, 722 F.2d at 1071) ("The overriding consideration for approval of a Section 363 sale is whether a 'good business reason' has been articulated").

    39.    In evaluating whether adequate business justification exists for a sale outside of a chapter 11 plan, the *Lionel* court set forth the following nonexclusive list of factors to be considered: (i) the proportionate value of the assets to the estate as a whole; (ii) the amount of time elapsed since the filing; (iii) the likelihood that a plan of reorganization will be proposed and confirmed in the near future; (iv) the effect of the proposed disposition on future plans of reorganization; (v) the proceeds to be obtained from the disposition vis-à-vis any appraisals of the property; (vi) which of the alternatives of use, sale, or lease the proposal envisions; and (vi) whether the asset is increasing or decreasing in value.  *Lionel*, 722 F.2d at 1071.  *See also General Motors*, 407 B.R. at 490 (considering the following additional factors: (a) does the estate have the liquidity to survive until confirmation of a plan; (b) will the sale opportunity still

exist as of the time of plan confirmation; (c) if not, how likely is it that there will be a satisfactory alternative sale opportunity, or a standalone plan alternative that is equally desirable; and (d) is there a material risk that by deferring the sale, the patient will die on the operating table); *In re Boston Generating, LLC*, 440 B.R. 302, 322 (Bankr. S.D.N.Y. 2010) (considering certain *Lionel* and *General Motors* factors).  The foregoing factors weigh in favor of finding that adequate business justification exists for the Debtors' proposed sale of substantially all of their assets to ABG.

40.    <u>The Debtors' Cash Situation Remains Precarious</u>.  There is no evidence to suggest a chapter 11 plan can be fully negotiated and consummated before the Debtors run out of cash. As noted in the Williams Declaration, the Debtors' liquidity deteriorated substantially prior to the commencement of their bankruptcy cases and the Debtors required immediate access to postpetition financing in order to continue the operation of their businesses, make payroll, and satisfy other working capital needs.  *See* Williams Declaration at ¶¶ 21, 107.  In addition, the Debtors expected to remain operationally cash flow negative in at least the near-term.  *See* Schedule 12 to the Williams Declaration (projecting, for the 30 day period following the commencement of the Debtors' bankruptcy cases, a net cash loss of $4.2 million); DIP budget attached as Exhibit A to the interim and final orders authorizing the Debtors to obtain postpetition financing, entered October 23, 2012 and November 21, 2012, respectively [Docket Nos. 36 and 168] (the "<u>DIP Orders</u>"); *see generally* Declaration of Michael P. Healy in Support of the Debtors' Proposed Sale of Substantially All of Their Assets, filed contemporaneously herewith (the "<u>Healy Declaration</u>").

41.    As noted in the Healy Declaration, since the commencement of their bankruptcy cases the Debtors have experienced negative net operating cash flow, excluding bankruptcy

related expenses and proceeds related to the sale of the Debtors' Canadian affiliate.  *See* Healy Declaration at ¶6.  Moreover, the Debtors have approximately $2 million in accrued but unpaid professional fees.  *Id*. at ¶7.  Because the Debtors have utilized substantially all of their available postpetition financing, unless the Debtors promptly sell their business they may not have enough liquidity to operate as a going concern if their cash flow situation persists.  *Id*. at ¶8.  If the sale process were extended, the Debtors project that they would need additional postpetition financing.

42.     <u>The Purchase Price Under the Stalking Horse Agreement Represents the Debtors' Fair Market Value</u>.  The Debtors' assets have been extensively marketed to numerous potentially interested parties both before these cases were commenced and after.  As noted above and in the Richards Declaration, as a result of Blair's marketing efforts over 70 potential purchasers executed confidentiality agreements with the Debtors and nine parties submitted ten indications of interest.  As a result of those efforts, only one party stepped up to the plate prior to the commencement of these cases and made an offer of approximately $70.1 million to buy substantially all of the Debtors' assets that includes the preservation of over 1,100 jobs.  After the commencement of these cases, the assets were again marketed.  As noted above and in the Richards Declaration, despite the Stalking Horse Agreement's "no shop" provision, ten additional confidentiality agreements were executed postpetition with potential purchasers.  As a result of Blair's efforts, the Debtors received the Carlyle/Bluestar Bid, which was later withdrawn, but which provides the Debtors with a strong basis to assert that the Debtors are receiving at least fair market value for their assets.

43.     <u>This Sale Opportunity May Not Exist at Plan Confirmation Time</u>.  As noted above and in the Healy Declaration, the Debtors cannot fund their operations from use of cash

collateral. Without a sale of their assets at this juncture, the Debtors will not have sufficient cash to fund the continuation of this case through January. The Debtors have made it this far because Salus has agreed to extend postpetition financing to the Debtors. Similarly, there is no assurance from ABG that if the sale is not approved at this juncture that it would have any interest is renewing its offer at a later time. Accordingly, the opportunity for any going concern sale, not just one to ABG, will not be available at a later date.

**B.     The Debtors Have Properly Exercised Their Business Judgment and Satisfied the Requirements of General Order M-383**

44.     Having established that legitimate business reasons exist for the sale, the Court must consider if the Debtors' decision to proceed with the sale process was a proper exercise of their business judgment and whether the sale satisfies the requirements of General Order M-383 setting forth Amended Guidelines for the Conduct of Asset Sales (the "General Order"). *See*, *e.g.*, *General Motors*, 407 B.R. at 473-74 ("With the Court having concluded that the requisite sound business justification exists … the inquiry turns to whether the routine requirements for any section 363 sale, and appropriate exercise of the business judgment rule, have been satisfied").

45.     Under the business judgment rule, corporate decision-makers' decisions are shielded from "judicial second-guessing when the following elements are present: (1) a business decision, (2) disinterestedness, (3) due care, (4) good faith, and (5) according to some courts and commentators, no abuse of discretion or waste of corporate assets." *Official Comm. of Subordinated Bondholders v. Integrated Res., Inc. (In re Integrated Res., Inc.)*, 147 B.R. 650, 656 (S.D.N.Y. 1992) (citations omitted).

46.     There can be no dispute that the sale process satisfies the foregoing requirements. First, the Debtors' board of directors engaged Mr. O'Hara as an independent director and

manager and gave him sole responsibility for all sale and bankruptcy decisions. Mr. O'Hara has, in fact, made all sale-related decisions and, by doing so, has ensured that a disinterested person made the decision as to the highest or otherwise best offer for the Debtors' assets. In addition, the Debtors exercised due care in connection with their pre- and post-petition sale process. Blair contacted approximately 180 potentially interested parties and, together with Mr. O'Hara, conducted good faith, arms-length negotiations with each potentially interested bidder.

47.     Given that valid business reasons exist for the proposed sale and the transaction easily passes muster under the business judgment standard, the Debtors' decision to sell their assets to ABG should be extended deference. *See In re GSC, Inc.*, 453 B.R. 132, 174 (Bankr. S.D.N.Y. 2011) (quoting *In re Johns-Manville Corp.*, 60 B.R. 612, 616 (Bankr. S.D.N.Y. 1986)) ("Courts give deference to the debtor as long as there is a 'reasonable basis for its business decision'"); *In re Murphy*, 288 B.R. 1, 5 (D. Me. 2002) (citing *Bakalis*, 220 B.R. at 532 and *In re Fas Mart Convenience Stores, Inc.*, 265 B.R. 427, 431 (E.D. Va. 2001)) ("Where … a trustee proposes to sell assets of the estate, the trustee's business judgment is subject to great judicial deference … The decision of the trustee will not be disturbed 'unless it is shown that the trustee 'acted in an irrational, arbitrary, or capricious manner, clearly contrary to reason and not justified by the evidence'"); *In re Gulf States Steel, Inc. of Al.*, 285 B.R. 497, 515 (Bankr. N.D. Ala. 2002) (debtor "is responsible for the administration of the estate and [its] judgment on the sale and the procedure for the sale is entitled to respect and deference from the Court").

48.     Moreover, the sale to ABG satisfies the requirements of Paragraph C of the General Order applicable to asset sales in this district. Specifically, (i) sound business reasons exist for the transaction; (ii) the Debtors' assets have been adequately marketed and the applicable purchase price will constitute the highest or otherwise best offer and provides fair and

reasonable consideration; (iii) the proposed transaction is the best interests of the Debtors' estates and their creditors; (iv) the transaction has been proposed and negotiated in good faith; (v) adequate and reasonable notice has been provided; (vi) the "free and clear" requirements of section 363(f) of the Bankruptcy Code have been met; (vii) the sale is consistent with the Debtors' privacy policy concerning personally identifiable information; (viii) except with respect to parties that filed cure or assumption objections (which the Debtors have or intend to resolve), the requirements of section 365 of the Bankruptcy Code have been met in respect of the proposed assumption and assignment or rejection of executory contracts and unexpired leases; (ix) Mr. O'Hara, an independent and disinterested director, has authorized the proposed transaction; and (x) the Stalking Horse Agreement was entered into without collusion, in good faith, and from arm's length bargaining positions, and no party engaged in conduct that would permit such agreement to be avoided under section 363(n) of the Bankruptcy Code.

## V.     The Committee's Remaining Objection Should be Overruled

49.     The Committee's remaining objection essentially goes to "good faith" which, as demonstrated above and in the supporting declarations, plainly exists here.  More specifically, the Committee alleges that the sale process was designed to "chill the bidding" by the speed of the process, by including terms in the Stalking Horse Agreement that were confusing or unclear to the Committee, and by denying potential bidders access to information that would have permitted them to submit Qualified Bids.  As the record makes clear, none of the Committee's allegations have any merit and "good faith" is unquestionably present here.

### A.     The Timing of the Sale Process Was Critical to Preserve the Value of the Debtors' Estates

50.     The Committee's argument that the dates and deadlines previously approved by the Court chilled bidding is nonsensical and now moot.  The Debtors agreed to extend the Bid

Deadline for two potential purchasers for an additional two days at the request of the Committee. These extensions facilitated the Carlyle/Bluestar Bid which was subsequently withdrawn. Having acceded to the Committee's request to extend the Bid Deadline, that part of their objection is now moot. Nonetheless, it is important that the Debtors make it clear for the record that the bid procedures previously approved by this Court were fully and completely adequate to permit any party to submit a Qualified Bid.

51.     As a preliminary matter, the Debtors began marketing their business in August 2012 – well before the commencement of these chapter 11 cases and the formation of the Committee. Further, as set forth above, Blair contacted nearly 200 potentially interested parties in connection with this transaction, 72 of which executed confidentially agreements and received a CIM. *See* Richards Declaration at ¶29. Potential purchasers have had more than adequate time to conduct due diligence and submit Qualified Bids.

52.     Perhaps the Committee's objection on this ground is based upon a failure to truly understand the intersection between the urgency of a sale and the Debtors' cash position. As set forth above and in the Healy Declaration, the Debtors' cash position has been and continues to be tenuous. Because of the Debtors' liquidity constraints, the value of the Debtors' estates is expected to decrease going forward. Failure to approve the sale to ABG will result in a default under the Debtors' postpetition financing agreement and termination of the Debtors' right to use cash. In turn, inability by the Debtors to use cash would effectively eliminate the Debtors' ability preserve its business through a sale and destroy the value the Debtors are attempting to capture through such a sale.

53.     The Debtors are entitled to rely upon the findings of this Court in the Bid Procedures Order. Specifically, the Bid Procedures Order found that "The Bidding Procedures

are reasonably designed to enable the Debtors to receive bids for the Purchased Assets and represent the best method for maximizing the realizable value of the assets." Bid Procedures Order at ¶G. The Committee consented to the entry of the Bid Procedures Order and cannot now be heard to complain.

54.     Moreover, the Bid Procedures Order's sale schedule is wholly consistent with (or less aggressive than) other sale schedules approved in large chapter 11 cases where the debtor is seeking the sale of substantially all of its assets. *See*, *e.g.*, *In re Blockbuster Inc.*, No. 10-14997 (BRL) (Bankr. S.D.N.Y. Mar. 17, 2011) [Docket No. 1223] (approving bid deadline of March 31, 2011, auction date of April 4, 2011, and sale hearing of April 7, 2011); *In re Grubb & Ellis Co.*, No. 12-10685 (MG) (Bankr. S.D.N.Y. Mar. 7, 2012) [Docket No. 94] (approving bid deadline of March 19, 2012, auction date of March 21, 2012, and sale hearing of March 22, 2012).

55.     Accordingly, the timing of the sale process was completely adequate for potential bidders to timely submit Qualified Bids and did not in any way chill the bidding for the Debtors' assets.

> **B.     The Terms of the Stalking Horse Agreement Were Plainly Disclosed in the Sale Motion and Further Disclosure of Related Matters Was Made Available to All Interested Parties**

56.     The Committee cannot seriously allege that certain critical terms of the Debtors' proposed sale (underlined below) were too confusing, unknown, or not finalized as of the commencement of the Debtors' cases, and therefore chilled bidding. The Committee's allegation is particularly puzzling since its own proposed financial advisor had at least four (4) detailed meetings with ABG regarding the sale and had ample opportunity to seek clarification of any term that it thought unclear. In any event, the terms of the sale have been plainly disclosed in the Stalking Horse Agreement and the Debtors made further disclosures of key documents in its data

room as well as in numerous meetings and discussions with parties in interest. Apparently, based upon the information available, the Committee's chosen buyer, Carlyle and Bluestar were able submit a bid for the Debtors' assets. Set forth below is a discussion of the relevant issues raised in the Committee Objection in this regard.

57.     The Terms of the Licensing Agreement Were Plainly Disclosed. Exhibit E to the Stalking Horse Agreement, which was filed on October 21, 2012, is a term sheet summarizing the key terms of the Licensing Agreement. Although the term sheet was subsequently developed into a Licensing Agreement, the Committee does not identify a single Licensing Agreement provision that materially deviates from the term sheet.

58.     Any Successful Bidder Could Utilize the Terms of Licensing Agreement as a Basis for their Bid. Following the commencement of the Debtors' bankruptcy cases, the Debtors advised many parties in interest, including the Committee, that they intended the Licensing Agreement to be offered to any successful bidder and not just ABG. At the November 20, 2012 hearing regarding the Debtors' motions for the then-proposed bid procedures and postpetition financing, Mr. Williams's counsel made clear that *any* Qualified Bidder was eligible to submit a higher going concern or liquidation bid and any alternative going concern bid need not even involve Mr. Williams in the Licensee's operations. *See* Nov. 20, 2012 Hearing Transcript [Docket No. 201] at 26:23-27:16 (Mr. Williams's counsel) ("if a bidder comes in tomorrow and says I don't want to work with Mr. Williams, I want to just do a liquidation bid and I'm going to throw a gazillion dollars, and the estate says that's the right thing to do, God bless; they can do that. That's within their discretion, and he has no part in the decision-making process … If someone else comes in and says I want to do an OpCo, and I've got my own operator, and I think my guy is the greatest thing since sliced bread, see ya, Doug. God bless. They can do that too.

This is purely to put optionality in and to preserve a business that we think works if it had proper financing").

59.     The Terms of the Licensee's Financing and Whether an Alternative Licensee Would be Entitled to Similar Financing is Not the Responsibility of the Debtors. The Debtors and Blair have gone to great lengths to make all disclosures required under applicable law (and then some) to potential purchasers and the Committee. However, the Debtors cannot be held responsible for failing to make disclosures regarding the Licensee's financing or potential financing for potential purchasers and their related Licensees – under the transaction it is up to these parties to make their own financing arrangements. In other words, bidders need to find their own Money.

60.     The Impact of the Salus Claim Discount is Clear and Unambiguous. The Salus Claim Discount was a matter of public record by November 12, 2012. To the extent any ambiguity concerning whether such discount would accrue to the Debtors' or ABG's benefit existed, such ambiguity was resolved by the Bid Procedures Order entered November 29, 2012.

61.     Perhaps more significantly, to the extent certain items were unknown or not finalized, the Committee has not and cannot demonstrate that this prejudiced any particular potential purchaser from conducting due diligence and submitting a Qualified Bid.

**C.      The Debtors and Their Advisors Promptly Responded to All Reasonable Requests For Additional Information**

62.     The Committee also argues that nondebtors Salus, ABG, and Mr. Williams did not provide adequate responses to requests for information (but notably, does not assert that the Debtors or Blair failed to adequately respond to requests for information). The Debtors cannot

speak for ABG or Salus.[7]  However, as noted in the O'Hara and Richards Declaration, Mr. Williams, together with Blair and/or Mr. O'Hara, did sit down with any potential purchaser interested in discussing his management of the Debtors and plans for the future, as the Debtors invited potential purchasers to do in open Court.[8]  Mr. Williams even turned down an offer to work exclusively with Carlyle/Bluestar in the interests of maintaining a level playing field and a competitive bidding environment.  *See* Richards Declaration at ¶42; O'Hara Declaration at ¶¶26-27.

63.     The Committee also complains the Debtors failed to provide adequate responses to requests for information concerning liabilities relating to: (i) contracts with Mr. Williams; (ii) specific lists of assets and liabilities; and (iii) which executory contracts shall be assumed and assigned (and related cure amounts). Mr. Williams' employment agreement, along with the employment agreements of the Debtors other key personnel, was posted in the Debtors' data room and was available for all potential bidders to view.  As for assets, liabilities, executory contracts, and cure amounts, (a) Blair and the Debtors likewise promptly responded to potential purchasers' requests for information concerning the foregoing; and (b) the Debtors filed their schedules and statements of financial affairs on November 20, 2012 [Docket Nos. 158-167], providing potential bidders with ample time to review the information contained therein.  In addition, the Stalking Horse Agreement specifies that the purchaser chooses which executory

---

[7] In furtherance of its argument that potential purchasers were not provided adequate information, the Committee asserts a request by a potential bidder for confirmation that Salus's loan to ABG would be available to other going concern bidders was "met with resistance."  The Debtors cannot provide details concerning the terms under which ABG or other potential bidders obtain financing as such financing arrangements are between nondebtors.

[8] *See* November 29, 2012 Hearing Transcript [Docket No. 235] at 39:2-12 (Mark K. Thomas, Debtors' counsel) ("We will continue to do everything in our power to bring Carlyle and Bluestar across the finish line.  Carlyle is a very big, sophisticated institution.  They know how to do this.  Thirty-two years ago, when I started clerking for a bankruptcy judge, I was taught two things about buying companies out of bankruptcy.  It's the M&M rule.  You need money and you need management.  If you don't have money and you don't have management, you can't buy the company.  So hopefully all the bidders out there know the M&M rule.  And if they're listening now, pay attention and let's get moving").

contracts would be assumed and assigned. *See* Stalking Horse Agreement § 2.6 ("Purchaser shall designate which of [the Assumed] Contracts it wishes to have Sellers assume and assign to Purchaser and/or Licensee"). Finally, Schedules 2.3 and 3.7 of such agreement set forth assumed contracts and related cure costs, and they all were filed with the Court.

64.     For the reasons set forth above, the Committee Objection should be overruled.

## VI.     Workers United's Objections Should be Overruled

65.     With respect to Workers United, certain arguments raised in its first objection have been mooted by the fact that a Licensing Agreement has been executed and the December 11th Amendment provides for the assumption and assignment of the Workers United's CBA.

66.     By its remaining objections, Workers United argues, first, that since under the Stalking Horse Agreement ABG retains rights to the Trademarks to be licensed to the Licensee, the Debtors' proposed assumption of Workers United's CBA and assignment thereof to the Licensee constitutes a "partial assignment" of the same and requires compliance with section 1113 of the Bankruptcy Code before it can be effected. *See* Second Workers United Objection at 6. In support of this argument, Workers United cites *In re Allegheny Health Educ. and Research Found.*, 383 F.3d 169, 177 (3d Cir. 2004) ("*American Flint Glass* … held that when a debtor … makes a partial assignment of a [CBA] in connection with a sale of substantially all its assets, this amounts to an attempt to reject the [CBA], and compliance with § 1113 is required").

67.     *American Flint Glass*, however, is completely inapposite. The assignee in *American Flint Glass* refused to accept all the provisions of the applicable collective bargaining agreement – specifically, it refused to pay retroactive payments to the employees as required by the labor agreement. *See Am. Flint Glass Workers Union v. Anchor Res. Corp.*, 197 F.3d 76 (3d Cir. 1999). The Court held that compliance with section 1113 was required because "the GMU CBA that Purchaser was willing to (and did) accept was *not* the same GMU CBA that Anchor

[the debtor] had originally negotiated, and had then assumed, post-bankruptcy"). *See also id.* at 81 (emphasis added) ("*when as here a debtor … binds itself contractually to obtain a change in the legal relations created by a CBA* as a condition precedent to closing a sale of substantially all of the debtor's assets, that constitutes an attempt to effect an alteration of the CBA. That being so, Anchor was required to comply with the procedures set out in Code § 1113"). *American Flint Glass*, therefore, stands for the proposition that compliance with section 1113 only is required where a change in the terms of the CBAs to be assumed is sought. In the instant case, the Debtors are not seeking to modify any of the terms of Workers United's CBA. Pursuant to the Sections 2.3 and 8.1 of the December 11th Amendment, the Debtors will assume the intact CBA and assign it in its entirety to the Licensee. The Licensee, accordingly, will be bound by all of the provisions of the CBA in the exact same manner as the Debtors currently are bound, section 1113 is inapplicable, and assumption and assignment of the CBA to the Licensee is subject only to section 365 of the Bankruptcy Code.[9] Notably, the CBA does not require any specific business structure to be maintained by the signatory nor does it require that the Debtors' Trademark rights must be held by the signatory.

68.     Second, Workers United argues the Stalking Horse Agreement itself is flawed because it contemplates ABG will hold the Sellers' Trademark assets, and another entity, the Licensee, will own and operate the Debtors' production facilities. Workers United alleges that the business structure contemplated by the Stalking Horse Agreement is inconsistent with the "Job Protection" provision of its CBA, which prohibits the Debtors from manufacturing Hickey

---

[9] Notably, nothing in the CBA requires a successor employer to comply with the CBA. Indeed, the CBA does not contain any successor and assigns language, or other restrictions on a sale of the Debtors' business. To the extent Workers United is attempting to claim that this sale would constitute an unlawful modification of the CBA, such an argument is belied by the fact that the CBA does not require any assumption by a purchaser. Nor does it require or prohibit any specific business structure after an asset sale. Since the sale would be permitted by the CBA in the absence of a bankruptcy proceeding, the pendency of the current bankruptcy proceeding cannot cause the sale to be considered a modification of the CBA.

Freeman or Hart Schaffner Marx garments in factories that are not under contract with Workers United or an affiliate.

69.     However, because the CBA is being assumed it will still apply to the Licensee, and thus, the Licensee will be prohibited from engaging manufacturers or contractors not under contract with Workers United to the extent required under the CBA. There simply is no statutory or contractual impediment to the business structure contemplated by the Stalking Horse Agreement. The CBA does not mandate that a sale require the maintenance a specific business structure. Similarly, the garment industry exemption to section 8(e) of the National Labor Relations Act, 29 U.S.C. § 158(e), does not mandate any specific business structure. It merely permits a union and an employer in the garment industry to enter into an agreement whereby an employer agrees to refrain from doing business with another entity. Further, *Geoffrey Beene v. New York Coat, Suit, Dress, Rainwear and Allied Workers' Union, AFL-CIO*, 562 F. Supp. 1216 (SDNY 1983), cited by Workers United, does not show that section 8(e) is an impediment to the proposed transaction.[10]

70.     Third, Workers United argues the Licensing Agreement requires that the Licensee pay ABG too much money annually in exchange for Trademark rights and that the Licensee's payment obligations will disadvantage Workers United and its membership, and therefore the sale is not "feasible." As noted above, the Debtors have determined in their business judgment

---

[10] In *Geoffrey Beene*, the signatory to a CBA, Geoffrey Beene, shut down its manufacturing operations and licensed them to a non-union company, in violation of the applicable CBA. Geoffrey Beene unsuccessfully argued that the job protection provision it violated was no longer lawful under the "garment industry proviso" to section 8(e) because the company no longer was an employer in the garment industry. That is, Geoffrey Beene outsourced its entire operation and claimed not to be a garment industry employer as a result. Here, to the contrary, the Debtors are engaging in an asset sale permitted by the CBA and are assuming and assigning the CBA to the Licensee. The Debtors remain in full compliance with the CBA and are not outsourcing any manufacturing. Unlike in *Geoffrey Beene*, ABG is not and has never been a signatory to the CBA and there is no statutory or contractual requirement that it become bound to its provisions. The Licensee, however, will be assuming the CBA and will be restricted by the CBA's Job Protection provision to the full extent that the Debtors are today.

that the proposed sale to ABG is in the best interests of the estates and should be approved. Moreover, because the Licensing Agreement is between two nondebtors the Debtors are not asking the Court to approve the same or the price provisions thereof. Finally, the Court is not required to evaluate feasibility in connection with section 363 sales. If the Debtors' assets were sold pursuant to a chapter 11 plan, the Court would be required to evaluate whether the sale is likely to be followed by "the liquidation … of … any successor to the debtor" pursuant to section 1129(a)(11) of the Bankruptcy Code. However, as noted above, under Second Circuit precedent the purchaser or Licensee's success is not a factor to be considered in evaluating whether a sale of substantially all of the Debtors' assets should be approved.

**<u>Conclusion</u>**

71.     After months of marketing, due diligence and a Court-supervised sale process, the Debtors have received only one Qualified Bid for the sale of substantially all of their assets – the going concern bid submitted by ABG in the Stalking Horse Agreement. A sale of the Debtors' assets to ABG is a sound exercise of their business judgment and will result not only in the estate receiving the highest and best offer for the Debtors' assets but will preserve over 1,100 jobs. The Debtors' management has worked tirelessly to make a going concern sale possible when a liquidation was a real possibility only a few short months ago. As the record has made clear and none of the Committee's unfounded allegations can disturb, the Debtors' sale process has been robust and at all times been conducted with good faith, fairness, and transparency. Therefore, the Debtors seek this Court's approval of the Debtors' proposed sale of substantially all of their assets to ABG pursuant to the Stalking Horse Agreement.

WHEREFORE, the Debtors respectfully request that the Court overrule the objections to the Sale Motion, grant the relief requested by the Debtors in the Sale Motion by approving the sale of substantially all of their assets to ABG pursuant to the terms of the Stalking Horse Agreement, and grant such other and further relief as the Court deems just and proper.

Dated: December 17, 2012
      New York, New York

Respectfully submitted,

/s/ Jared D. Zajac
Mark K. Thomas
Peter J. Young
PROSKAUER ROSE LLP
Three First National Plaza
70 West Madison, Suite 3800
Chicago, Illinois 60602
Tel: (312) 962-3550
Fax: (312) 962-3551

- and -

Jared D. Zajac
PROSKAUER ROSE LLP
Eleven Times Square
New York, New York 10036
Tel: (212) 969-3000
Fax: (212) 969-2900

*Counsel for the Debtors and Debtors in Possession*

# EXHIBIT A

**(E-mail from Counsel to Carlyle/Bluestar)**

**From:** "Lisa G Laukitis" <llaukitis@JonesDay.com>
**Date:** December 17, 2012, 8:29:24 AM EST
**To:** mthomas@proskauer.com
**Subject: HMX**

Mark -

Unfortunately, Carlyle and Bluestar are withdrawing from the process and will not be submitting a qualified bid. We thank you for your assistance during this process, including the granting of our requested extensions.

Please arrange for return of the certified check to Bluestar. We would also appreciate your assistance with arranging for return of Carlyle's funds from The Private Bank escrow account.

Best,
Lisa



**Lisa Laukitis**

222 East 41st Street • New York, NY 10017-6702
**DIRECT** 212.326.3657 • **FAX** 212.755.7306

llaukitis@jonesday.com

==========
This e-mail (including any attachments) may contain information that is private, confidential, or protected by attorney-client or other privilege. If you received this e-mail in error, please delete it from your system without copying it and notify sender by reply e-mail, so that our records can be corrected.
==========

# EXHIBIT B

## (Additional Objections)

| Objecting Party | Status / Response |
|---|---|
| Simon Property Group, Inc. ("SPG") [Docket No. 202]<br><br>SPG objects (i) to the Debtors' proposed cure amount in connection with their proposed assumption and assignment of a lease, and (ii) on grounds that ABG has not provided adequate assurance of future performance. | SPG's cure objection has been resolved and the Debtors are working to resolve SPG's adequate assurance objection. |
| Madison & 54th Street Associates, L.P. ("Madison") [Docket No. 206]<br><br>Madison objects to the Debtors' proposed cure amount in connection with their proposed assumption and assignment of a lease. | This objection has been resolved. |
| Iron Mountain Information Management, LLC ("Iron Mountain") [Docket No. 209]<br><br>Iron Mountain asserts that the notice of assumption and assignment it received does not adequately specify the contracts the Debtors propose to assume and assign, and thus it cannot determine whether the Debtors' proposed cure amount is correct. | This objection has been resolved. |
| Jonesheirs, Inc. ("Jonesheirs") [Docket No. 210]<br><br>Jonesheirs does not object to the Debtors' proposed cure payment, but objects to the Debtors' proposed assumption and assignment of their trademark Licensing Agreement without Jonesheirs's consent. | The Debtors have requested Jonesheirs' consent to assume and assign the Licensing Agreement. |

| Objecting Party | Status / Response |
|---|---|
| Infor Global Solutions (Michigan), Inc. ("Infor") [Docket No. 213]<br><br>Infor objects to the Debtors' proposed assumption and assignment of three software Licensing Agreements in a piecemeal liquidation without Infor's consent. As noted in Infor's objection, two of these agreements permit their assignment in the context of a going concern sale of substantially all of the Debtors' assets and the third permits its assignment to "any entity with which [the Debtors] may be statutorily merged or consolidated." | If the sale to ABG is approved, such sale shall be a going concern sale of substantially all of the Debtors' assets under which the Debtors assets (less their Trademark assets) are being merged and consolidated into the Licensee pursuant to section 363 of the Bankruptcy Code – not a piecemeal liquidation. In this instance, Infor should be deemed to have consented to the Debtors' proposed assumption and assignment of Infor's Licensing Agreements. Out of an abundance of caution, the Debtors have requested Infor's consent to assume and assign the Licensing Agreements. |
| Canon Financial Services, Inc. ("Canon")[Docket No. 223]<br><br>Canon objects to the Debtors' proposed cure amount in connection with their proposed assumption and assignment of various lease agreements. | This objection has been resolved. |
| Argyle Culture LLC ("Argyle")[Docket No. 229]<br><br>Argyle objects to (i) the Debtors' proposed assumption and assignment of their trademark Licensing Agreement without Argyle's consent, and (ii) the Debtors' proposed cure amount. | This objection has been resolved. |
| Destiny USA Holdings, LLC ("Destiny")[Docket No. 230]<br><br>Destiny filed a limited objection to the Debtors' proposed assumption and assignment of their lease on several grounds:<br><br>(i) Adequate Assurance. Destiny objects to the sale on account of | (i) Adequate Assurance. The Debtors understand from Destiny that its adequate assurance objection would be resolved if ABG's going concern bid is approved by the Court. |

| Objecting Party | Status / Response |
|---|---|
| the fact that as of the December 12, 2012 objection deadline, it remained unclear to which entity its lease could be assigned to, and thus, it was impossible for such entity to provide adequate assurance of future performance.  Destiny also objects to Stalking Horse Agreement provisions providing that the purchaser is only liable for post-closing obligations (§ 2.3) and that the purchaser may assign such agreement to affiliates (without making such assignment subject to the affiliate providing adequate assurance of future performance) (§§ 1.1, 2.1, and 2.3).  Destiny also requests that language in the proposed sale order providing that the sale shall be free and clear of liens, claims, and encumbrances be modified to carve out permitted encumbrances and accrued, but unbilled or not yet due obligations, and indemnity obligations.<br><br>(ii) <u>Cure</u>.  Destiny objects to the Debtors' proposed cure amount.<br><br>(iii) <u>Anti-Assignment Provisions in Lease</u>.  Destiny requests that language included in the proposed sale order pursuant to section 365(f) of the Bankruptcy Code be modified so as not to permanently abrogate lease provisions.<br><br>(iv) <u>Amendments</u>.  Destiny requests that language in the proposed sale order providing that the Stalking Horse Agreement and related documents may be amended specify that any such amendments may not adversely affect Destiny's rights.<br><br>(v) <u>Liquidating Sale</u>.  Destiny's objections include instructions to be followed in the event a liquidating bid is selected. | (ii), (iii), and (iv) <u>Stalking Horse Agreement and Proposed Sale Order Proposed Modifications</u>.  The Debtors are working with Destiny to resolve its objections to identified portions of the Stalking Horse Agreement and proposed sale order.<br><br>(ii) <u>Cure</u>.  The Debtors are working to resolve Destiny's cure objection.<br><br>(v) <u>Liquidating Sale</u>.  This objection will be moot, provided the Court approves the Debtors' proposed going concern sale to ABG. |

| Objecting Party | Status / Response |
|---|---|
| Deutsche Bank Trust Company Americas, as Trustee, by and through Midland Loan Services, as Special Servicer ("<u>DBTCA</u>")[Docket No. 234]<br><br>DBTCA filed a limited objection to the proposed sale of certain property located at 1680-1700 East Touhy Avenue, Des Plaines, Illinois (the "<u>Property</u>"), and the assignment to the Licensee of (a) the Promissory Note, (b) the Mortgage, Security Agreement, and Fixture Filing, and (c) the Assignment of Leases and Rents (together, the "<u>Transaction Documents</u>").<br><br>(i) DBTCA argues that although the property is operated by Debtor HMX, LLC, it is owned by nondebtor HMX Touhy Avenue, LLC ("<u>HMX Touhy</u>") and thus cannot be sold free and clear of liens pursuant to section 363(f) of the Bankruptcy Code.<br><br>(ii) In addition, because nondebtor HMX Touhy is party to the Transaction Documents, the same cannot be assumed and assigned to Licensee pursuant to section 365 of the Bankruptcy Code, as the Debtors have proposed.<br><br>(iii) Even if HMX Touhy were a Debtor, the Transaction Documents cannot be assumed and assigned because they are a financial accommodation contract under section 365(c)(2) of the Bankruptcy Code. | The Debtors are working to resolve DBTCA's objection. To the extent this objection is not resolved by the sale hearing, the Debtors respond as follows:<br><br>(i), (ii), and (iii) The Debtors are not proposing to sell the Property free and clear of liens, claims, and encumbrances arising under the terms of the Transaction Documents pursuant to section 363(f) of the Bankruptcy Code. If DBTCA does not consent to the assignment of the Transaction Documents to the Licensee, the Licensee can purchase the Debtors' equity interest in HMX Touhy or its holding company, HMX Des Plaines, LLC. |