1

2  UNITED STATES BANKRUPTCY COURT

3  SOUTHERN DISTRICT OF NEW YORK

4  Case No. 12-14300-alg

5  - - - - - - - - - - - - - - - - - - - -x

6  In the Matter of:

7

8  HMX ACQUISITION CORP., et al.,

9

10           Debtors.

11

12  - - - - - - - - - - - - - - - - - - - -x

13

14           United States Bankruptcy Court

15           One Bowling Green

16           New York, New York

17

18           December 19, 2012

19           3:18 PM

20

21  B E F O R E:

22  HON. ALLAN L. GROPPER

23  U.S. BANKRUPTCY JUDGE

24

25

1

2  Application of the Official Committee of Unsecured Creditors to

3  retain and employ Leonard, Street and Deinard Professional

4  Association as counsel, nunc pro tunc to November 14, 2012

5

6  Application establishing the deadline for filing proofs of

7  claim and approving the form and manner of notice thereof

8

9  Motion by Debtors authorizing rejection of certain employment

10  agreements.

11

12  Sale Hearing Re: Motion by Debtors authorizing the debtors'

13  entry into the stalking horse purchase agreement, authorizing

14  and approving the bidding procedures and break-up fee.

15

16

17

18

19

20  Transcribed by:  Penina Wolicki

21  eScribers, LLC

22  700 West 192nd Street, Suite #607

23  New York, NY 10040

24  (973)406-2250

25  operations@escribers.net

```
 1
 2  A P P E A R A N C E S :
 3  PROSKAUER ROSE LLP
 4         Attorneys for Debtors
 5         70 West Madison
 6         Suite 3800
 7         Chicago, IL 60602
 8
 9  BY:   MARK K. THOMAS, ESQ.
10         PETER J. YOUNG, ESQ.
11
12
13  PROSKAUER ROSE LLP
14         Attorneys for Debtors
15         Eleven Times Square
16         New York, NY 10036
17
18  BY:   JARED ZAJAC, ESQ.
19
20
21
22
23
24
25
```

1

2   UNITED STATES DEPARTMENT OF JUSTICE

3          Office of the United States Trustee

4          33 Whitehall Street

5          21st Floor

6          New York, NY 10004

7

8   BY:   NADAR KHODOROVSKY, ESQ.

9

10

11   LEONARD STREET AND DEINARD

12          Attorneys for the Creditors' Committee

13          150 South Fifth Street

14          Suite 2300

15          Minneapolis, MN 55402

16

17   BY:   ROBERT T. KUGLER, ESQ.

18

19

20

21

22

23

24

25

1

2   DLA PIPER LLP (US)

3         Attorneys for Authentic Brands Group

4         203 North LaSalle Street

5         Suite 1900

6         Chicago, IL 60601

7

8   BY:   RICHARD A. CHESLEY, ESQ.

9         CHUN I. JANG, ESQ.

10

11  SCHULTE ROTH & ZABEL, LLP

12         Attorneys for Amalgamated Health Fund

13         919 Third Avenue

14         New York, NY 10022

15

16  BY:   LAWRENCE V. GELBER, ESQ.

17

18

19  GREENBERG TRAURIG, P.A.

20         Attorneys for Salus Capital Partners

21         200 Park Avenue

22         New York, NY 10166

23

24  BY:   JEFFREY M. ROSENTHAL, ESQ.

25

1

2  GREENBERG TRAURIG, P.A.

3        Attorneys for Salus Capital Partners

4        333 Avenue of the Americas

5        Miami, FL 33131

6

7  BY:   PAUL J. KEENAN, JR., ESQ.

8

9

10  KENNEDY, JENNIK & MURRAY, P.C.

11        Attorneys for Workers United

12        113 University Place

13        New York, NY 10003

14

15  BY:   THOMAS M. KENNEDY, ESQ.

16

17

18  KILPATRICK TOWNSEND & STOCKTON LLP

19        Attorneys for Midland Loan Services

20        1100 Peachtree Street NE

21        Suite 2800

22        Atlanta, GA 30309

23

24  BY:   MATTHEW W. LEVIN, ESQ.

25

```
 1

 2   PRYOR CASHMAN LLP

 3         Attorneys for Argyle Culture LLC

 4         7 Times Square

 5         New York, NY 10036

 6

 7   BY:   SETH H. LIEBERMAN, ESQ.

 8

 9

10   BLANK ROME LLP

11         Attorneys for Infor Global Solutions

12         1201 Market Street

13         Suite 800

14         Wilmington, DE 19801

15

16   BY:   VICTORIA A. GUILFOYLE, ESQ. (TELEPHONICALLY)

17

18

19   MENTER, RUDIN & TRIVELPIECE, P.C.

20         Attorneys for Destiny USA Holdings

21         308 Maltbie Street

22         Suite 200

23         Syracuse , NY 13204

24

25   BY:   KEVIN M. NEWMAN, ESQ. (TELEPHONICALLY)
```

```
 1
 2  HALPERIN BATTAGLIA RAICHT, LLP
 3         Attorneys for Douglas Williams
 4         555 Madison Avenue
 5         9th Floor
 6         New York, NY 10022
 7
 8  BY:   ALAN D. HALPERIN, ESQ.
 9         DONNA H. LIEBERMAN, ESQ.
10
11
12  ALSTON & BIRD LLP
13         Attorneys for Jonesheirs.
14         90 Park Avenue
15         New York, NY 10016
16
17  BY:   JOHN W. SPEARS, ESQ.
18
19  ALSO PRESENT: (TELEPHONICALLY)
20         ALEX DAMBACH, City of Des Plaines Illinois
21
22
23
24
25
```

1                    P R O C E E D I N G S

2            THE COURT:  Can I have appearances, please?

3            MR. THOMAS:  Good afternoon, Your Honor.  Mark Thomas

4    of Proskauer, with my colleagues Peter Young and Jared Zajac,

5    on behalf of HMX Acquisition Corp. and it's affiliated debtors

6    and debtors-in-possession.

7            MR. ROSENTHAL:  Good afternoon Your Honor.  Jeffrey M.

8    Rosenthal from Greenberg Traurig, with my colleague Paul

9    Keenan -- my partner, Paul Keenan, representing Salus Capital.

10           MR. KUGLER:  Good morning, Your Honor.  Robert Kugler

11   from Leonard Street and Deinard on behalf of the official

12   committee of unsecured creditors.

13           MR. HALPERIN:  Good morning -- afternoon, Your Honor.

14   Alan Halperin, Halperin Battaglia Raicht, here with my

15   colleague, Donna Lieberman, on behalf of Douglas Williams and W

16   Diamond.

17           MR. CHESLEY:  Your Honor, Richard Chesley, DLA Piper,

18   with Chun Jang here on behalf of the stalking horse, ABG.

19           MR. KHODOROVSKY:  Nazar Khodorovsky for the U.S.

20   Trustee, Your Honor.

21           THE COURT:  Anyone else wish to note an appearance?

22           Anyone on --

23           MR. NEWMAN:  Yes, Your Honor.  Kevin Newman, Menter,

24   Rudin & Trivelpiece, P.C., for Destiny USA Holdings, LLC.

25           THE COURT:  For whom?

1          MR. NEWMAN:  Destiny USA Holdings, LLC.

2          THE COURT:  And what is your interest in the matter?

3          MR. NEWMAN:  Landlord.

4          THE COURT:  All right.  Anyone else wish to note an

5    appearance.

6          MS. GUILFOYLE:  Good afternoon, Your Honor.  Tori

7    Guilfoyle of Blank Rome, LLP, on behalf of Infor Global

8    Solutions Michigan, Inc.

9          THE COURT:  And your interest in the matter?

10         MS. GUILFOYLE:  We are a software licensor to the

11   debtor.

12         THE COURT:  All right.  Anyone else?

13         MR. DAMBACH:  Good afternoon, Your Honor.  This is

14   Alex Dambach with the City of Des Plaines.

15         THE COURT:  Anyone else?  All right, counsel, please

16   proceed.

17         MR. KUGLER:  Your Honor, I believe the first matter on

18   the agenda is the application to employ Leonard Street and

19   Deinard filed by the unsecured creditors' committee at docket

20   number 205.  This application was submitted to the U.S.

21   Trustee.  Comments were received from the U.S. Trustee.  We

22   made the changes in accordance with the U.S. Trustee's request.

23   We received no objection or other comments to the employment

24   application.  And if it's acceptable to Your Honor, we'd ask

25   that it be approved.

1          THE COURT:  Does anyone wish to be heard?

2          MR. KHODOROVSKY:  Your Honor, Nazar Khodorovsky for

3    the U.S. Trustee.  In light of the revisions made, the U.S.

4    Trustee has no objection.  Thank you, Your Honor.

5          THE COURT:  Very well.  Do you have a revised order?

6          MR. KUGLER:  We can submit one, Your Honor.  I don't

7    have one.

8          THE COURT:  Well, please do so as soon as possible.

9          All right.  Anything else till we get to the sale?

10         All right, please go ahead.

11         MR. THOMAS:  Thank you, Your Honor.  Mark Thomas on

12   behalf of the debtors.  Your Honor, we are pleased and relieved

13   to report that we have a fully consensual sale order that would

14   approve the debtors' motions for orders authorizing the sale of

15   substantially all of our assets to our stalking-horse

16   purchaser.  The motion was docket number 21.

17         We have worked with the objectors, principally the

18   union, which filed two objections, and the unsecured creditors'

19   committee.  We've resolved those objections.

20         THE COURT:  Is the union here?

21         MR. KENNEDY:  Yes, Your Honor.

22         THE COURT:  Well, come forward and give your

23   appearance.

24         MR. KENNEDY:  Excuse me, Your Honor.  Tom Kennedy;

25   Kennedy Jennick & Murray for Workers United.

1          THE COURT:  Please have a seat.  You bought a seat at

2     the table.

3          All right.  Please go ahead, Mr. Thomas.

4          MR. THOMAS:  And, Your Honor, we've also resolved the

5     objections filed by the committee.  The union and the committee

6     filed the real substantive objections, although we do have a

7     host of objections with respect to adequate assurance of future

8     performance, cure costs.  And my colleague, Mr. Young will walk

9     through the Court through those.  We believe we've resolved

10    virtually all of those, but we'll pick that up a little bit

11    later.

12         Your Honor, I would say that I think it's important in

13    support of the relief requested, that Your Honor take judicial

14    notice of certain declarations of people that are here in court

15    and are willing and able to testify if necessary with respect

16    to the facts set forth in their declarations.  And the record

17    should reflect that in support of the order, we would submit

18    the declaration of Geoffrey A. Richards.  He's with William

19    Blair.  He's been leading the engagement on behalf of the

20    debtor's investment banker, William Blair.  And his declaration

21    was filed at docket number 257.  It is an extensive declaration

22    that lists the many pre-petition and post-petition marketing

23    efforts that were run by the investment banker on behalf of

24    this debtor, commencing in August, two months before the

25    petition date, and then picking up again in November -- early

1  November -- November 5th, after a no-shop clause expired upon

2  the entry of your bidding procedures orders.

3           Your Honor, there's also a declaration of Michael

4  O'Hara.  Michael O'Hara is also in court.  He is the

5  independent director of the debtors.  His declaration is docket

6  number 256.  Mr. O'Hara was appointed as independent director

7  by the debtors' boards of directors in August 2002 (sic), prior

8  to the commencement of these bankruptcy cases, and was granted

9  the sole and exclusive power and authority over the entire sale

10 process and the bankruptcy process.  And Mr. O'Hara's

11 declaration principally deals with his role as an independent

12 director, his activity in connection with the sale process, and

13 the fact that all decisions regarding the sale process,

14 regarding the choice of the stalking-horse bidder, and

15 regarding how to proceed with the sale process, were subject to

16 his direction and control as independent director.

17          Your Honor, we would also submit the declaration of

18 Mr. Michael Healy.  Mr. Healy is a managing director of CDG Co.

19 and CDG Co. has been employed as financial advisor to the

20 debtors.  His declaration is docket number 258.  Mr. Healy's

21 declaration principally deals with the facts that the liquidity

22 crisis that these debtors have faced since spring of 2012

23 commencing (sic) in July 2012 when we defaulted on our payment

24 obligations under our original 2009 credit agreement, and

25 continue on through this case, are so acute that extending the

1   sale process or otherwise continuing the sale process could

2   possibly result in irreparable harm to the estate, and that the

3   costs would require a substantial new debtor-in-possession

4   financing facility.

5          Your Honor, Douglas Williams, the CEO of the debtors,

6   has submitted two declarations.  The first was docket number 3,

7   which was submitted in connection with our first-day pleadings.

8   And the second recent declaration was submitted by Mr.

9   Williams, by his counsel, Mr. Halperin -- he has separate

10   counsel.  It's docket number 247.  And it was submitted in

11   response to the objections filed by the committee to the sale.

12          Your Honor, the ultimate outcome of the situation is

13   that there were no qualified bids that were received by the

14   debtors in accordance with the bidding procedures that were

15   approved.  And three different bidding procedures orders were

16   entered.  Rather unusual, Your Honor, but we had an unusual and

17   rocky start to the case, given the hurricane, which delayed the

18   appointment of a creditors' committee, which resulted in some

19   interim bid procedures orders, two of them being entered before

20   the committee really had time to get up to speed.  And those

21   bid procedures orders were docket number 104, docket number 169

22   and docket number 185.

23          We were pleased to file, Your Honor, a letter, docket

24   number 220, which reflected the fact that on or about December

25   11th, the stalking-horse asset purchase agreement that had been

1    submitted in October had become a firm commitment for a going-

2    concern sale.  And as we've discussed in prior court hearings,

3    when we filed this case in October, we had a stalking-horse

4    bid.  And the bid could either be a going-concern bid or a

5    liquidation bid.

6          The only firm nonconditional aspect of the stalking-

7    horse agreement was the liquidation aspect.  The going-concern

8    aspect was subject to two conditions.  And we had no idea

9    whether those conditions would ever be met or fulfilled.  But

10   we wanted to have the opportunity and the time to have those

11   conditions fulfilled so a going-concern sale could occur.

12         The conditions were that number one, the stalking-

13   horse buyer, Authentic Brands, enter into a license agreement

14   with a company that Mr. Douglas Williams would form.  The

15   second condition was that the newly formed license company,

16   formed by Mr. Williams, would have financing acceptable to the

17   stalking-horse bidder in the stalking-horse bidder's sole

18   discretion.

19         THE COURT:  Who is providing the financing to Mr.

20   Williams, or his company?

21         MR. THOMAS:  The financing -- Your Honor, the

22   financing with Mr. Williams will be provided by Salus Capital.

23   Salus Capital is the debtors' DIP lender.  Salus Capital is the

24   debtors' pre-petition lender.  And, Your Honor, Salus Capital

25   came on the scene -- and these are in the declarations -- on or

1   about August 14th of 2012.  In July of 2012, a refinancing

2   effort failed.  The debtors had arranged financing with Salus

3   Capital, and Salus was ready, willing, and able to close in

4   July.  However the debtors' principal owners, a publicly traded

5   company, SKNL, had committed to infuse twenty-five million

6   dollars into the debtors as part of that refinancing.  And that

7   twenty-five million dollars would have been critical new

8   liquidity for the debtors' operations.

9           On the eve of the July 16th closing of the

10  refinancing, the debtors were informed that their owners were

11  not able to make the required equity infusion, and therefore

12  the refinancing did not --

13          THE COURT:  We're -- let's leave history -- the

14  history had been presented to me in every hearing.  I think I

15  recall enough of it.

16          MR. THOMAS:  Okay.

17          THE COURT:  So what we're doing, in essence, is to

18  separate out the ownership of the brands and the ownership of

19  the business -- the operating business, which is called the

20  license agreement.  Is that what we're doing?

21          MR. THOMAS:  That is absolutely correct, Your Honor.

22          THE COURT:  And Salus is financing both sides of this,

23  or just the licensee side?

24          MR. THOMAS:  To my knowledge, Salus is only financing

25  the licensee side, in other words, the operating company.

HMX ACQUISITION CORP., ET AL.                    17

1          THE COURT:  The operating company is taking over the
2     entirety of the business of the debtor, more or less?  Is
3     that --
4          MR. THOMAS:  Yes, the operating company is assuming
5     the collective bargaining agreement with the union workers, has
6     the ability to offer employment to non-union workers, and is
7     taking over the real estate, machinery and equipment, and the
8     working capital assets, receivables and inventory, and then
9     will have a license to manufacture the branded goods that will
10    now be owned by the licensor, Authentic Brands.
11         THE COURT:  Which is ABG?
12         MR. THOMAS:  ABG.
13         THE COURT:  ABG being an independent company with its
14    own resources?
15         MR. THOMAS:  Its own resources.  A well-known --
16         THE COURT:  Whatever they are.
17         MR. THOMAS:  Yes.
18         THE COURT:  All right.  Now, I understand that there
19    was another potential purchaser that made a bid, but that --
20    and got an extension of time, and withdrew the bid.
21         MR. THOMAS:  Correct, Your Honor.
22         THE COURT:  Do you know why the bid was withdrawn?
23         MR. THOMAS:  I -- the purchaser had appeared in court
24    before.
25         THE COURT:  They appeared --

1           MR. THOMAS:  Their counsel --

2           THE COURT:  -- they appeared by counsel several times.

3           MR. THOMAS:  Right.  Their counsel is not in court

4   today.  I spoke to counsel on Monday -- Monday, December 17th,

5   at 7:30 a.m., and was told that the potential bidder could not

6   get comfortable with the risks posed by operating the US

7   manufacturing facilities and the union work force.  In essence,

8   they couldn't get comfortable with the operational risks of

9   taking -- stepping into the IPCo/OpCo structure.

10          The potential bidder had been involved in the process

11  since September, pre-petition, had reengaged, did request

12  extensions, did provide a bid by Friday, December 14th, and we

13  worked over the weekend to try to make that bid a qualified

14  bid, and ultimately they determined to withdraw the bid.  So

15  there was not an auction in accordance with the bid procedures

16  rules.

17          THE COURT:  All right.

18          MR. THOMAS:  In lieu of an auction, we spent the day

19  trying to craft a compromise between the committee, the union,

20  the debtors, Authentic Brands, and the licensing company, and

21  we were successful in achieving that.

22          THE COURT:  Well, I see that.  That is Exhibit D to

23  the sale order.

24          MR. THOMAS:  Yes, Your Honor.  And that --

25          THE COURT:  This is new to me, which is fine.  I'm not

1  complaining.  But how is this going to be effectuated?

2          MR. THOMAS:  Your Honor, it would -- parts of it are

3  effectuated under the sale order.  Others will have to be

4  effectuated in corporate governance documents of the licensee

5  entity.  And other parts will have to be effectuated through a

6  plan that the debtors and the committee hope to confirm.

7          There are releases that will really be effectuated

8  through a plan.  There are corporate governance provisions

9  whereby the committee will have the ability to designate a

10  board member of the license company.  There are equity

11  participation or profit participation rights, whereby the

12  licensing company will make profit participations available to

13  all employees of the company, including the rank and file union

14  workers.  There's a bucket for the employees.  There's a bucket

15  of profit participation for the unsecured creditor body, which

16  we anticipate will be a trust created upon confirmation of a

17  plan.

18          There's a bucket of equity for executive management,

19  other than Mr. Williams.  And there's a slice of equity

20  available, because this license company will have to have an

21  independent director that was part of the negotiations.  And

22  there's a possibility that an independent director would like

23  some equity upside and that that is made available as well.

24          THE COURT:  And if there's no plan?

25          MR. THOMAS:  If there's no plan, I think we would

1   probably -- and we've discussed this but it's not in here --

2   we've discussed this with the committee.  We think that --

3            THE COURT:  I'm not assuming there will be no plan.

4   I'm just trying to look forward.  This company will have

5   virtually no assets left --

6            MR. THOMAS:  Yes.

7            THE COURT:  -- other than a lot of lawyers.  I guess

8   the committee still has its investigation period.  And

9   somebody's going to have to draft a plan.  But it won't have

10  any business operations.

11           MR. THOMAS:  No business operations, Your Honor.

12  There will cash payments to the estate at closing.  So there --

13           THE COURT:  We'll get to that.  That's new to me too.

14  So we'll get to that -- we'll get to where the cash goes.

15  Let's stick with the sale.  But explain -- yes, how is Exhibit

16  D going to be effectuated?

17           MR. THOMAS:  Your Honor, it's --

18           THE COURT:  Through a plan --

19           MR. THOMAS:  A plan.

20           THE COURT:  I suppose it could be effectuated

21  otherwise if it had to be?

22           MR. THOMAS:  Yes, Your Honor.  We think there's

23  basically -- this debtor-in-possession has three options.  It

24  will -- there will either be a plan or there will be a

25  conversion and a trustee will take control.

1          THE COURT:  No, there won't be a conversion --

2          MR. THOMAS:  Thank you.

3          THE COURT:  -- because there won't be a sale.

4          MR. THOMAS:  Thank you.  We don't think there --

5          THE COURT:  There won't be a sale today unless you can

6    give me -- and Mr. O'Hara is going to take the stand and assure

7    me that this debtor can pay its administrative and priority

8    claims.  That's been -- I think I've been pretty clear that

9    we're not going to have a sale in this case and have an

10   administratively insolvent estate.

11         MR. THOMAS:  You have been.  And we have been

12   preparing and negotiating to accomplish that goal.  And we have

13   accomplished that goal.

14         THE COURT:  All right.

15         MR. THOMAS:  I was just speaking hypothetically.

16   There's only three ways for a debtor to get out of --

17         THE COURT:  Well, that's true.

18         MR. THOMAS:  -- bankruptcy.

19         THE COURT:  Hypothetically.

20         MR. THOMAS:  So, and we don't want that either.

21         THE COURT:  And it can happen.  One never knows.

22         MR. THOMAS:  And the other way, Your Honor,

23   hypothetically, would be a structured dismissal.  And what I

24   would say is if there -- in any of those circumstances, the

25   consideration that the committee bargained for would transfer

1    to some kind of trust created for the benefit of the holders of

2    allowed unsecured claims.  The governance will -- the

3    governance of the licensee will take care of the board seats

4    and the governance.

5            THE COURT:  Yes, that's -- that is certainly something

6    that can be effectuated outside of a plan.  All right.

7            You wanted me to take notice -- to accept as a

8    proffer, the three declarations that you referred to that were

9    submitted in connection with your motion for the sale.  Is

10   there any objection to my taking those declarations as a

11   proffer?

12           MR. KUGLER:  No objection from the committee, Your

13   Honor.

14           THE COURT:  All right.  No other objections?  Does

15   anyone wish to cross-examine?

16           All right.  I'd like to ask Mr. O'Hara or -- invite

17   you to ask him a few questions, with regard to his governance

18   of the debtor, his independence, and that we have, on the

19   numbers that you are proposing to include in the sale order --

20   and we'll get to that -- we have an administratively solvent

21   estate.  We know we can pay the administrative claims and the

22   priority claims.

23           Obviously, it would nice if we had an unsecured

24   creditors' recovery, but I don't think Congress gave me the

25   power or the right to set a minimum recovery for unsecured

 1  creditors, as much as unsecured creditors would like me to do

 2  that sometimes.

 3          MR. THOMAS:  Your Honor, I would call Mr. Michael

 4  O'Hara.

 5          THE COURT:  Please state your name for the record.

 6          THE WITNESS:  Michael O'Hara.

 7      (Witness sworn)

 8          THE COURT:  Please be seated.

 9  DIRECT EXAMINATION

10  BY MR. THOMAS:

11  Q.   Good afternoon, Mr. O'Hara.

12  A.   Good afternoon.

13  Q.   Did you submit a declaration on or about December 17th, in

14  connection with the debtors' response to the committee's

15  objection to the sale motion?

16  A.   I did.

17  Q.   Did you review that declaration?

18  A.   I did.

19  Q.   Did you comment on the declaration?

20  A.   I did.

21  Q.   And is that declaration true and correct?

22  A.   It is.

23  Q.   When did you first become engaged by these debtors?

24  A.   I became appointed as the lead independent director on or

25  around August 15th, shortly after Salus Capital became the

HMX ACQUISITION CORP., ET AL.                                24

1  debtor's senior secured lender.

2  Q.   And upon your appointment in August of 2012, do you recall

3  what the situation was with the debtor?

4  A.   Yes.  The -- we had a week or two in which the debtor's

5  primary equity investor could make an additional equity

6  investment.  And if they did that, the company had great plans

7  to progress towards its growth.  In the absence of that

8  investment, the debtors had agreed with their secured lender to

9  run an orderly sale process.  They had agreed with a lender to

10 appoint an investment banker -- in this case, William Blair --

11 to lead a process.

12       Because there was a possibility that the company's equity

13 investor may make an equity investment or may otherwise have an

14 impact on the sale process they -- the lender and the equity

15 investor agreed to separate out the sale monitoring corporate

16 governance component to an independent director.  And so that's

17 why they asked me to come in at that time.

18 Q.   Have you served as a director before?

19 A.   I have, indeed, yes.

20 Q.   And have you ever been engaged in the marketing or sale of

21 a company?

22 A.   Yes.  It's a regular part of my regular business.

23          THE COURT:  What is your regular business, Mr. O'Hara?

24          THE WITNESS:  Your Honor, I'm the founder and chief

25 executive officer of a boutique investment banking firm by the

1   name of Consensus.  We work exclusively with retail and

2   consumer product companies.  We work with companies, really, at

3   any stage of their life.  We work with early stage growing

4   companies, where we raise capital for them.  We work with

5   companies in the mid-market, that are looking to sell

6   themselves or to buy or acquire other entities.  We do

7   financial advisory work where we will sometimes be investment

8   bankers to distressed companies.  We'll act and serve as chief

9   restructuring officers.  We do due diligence and valuation work

10  for investors and lenders.  So we do all of those things.  So

11  everything from early stage to death and dying within retail

12  and consumer.

13          THE COURT:  Let me just point out, we don't usually

14  have death and dying in this courtroom.  We speak of it as

15  restructuring and rehabilitation.  But I suppose we were

16  talking about conversion a few moments ago.  So it can happen.

17          How many employees does your company have?

18          THE WITNESS:  Our firm has thirteen employees in the

19  United States and one in London, England.

20          THE COURT:  All right.

21  BY MR. THOMAS:

22  Q.   And, Mr. O'Hara, when you began your engagement in August

23  2012, did you have an understanding about whether Blair had

24  just been retained by the debtors?

25  A.   No.  I understood that Blair had been involved for nearly

1  the entire year, looking to raise capital for the company.

2  Q.   The owners didn't put in the equity.  The sale process

3  proceeded.  Can you explain your role in the marketing and sale

4  process from the time of August when you were engaged up until

5  on or about October 18th, when these debtors filed their

6  Chapter 11 petitions?

7  A.    Yes.  And Your Honor, if you don't mind, I'll go back a

8  little bit into history.  Our firm --

9        THE COURT:  You can summarize.

10        THE WITNESS:  I'll summarize as quickly as possible.

11        THE COURT:  You don't have to go over the entire

12  history, because first, I remember the affidavits, and

13  secondly, I'm most interested in getting to the question of

14  administrative solvency.

15        MR. THOMAS:  Well --

16        THE COURT:  But go ahead.

17        THE WITNESS:  I'll be very brief.

18        THE COURT:  Give me a summary.  I don't mean to

19  preclude Mr. Thomas from asking you any questions that he

20  thinks should be answered.

21  A.    And the reason I mention this, it goes to -- it goes to

22  Mr. Thomas' question.  Our firm conducted extensive due

23  diligence on behalf of Salus back when they thought they were

24  doing a loan to the company in June and July.  And so when I

25  was engaged to be the board member in the middle of August, I

1  hit the ground running, so to speak, and oversaw the process

2  from day one with a pretty good understanding of the company,

3  so immediately helped oversee and comment on the confidential

4  information memorandum that the Blair team had put together and

5  immediately helped providing names, and in some instances

6  introductions to potentially interested parties.

7  Q.   Okay.  And you know that the stalking-horse bid had what

8  we call the IPCo/OpCo structure.  And do you think that was

9  beneficial for these debtors, and why?

10 A.   We do.  At the time the IPCo/OpCo structure was first

11 proposed, our only legitimate alternatives were liquidation of

12 the company in a manner that would have left our employees out

13 of work in their entirety.  We put a lot of effort in -- myself

14 and the William Blair team, as well as Doug Williams, looking

15 for a going-concern buyer.  At the time the IPCo/OpCo structure

16 was worked through, and I was a part of pulling all of that

17 together, it was the only option on the table to keep the

18 business going forward and keep employees employed.

19 Q.   Mr. O'Hara, in connection with the proposed sale to the

20 stalking-horse purchaser, did you have occasion to attempt to

21 determine whether or not the sale would produce sufficient

22 receipts for the company to pay its accrued and projected go-

23 forward administrative expenses?

24 A.   Yes.  I'm glad Your Honor raised it, because it's been a

25 focus of ours from the beginning.  The initial purchase price

1    that was proposed to us under the IPCo/OpCo bid, was, indeed,

2    not sufficient to cover what we projected to be our

3    administrative needs.  We negotiated for a price that would get

4    us over our projected needs.  And that's why the price you saw

5    in our purchase agreement was effectively the level of the

6    Salus claim plus 5.1 million dollars.  In addition to that, as

7    you know, Your Honor, from reading all the papers in this case,

8    the estate gained an additional three million dollars in what's

9    the so-called Salus discount.  So we have about 8.1 million

10   dollars, plus we've got money funded into an escrow for

11   professional fees.

12            THE COURT:  Is that on account of the carve-out to

13   date or otherwise?

14            MR. THOMAS:  It has been funded, Your Honor.

15            THE COURT:  It has been funded by Salus, therefore

16   it's part of the Salus claim?

17            MR. THOMAS:  Yes.  Part of the DIP loan, pursuant to

18   the DIP budget.  And it does satisfy the carve-out.  Although

19   nothing -- because of the pace of the case, there have been no

20   interim payments.  But the escrow's been established.

21            THE COURT:  But there've been monthly -- do we have a

22   monthly fee --

23            MR. THOMAS:  Your Honor, we do have an interim --

24            THE COURT:  -- order?

25            MR. THOMAS:  -- comp order.  But because of the delay

1    in the hearings, it wasn't entered until, I think November

2    29th --

3               THE COURT:  So it hasn't had any effect.

4               MR. THOMAS:  Correct.

5               THE COURT:  But those fees are considered as in effect

6    earned or paid?  They're part of the Salus claim?  Is that how

7    it works or --

8               MR. THOMAS:  Your Honor, how it works is that the DIP

9    loan provided for a budget which included projected

10   professional fees.  Because we realized the case would move so

11   quickly, we had those fees sort of paid into an escrow, subject

12   to court allowance of professional fees.  The idea being if

13   there was a sale and the DIP wasn't drawn, there would be

14   nothing to pay admin claims that had accrued to get to that

15   sale.

16              So it is part of the Salus claim, everything that has

17   been deposited into that professional fee escrow account.

18              THE COURT:  And how much is in there right now?

19              MR. THOMAS:  I think right now there's approximately

20   2,100,000 dollars.

21              THE COURT:  And what is -- what are the other

22   administrative claims projected, to date?  Do we have a --

23   BY MR. THOMAS:

24   Q.   Mr. O'Hara, in addition to professional --

25              THE COURT:  -- an approximate amount?

1    A.   We do, Your Honor.  If you don't mind, myself refreshing

2    my recollection by looking --

3            THE COURT:  No, please.

4    A.   -- at the document.

5            THE COURT:  If you have -- if you have something, that

6    would be very helpful.

7    A.   The great majority of the fees that will be owed by the

8    estate do relate to professional fees.  That's because in large

9    part the negotiations with ABG and the licensee resulted in the

10   licensee assuming a decent amount of what might have otherwise

11   been 503(b)(9) claims.  So we're fortunate that the 503(b)(9)

12   claims that we think we're retaining are very modest.  But

13   those are part of the dollars that we've covered.

14       We do have some priority tax claims that we are -- that we

15   are -- that we've projected to pay.  We have put in place as

16   well some dollars to provide for administrative services to the

17   estate as it winds down.  We are -- we have negotiated, we

18   believe, with ABG and the licensee to be able to continue to

19   use retained employees.  But we also believe we'll need to hire

20   back some employees who will provide certain functions such as

21   reconciliation of invoices, as well as perhaps the preparation

22   of tax returns and dealing with customs issues and things like

23   that.

24       So we've put together a budget that covers all of that.

25   And with regard to professional fees, our expectation is that

1   we will work together between the debtors' professionals and

2   the committee's professionals.  And Mr. Kruger (sic) and I are

3   talking about that tomorrow.  But our expectation is that we

4   have some money put aside for counsel for both entities.  We

5   have CDG continuing to run financial information to prepare

6   MORs and things of that nature and help with the distribution.

7   We have a claims agent.  And so all of those things have been

8   projected out through a plan of liquidation or a plan of

9   distribution.

10         And we believe we've got sufficient funds for it.  And,

11   Your Honor, unless we run into another bump in the road -- and

12   as you know, we've run into every possible bump in the road so

13   far -- we believe that the money that we have retained from the

14   deal will provide us with something to distribute to unsecured

15   creditors in the form of cash.

16         And as Mr. Thomas previously pointed out, we also need to

17   account for the distribution of profit interests in the new

18   licensing entity.  So we hope we will have cash and these

19   equity-like instruments to distribute through a plan.  And

20   Poskauer and committee counsel have already put their heads

21   together about how we'll effect that.

22         THE COURT:  All right.  What -- do we have a number

23   for unsecured claims, an approximate amount?  Just for

24   curiosity?

25         MR. KUGLER:  Your Honor, kind of at the outset, it is

1    our understanding that unsecured claims are twenty-three,

2    twenty-four million.  Eight million of those are going to be

3    assumed, approximately, by the -- by the licensee.  That leaves

4    about fifteen million.  Now that excludes a claim by the prior

5    owner of the debtor, SKNL.  They have, I believe, a nineteen-

6    million-dollar claim that the committee's going to need to take

7    a hard look at in terms of where it should fall in the priority

8    chain.  But that's the best of our understanding at this point.

9             THE COURT:  All right.  Thank you.  All right.

10            MR. THOMAS:  I have no fur --

11            THE COURT:  I have no questions -- no further

12   questions of Mr. O'Hara.

13            MR. KUGLER:  I have no further questions.

14            MR. KHODOROVSKY:  I have two brief questions of Mr.

15   O'Hara.

16   CROSS-EXAMINATION

17   BY MR. KHODOROVSKY:

18   Q.   Mr. O'Hara, after the sale -- if the sale is approved

19   today by His Honor and the sale closes, who will be in charge

20   of running the companies' affairs from day to day; in other

21   words, signing corporate documents, complying with corporate

22   formalities?

23   A.   Unless the parties that are involved in the process choose

24   otherwise, I intend to remain in this position to do so.

25   Q.   And Mr. O'Hara, will you be willing to sign the debtors'

1  operating reports and the plan and disclosure statements of the

2  debtors, the proposed one?

3  A.    I will.

4         MR. KHODOROVSKY:  Thank you, Your Honor.  No further

5  questions.

6         THE COURT:  Thank you.  Anyone else?

7         All right, thank you very much, Mr. O'Hara.

8         THE WITNESS:  Thank you, Your Honor.

9         THE COURT:  All right.  Anything else, Mr. Thomas, or

10 from any other party, with regard to approval of the sale?

11        MS. GUILFOYLE:  Your Honor, this is Tori Guilfoyle of

12 Blank Rome.  I believe the debtors have still yet to address

13 the assumption and assignment issues.  Is that correct?

14        THE COURT:  That is correct, yes.

15        MS. GUILFOYLE:  Okay, thank you, Your Honor.

16        MR. KUGLER:  Your Honor, Robert Kugler, again, on

17 behalf of the committee.  And I will keep it brief, unless Your

18 Honor would like to hear from me on a more lengthy basis.

19 We're prepared to present either an offer of proof of

20 testimony, if the Court would like to get the sense of

21 perspective from the committee.

22        But in the thirty-five days we've been involved in

23 this case, we have worked as a committee, extraordinarily hard.

24 I would imagine we've had at least twenty meetings between

25 those thirty-five days.  A fully engaged, active committee.  We

1    tried everything that we could think of to come up with

2    additional bidders, or alternatively, to come up with financing

3    to extend the auction period so that we would have time to come

4    up with additional bidders.  We turned over ever rock.  We

5    looked in every nook and cranny; and we thought we had one.

6    And we worked very, very hard with that particular bidder, who

7    walked away twice, came back a third time.

8            At 2 a.m. on Monday morning, we had a deal.  They were

9    going to come in and we were going to have an auction the next

10   morning.  And by the time I got out of the shower the next

11   morning, they had evaporated into the ether.

12           We didn't have a lot of great choices at that point in

13   time.  And we sat down with the debtor and with ABG and engaged

14   in what I would characterize as vigorous but very good-faith

15   negotiations.  We negotiated throughout the better part of the

16   day.  The committee was locked up in a conference room and was

17   informed and kept regularly apprised of the situation.  And by

18   that evening, we had reached an agreement.

19           The agreement isn't perfect.  But as my mentor taught

20   me, you can't let the perfect be the enemy of the good.  And it

21   is a good agreement.  The estate -- the creditors are going to

22   get cash in some amount.  And that currently looks like it

23   could be a seven-figure amount, possibly; knock on wood.

24   They're going to get profit participation units in the new

25   operating entity.  And they're going to get to keep those

1    profit participation units until all unsecured claims are paid
2    in full.  That may never happen.  But if the company does as
3    well as ABG believes it will, there's an opportunity for some
4    real upside.

5          We were able to have the new entity assume a third of
6    the unsecured debt in the case.  It's a significant factor and
7    really is another form of recovery for the unsecured creditors
8    here.  The new --

9          THE COURT:  Plus the union contracts.

10         MR. KUGLER:  Plus the union contracts.  Absolutely.
11   They're also assuming Mr. Williams' contracts, which are a
12   liability that will not be part of our estate as we go forward.

13         We're going to have a board seat on the operating
14   company going forward.  We're going to have participation at
15   the management level, so we can see what's going on and
16   hopefully help guide it to be a very successful entity.  That
17   board seat is going to be filled by the soon-to-be former
18   chairman of the committee, Mr. Roup.  ABG had a good
19   conversation.  They proposed that Mr. Roup fill that board
20   seat.  Mr. Roup was not part of the committee decision to allow
21   that to happen.  He recused himself from that.  But he has a
22   very deep and very broad understanding not only of this
23   industry but of this particular debtor.  He was a committee
24   member on the prior Hart Marx bankruptcy case.  He's the
25   chairman of the committee in this case.  He doesn't want to be

1    a committee member on a third Hart Marx bankruptcy case.

2              So he will be resigning, much to my chagrin, from the

3    committee.  And he will go forward on the board of the new

4    OpCo.  Like I said, we're going to have a voice in management,

5    who's going to be managing the new entity.  And we're going to

6    get the opportunity to participate in the selection of an

7    independent board member.  So we're going to have kind of a

8    different situation going forward.  We're going to be a

9    partner; maybe a junior partner, but we're going to be a

10   partner in this operation going forward.  And we are going to

11   take that very seriously, because each ten percent of profit

12   comes back to our folks.

13             And when I say the ten percent, that's to the

14   creditors.  The rank and file employees are getting ten percent

15   as well.  And so we're not going to lose sight of that.

16             Your Honor, it's been -- I think the last time I was

17   in here I said I feel like I live between a rock and a hard

18   spot in this case.  And it has been difficult.  There has been

19   incredible effort on behalf of the committee.  I've represented

20   numerous committees, and I've not seen a committee try as hard

21   as it has here to bring about a good result.  Our number one

22   goal was to have a viable entity going forward.  We've got

23   that.

24             And now we're talking about a return to the creditors

25   that is significant.  It's a good result, and we support it,

1   Your Honor.

2           THE COURT:  Thank you very much.  Anyone else?

3           Mr. Khodorovsky, why don't you wait for a moment.

4           MR. HALPERIN:  Alan Halperin on behalf of Douglas

5   Williams and W Diamond.  Your Honor, I've appeared before you

6   several times and I made certain statements.  And I am pleased

7   to say that at the end of the day, while perhaps an auction

8   didn't occur, one of Mr. Williams' overarching goals did occur.

9   The company doesn't have to liquidate, and that 1,100 people's

10  jobs get saved.

11          I will tell you that he spent this morning up in

12  Rochester at the plant.  He planned to go to Chicago as well.

13  He couldn't do it logistically, so he's going to be having a

14  video conference with them tomorrow.  Pleased to hear that

15  basically, when he walked in the room to speak with people what

16  happened was a standing ovation and a thank you for saving

17  jobs.

18          This has been a very difficult, hard-fought process.

19  People can have differences of opinion.  It's been very

20  difficult on him, but ultimately the process worked.  And we

21  have a company that doesn't get liquidated, and we're all very

22  pleased about that.

23          Just so we are a little bit clear, Mr. Kugler

24  indicated that he had conversations with ABG, but the

25  concessions were those of the OpCo, which ABG is not a part of.

1    ABG very graciously and I think wisely served as an

2    intermediary, because tempers had gotten very hot.  There were

3    concerns and issues and perhaps even a little bit of acrimony

4    back and forth in the heat of the moment, and ABG served as an

5    intermediary and helped to broker a deal.

6           At the end of the day, it's everybody's goal that this

7    company succeed.  And once Mr. Williams knew that he was going

8    to be the guy, at that point, as long as he had appropriate,

9    intelligent, savvy businesspeople on a board, it was time to

10   talk about making those kinds of concessions, and making them

11   because it would work and it would help.

12          We're pleased with the outcome.  We're pleased that

13   the jobs are going to be saved.  And we think ultimately this

14   is the best result for the company.

15          THE COURT:  Thank you.  Anyone else?

16          Yes, sir.

17          MR. KENNEDY:  Your Honor, Tom Kennedy on behalf of

18   Workers United.  I'm not going to belabor the point.  We

19   believe this is in arrangement that does maintain these jobs

20   and provides the opportunity, equally importantly, for these

21   facilities to grow.  They have not been working forty hours at

22   those facilities because of a lack of materials and a lack of

23   capital.  And we believe that we've become comfortable now with

24   the leadership that ABG and Mr. Williams and the new board will

25   be giving.  And we're looking forward to working with this

1    company and negotiating a new collective bargaining agreement

2    and being able to grow this portion of the industry.  So thank

3    you.

4            THE COURT:  Thank you.  It's all very hopeful for the

5    future.

6            Mr. Khodorovsky?

7            MR. KHODOROVSKY:  Thank you, Your Honor.

8            THE COURT:  You can stay there.

9            MR. KHODOROVSKY:  Oh, thank you, Your Honor.  I

10   appreciate that.  Nazar Khodorovsky for the U.S. Trustee.  Your

11   Honor, I'll be extremely brief.

12           Your Honor, when the U.S. Trustee saw the revised sale

13   order, the order and the Exhibit D were as new to the U.S.

14   Trustee as they were to Your Honor.  However, as a result of

15   discussions, and I believe those discussions were productive,

16   certain revisions were made to the order and to the Exhibit D,

17   which I believe are consensual.

18           The revisions to Exhibit D ensure that any releases

19   that Mr. Williams is to receive will be undertaken as part of a

20   plan, with the consent of the creditors' committee.  The U.S.

21   Trustee's also gratified that Mr. Roup will be resigning from

22   the committee, as I understand it, effective tomorrow.

23           The U.S. Trustee is also gratified that the proposed

24   sale order was revised to ensure that William Blair, the

25   investment banker, will comply with its retention order and

12-14300-alg   Doc 390   Filed 02/25/13   Entered 02/26/13 09:18:24   Main Document
Pg 40 of 83

HMX ACQUISITION CORP., ET AL.                    40

1  will file an appropriate fee application, and that all fees

2  will be subject to Your Honor's review.

3         And finally, Your Honor, an earlier draft of Exhibit D

4  indicated that Mr. Roup was to have a consulting arrangement

5  with the licensee entity, Your Honor.  And that has been

6  removed from, I think, the revised Exhibit D.  So in light of

7  all of these revisions, Your Honor, the U.S. Trustee has no

8  further objection.  Thank you, Your Honor.

9         THE COURT:  Well, Exhibit D says that Mr. Roup will

10  provide consulting services.  It doesn't speak of any

11  agreement.  I gather that's being left for the future.  There's

12  no pre-existing deal, but there's no preclusion against any

13  such deal.  Is that right?

14         MR. KHODOROVSKY:  There's no preclusion, Your Honor.

15  But to the best of my understanding, the latest draft, as the

16  parties have discussed, eliminates the language "current

17  consulting position" for Mr. Roup.  Thank you, Your Honor.

18         THE COURT:  Nothing current, in other words?

19         MR. CHESLEY:  No, Your Honor.  Richard Chesley, DLA

20  Piper.  I rise very, very briefly.  As the stalking horse --

21  hopefully the successful --

22         THE COURT:  Well, why don't we cease that name.  I

23  would like to get rid of that name --

24         MR. CHESLEY:  As would we, Your Honor.

25         THE COURT:  -- as general principles in the bankruptcy

1  process.  But you represent ABG?

2           MR. CHESLEY:  Yes, Your Honor.  We have --

3           THE COURT:  And I gather that in any event, Mr. Roup

4  will be providing consulting services to the new licensee?

5           MR. CHESLEY:  Your Honor, there is a revision to

6  Exhibit D that eliminates that reference.  Mr. Roup will be

7  resigning from the committee, will be becoming a member of the

8  board, in that he may provide some assistance with respect to

9  business con --

10          THE COURT:  All right.

11          MR. CHESLEY:  -- business consulting from time to

12 time, but there's no mention of it anymore with respect to

13 Exhibit D to the sale order.  So we have eliminated that as

14 part of the negotiation, today, which we served again, in the

15 intermediary role.

16          THE COURT:  All right.

17          MR. CHESLEY:  The last thing I would mention, Your

18 Honor, is -- obviously we've been before the Court before -- we

19 were happy to participate in this process from the beginning.

20 It became clear to us, along with our partner, Leonard Green

21 Partners, that we were only interested in this transaction to

22 the extent we could serve as a conduit to a going-concern sale,

23 save these jobs and bring this company back to life.

24          We're pleased with all of the efforts, everybody's

25 hard work, to do that; and we are graciously looking forward to

1  this process.  It's cost us a little bit more money to make

2  sure that the debtors remained administratively insolvent

3  (sic), but we were willing to do so, Your Honor, to make sure

4  that this process got done, got done timely, and that the

5  workers would know when they went home for Christmas, that they

6  had jobs.

7          THE COURT:  And you can endorse what the debtors' have

8  said from your perspective as counsel for the purchaser --

9  proposed purchaser -- that there were no side deals that have

10  not been disclosed to the Court; that the parties have acted at

11  arm's length and in good faith throughout?

12          MR. CHESLEY:  Absolutely, Your Honor.  I can affirm

13  that as a representative of the court.

14          THE COURT:  All right.  Thank you.

15          MR. CHESLEY:  Thank you, Your Honor.

16          THE COURT:  All right.  Anyone else?

17          All right.  Now, I think Mr. Thomas, you were going to

18  have one of your colleagues deal with some of the assumption

19  and assignment issues.

20          MR. THOMAS:  Thank you.

21          MR. YOUNG:  Thank you, Your Honor.  Peter Young,

22  Proskauer, for the debtors.

23          Your Honor, there were nine filed objections on

24  contract and assumption issues and one informal objection that

25  the debtors received.  And I'd like to walk Your Honor through

HMX ACQUISITION CORP., ET AL.                          43

1    each of them and let you know what our resolution has been;

2    eight of which, I believe, are fully resolved, and two of which

3    we think are resolved; there may be some commentary from the

4    counsel on telephone to the contrary.  But I don't believe so.

5            Your Honor, Simon Property Group, at docket number

6    202, filed an objection on --

7            THE COURT:  The filed a withdrawal of objection.

8            MR. YOUNG:  They filed a withdrawal at docket number

9    264.

10           THE COURT:  All right.

11           MR. YOUNG:  Your Honor, docket number 206, Madison and

12   54th Street Associates, filed an objection to the cure amount.

13   That objection was resolved by the debtors' revised schedules

14   2.3 and 3.7 to the APA which were filed at docket number 239.

15   That revised the cure amount so that Madison and 54th Street

16   Associates no longer objects to the proposed cure amount by the

17   debtors.

18           Your Honor, Iron Mountain Information Management filed

19   an objection at docket number 209.  The objection was to the

20   adequate specificity of the contracts that were presume -- that

21   were proposed to be rejected -- sorry, assumed.  The debtors

22   have taken those contracts off of the assumption list, and

23   they're no longer to be assumed and assigned.  That resolves

24   the objection of Iron Mountain Information Management.

25           Your Honor, at docket number 210, Joneshiers, Inc., a

1  licensor to the debtors, filed an objection that they said that

2  they would withdraw in the event that there was a going-concern

3  bid to ABG and the licensee W Diamond.  They have withdrawn

4  that objection at docket number 262.

5       Your Honor, docket number 213, Infor Global Solutions

6  filed an objection on the grounds that these are licenses that

7  could not be assumed and assigned without the licensor's

8  consent.  Ms. Guilfoyle is on the line.  The debtors' response,

9  Your Honor, is to take off the license agreements from the

10 assumption list.  This is done in conjunction with ABG and W

11 Diamond, who will no longer, at this time, seek to assume and

12 assign these agreements.

13      We're leaving open the possibility of an arrangement

14 to be made between W Diamond as licensee, and Infor, at a later

15 time, at which we would seek to assume and assign these

16 contracts, if in fact, a deal is struck.  If not, the debtors

17 will seek to reject these three licenses.

18      THE COURT:  Counsel, can you hear us?

19      MS. GUILFOYLE:  Yes, I can, Your Honor.

20      THE COURT:  All right.

21      MS. GUILFOYLE:  Just for the record, I'm Tori

22 Guilfoyle on behalf of Infor Global Solutions Michigan.  And

23 thank you, Your Honor, for letting me appear telephonically.

24      Although the debtors are not seeking to assume and

25 assign the Infor agreements in connection with today's request

1    for approval of the sale, Infor does have a slight concern with

2    the proposed transaction.  If in connection with the sale, the

3    debtors will transfer the computer equipment that contains the

4    Infor software to the purchaser, which will then turn around

5    and license that computer equipment to the new operating

6    company.  So as a result of that transaction, a nondebtor who

7    is not the licensee of the Infor software, will have physical

8    possession of the computer equipment and therefore the Infor

9    software.

10           THE COURT:  Well, I suggest you take up the issue with

11   counsel separately.  We don't need a whole courtroom of people

12   to deal with this.  I assume if the --

13           MS. GUILFOYLE:  I assure Your Honor we actually

14   have --

15           THE COURT:  -- if the --

16           MS. GUILFOYLE:  -- taken this point up with debtors'

17   counsel.  And we requested proposed language to be added to the

18   sale order that would protect Infor's rights and interests in

19   their software pending a possible later assumption and

20   assignment of Infor's software agreements.  We included the

21   language in our sale objection.  I also circulated slightly

22   revised language this morning to debtors' counsel.  And as far

23   as I know the debtors have not agreed to include that language

24   in the sale order.

25           So, I guess I'm requesting Your Honor to order the

1    debtors to include the protective language to ensure that the

2    nondebtor, nonlicensees do not use the Infor software absent an

3    Infor-purchaser or Infor-operating company agreement.

4           MR. YOUNG:  Your Honor, the debtors are investigating

5    now whether they're using the software in any event, which is

6    the reason for their potential rejection of these contracts.

7    But what Ms. Guilfoyle asked us to include in the sale order

8    imposed obligations on the debtors which we don't think the

9    Code imposes upon us.

10          We're removing the three license agreements from the

11   list of those that will be assumed and assigned at this time,

12   and we will abide by the terms -- the debtors will abide by the

13   terms of the license agreements.  We will instruct the

14   purchaser, to the extent that those are not purchased assets,

15   that they're not used in connection with those purchased

16   assets.

17          THE COURT:  I guess you can take some steps to

18   effectuate that instruction, can you not?

19          MR. YOUNG:  Certainly.  Certainly.

20          THE COURT:  And you intend to do so?

21          MR. YOUNG:  We will.

22          THE COURT:  And if you do not, you're simply creating

23   additional possible -- and I stress the words possible claims

24   against the estate.

25          MR. YOUNG:  That's correct, Your Honor.  And one of

1    the reasons we're willing to take these licenses off of the

2    assignment and assumption list and leave them for a later day

3    with respect to either assumption and assignment or rejection,

4    is in large part because they don't create administrative

5    liabilities for the estate.  There are no amounts payable under

6    these license agreements.

7         So we will, in short order, make a determination as to

8    whether the buyer will seek an assignment or we will seek to

9    reject those licenses.

10        THE COURT:  All right.  I don't think anything is

11   needed for the order.  The debtors intend to abide by their

12   contractual responsibilities, and I have no information to the

13   contrary.  All right, next --

14        MS. GUILFOYLE:  Your Honor, I was wondering if maybe

15   possibly the purchaser or the new operating company's

16   representatives would state on the record that they will not

17   use the Infor software pending this time period where the

18   debtors may either reject or seek to assume and assign the

19   Infor software.  Because once again, the concern is they're

20   going to be in physical control of the computer equipment so --

21        THE COURT:  We don't -- we don't know -- we don't know

22   when physical control is going to be turned over.  We don't

23   know the circumstances of obtaining the computer equipment.

24   And we do not know what will be done with the computer

25   equipment.

1    You have put the parties on notice of their -- of your

2  concern and the fact that you apparently are intent on making

3  the transfer of any rights here so difficult and so onerous

4  that it may be that the purchasers will have no interest

5  whatsoever in dealing with your client.  That's for another

6  day.  They are not going to attempt to assume and assign the

7  contract.

8    And you may well, on behalf of your client, have a

9  perfect pyrrhic victory, where there is no assumption and

10 assignment, but no business whatsoever for your client.  But

11 that's for another day.  The parties are on notice and are

12 requested to pass on your concerns to their businesspeople, so

13 care is taken not to create additional problems.  And I don't

14 think we have to spend any more time on this matter today.

15    Next?

16    MR. YOUNG:  Your Honor --

17    MS. GUILFOYLE:  Thank you, Your Honor.

18    MR. YOUNG:  Thank you, Your Honor.  Your Honor, with

19 respect to docket numbers 223 and 229, in each case there were

20 objections to proposed cures, proposed assumptions.  They will

21 no longer be on the assumption and assignment list.

22    THE COURT:  All right.  Another pyrrhic victory for

23 the objector.

24    MR. YOUNG:  Your Honor, with respect to docket number

25 230, Destiny Holdings, which is one of the landlords of the

1   debtors, Mr. Newman is on the phone.  I believe we've resolved

2   all issues subject to one caveat, that is, that Mr. Newman

3   wants to see revised cure amounts to which the debtors have

4   agreed with Mr. Newman's clients, as set forth on Exhibit B to

5   the APA, which will be the final place at which those cure

6   amounts are reflected.

7           THE COURT:  All right.  Do we know the numbers?  Do

8   you have the numbers in front of you?

9           MR. YOUNG:  I don't.

10          THE COURT:  If you don't, then we'll go on.  We won't

11  take the time.

12          MR. YOUNG:  Your Honor, I understand --

13          MR. NEWMAN:  Your Honor, this is --

14          MR. YOUNG:  -- oh.  Mr. Newman, I understand, from the

15  debtors' side, the number is $7,621.95 plus outstanding

16  attorneys' fees due to Mr. Newman and his firm.

17          MR. NEWMAN:  That's correct, Your Honor.

18          THE COURT:  All right.  Let's not spend any more time

19  and run that up double by keeping a lot of lawyers here today.

20          Next item?

21          MR. YOUNG:  Your Honor, the last filed objection was

22  filed by Midland Loan Services, a special servicer, on the Des

23  Plaines mortgage.  Your Honor may note that the Des Plaines

24  mortgage holder is a company called HMX Touhy LLC.  It is a

25  nondebtor.  Its equity interest at HMX Touhy LLC are owned by

1    HMX Des Plaines LLC, also a nondebtor.  One hundred percent of

2    the equity interest of HMX Des Plaines LLC is owned by debtor

3    HMX Acquisition Corp.

4              Neither Touhy or Des Plaines were obligated on the

5    senior debt and are not debtors.  Nevertheless, the APA

6    contemplates the transfer of the real estate owned by HMX Touhy

7    LLC to ABG and to W Diamond, specifically in the purchase.

8              Our plan,  Your Honor, is to effectuate that outside

9    of court.  We're going to amend the APA to reflect that the

10   equity interests of HMX Touhy-Des Plaines are transferred to

11   the purchaser, so as not to trigger ownership changes at the

12   HMX Touhy level.

13             There was an objection filed that we were seeking to

14   have Your Honor approve an assignment and assumption of that

15   mortgage or of the deed or of the loan.  We are not, Your

16   Honor.  They're included simply because we're trying to

17   transfer the real estate.

18             There was an objection, Your Honor, by the special

19   servicer to that transfer, because the special servicer has

20   indicated that they believe the transfer will trigger a default

21   under the mortgage.  The way we're hoping to solve that, Your

22   Honor, is to have Your Honor's order approve a sale of the

23   assets to ABG and W Diamond.  That equity interest will occur

24   in connection with the sale.  Ultimately, W Diamond as licensee

25   will work directly with the special servicer to get the consent

1    of the lender ultimately to that transfer.  And that transfer

2    will become effective upon further notice to this Court.

3           W Diamond's counsel will file a notice saying the

4    transfer was effected by virtue of the agreement between the

5    lender and the essential -- the new owner.  That will take

6    place, Your Honor, probably after closing, but will be

7    documented in a third amendment to the APA which will be

8    attached to the order approving the sale.

9           THE COURT:  And the counsel to the special servicer is

10   on the line?

11          MR. YOUNG:  He is here, Your Honor.

12          THE COURT:  He is here.

13          MR. LEVIN:  I didn't feel I warranted a seat at the

14   table, so I stayed at the back.  But Your Honor, I was admitted

15   pro hac vice in this matter by the Court on December 17th.

16          THE COURT:  Well, it would be helpful if you gave us

17   your name.

18          MR. LEVIN:  I would -- Matthew Levin with Kilpatrick

19   Townsend & Stockton, representing Midland Loan Services, which

20   is, as Mr. Young indicated, the special servicer for the loan

21   in question.

22          I agree with counsel.  I think we've resolved this.

23   The one other thing I wanted to state on the record is that

24   counsel did agree to insert into the order -- the sale order,

25   that is -- language to the effect that nothing in the order is

 1  seeking to effectuate a sale of the real properties, because

 2  that's now changed, and that everybody's rights are preserved

 3  in terms of the loan documents, since these are all with

 4  respect to Midland and HMX Touhy, nondebtors in this case.

 5          We didn't want there to be any ambiguity that the

 6  order in any way affected those rights.  And I believe that was

 7  agreed to.

 8          THE COURT:  All right.  Thank you.

 9          MR. LEVIN:  Thank you, Your Honor.

10          THE COURT:  And we have the City of Des Plaines on the

11  phone too?  They want to be sure the taxes are paid.  Is that

12  right?

13          MR. DAMBACH:  Well, we were primarily -- this is Alex

14  Dambach from the City of Des Plaines.  Our primary concern, of

15  course, is that this sale goes through successfully.  We're

16  concerned for the jobs and the -- and of course, we do want to

17  make sure that they do pay taxes when they come due.

18          THE COURT:  Well, maybe you need to talk to the

19  special servicer.  But my experience is that that's not easy.

20  But since there actually is a human being here in court,

21  counsel for the special servicer, you actually have somebody to

22  talk to.  And that's a big step forward.

23          All right.  I appreciate the fact that the parties

24  have been able to work out the technical details.  And I

25  gather -- do I have a -- I don't remember seeing a clause in

HMX ACQUISITION CORP., ET AL.                              53

1    this draft of the sale agreement.

2            MR. YOUNG:  Mr. Levin is drafting for us, if he has

3    not already, some language, Your Honor, that we've agreed to

4    include.

5            THE COURT:  All right.  Now, let me just say that this

6    is -- "this" being the sale order, is thirty-three pages.  If

7    you draft too lengthy a paragraph, you may well approach the

8    all time record of sale orders in this court.  And that would

9    not be a good thing.

10           MR. YOUNG:  No one wants that, Your Honor.

11           THE COURT:  I already intend to penalize counsel for

12   every page over page 20 for sale orders.

13           MR. LEVIN:  I'll make it a separate paragraph.

14           THE COURT:  Thank you.  All right.  We'll get to the

15   form of the order in just a few minutes.

16           MR. YOUNG:  I'm going to let Mr. Thomas come back,

17   Your Honor, for that portion.

18           Your Honor, there was one informal objection that was

19   also lodged by another landlord, Neapolitan Enterprises.  And

20   on December 13th, when the debtors filed revised schedules

21   2.7 -- sorry, 2.3 and 3.7 to the APA, we revised a cure amount

22   in favor of Neapolitan Enterprises.  They have a deadline to

23   object to that proposed cure amount of December 24th and wanted

24   to make sure that their rights were preserved.

25           I indicated that I would say on the record that, in

1  fact, their rights are preserved, and that remains the deadline

2  for objections.

3          THE COURT:  All right.  And that covers all of the

4  filed and informal objections in terms of assumption and

5  assignment and cure amount.

6          MR. YOUNG:  Correct.

7          THE COURT:  I think there -- were there several

8  licensors who claimed to have the right to prevent the sale of

9  certain instruments?  And you've covered them all.

10          MR. YOUNG:  We have, Your Honor.  Jonesheirs consented

11  by filing their withdrawal.  Argyle Culture, we've taken off

12  the list and will not seek to assume those licenses.  And you

13  heard on the Infor issues, those licenses --

14          THE COURT:  All right.  Thank you.

15          MR. YOUNG:  -- have been removed.

16          THE COURT:  All right.

17          MR. YOUNG:  Certainly, Your Honor.

18          THE COURT:  All right.  Does anyone wish to be heard

19  on any of the issues that have been raised today?

20          MR. SPEARS:  Good afternoon, Your Honor.  John Spears

21  of Alston & Bird for Jonesheirs.  I would simply note for the

22  record that Jonesheirs' consent is subject to appropriate

23  documentation.  And until such documentation is executed,

24  Jonesheirs reserves all of its rights.

25          THE COURT:  What documentation were you looking for?

HMX ACQUISITION CORP., ET AL.                                55

1          MR. SPEARS:  Documentation regarding the ultimate

2    assignment to W Diamond Group.

3          THE COURT:  All right.  Thank you.  Anyone else?

4          All right.  Shall we proceed to the sale order?

5          MR. THOMAS:  Thank you, Your Honor.  Mark Thomas on

6    behalf of the debtors.

7          We were able to tender to your clerk about fifteen

8    minutes before our scheduled 2:30 start, a black-line of the

9    proposed order against the version that was filed as an exhibit

10   to docket number 21.  We did spend some time with all the

11   parties-in-interest, and we have made some additional changes.

12         So what I would propose, Your Honor, is that we go

13   through the order, I try to highlight the changes, and we will

14   go back, create a clean copy, upload all the exhibits, and file

15   it.  I would note also that Exhibit D has changed a bit, based

16   on --

17         THE COURT:  All right.

18         MR. THOMAS:  -- negotiations.

19         THE COURT:  All right.  Why don't you tell me all

20   material changes.  If any party wishes every change to be

21   noted, they certainly may.  But I assume that the principal

22   parties here, or anyone who wishes it, will get a copy of the

23   revised version -- a or a further black-line copy.  And I'll

24   have some comments on the sale order as we go through.

25         I'm looking at the black-line version that you gave us

1   this afternoon.

2           MR. THOMAS:  Yes, Your Honor.  It has "Version 4" on

3   the bottom on the first page.

4           THE COURT:  Correct.  All right, where do you --

5           MR. THOMAS:  Your Honor, I'm on page 17 looking for

6   material changes.  There's a lot of changes.  I would say most

7   of it is conforming changes, cleanup changes.

8           THE COURT:  All right.  We'll go through it as quickly

9   as we can.  Page 10, I've basically accepted a proffer of the

10  good faith of the parties, including Mr. Williams, in

11  negotiating the terms of the various agreements, that all

12  agreements among the purchaser, the licensee, and the debtors

13  and any related entities, have been disclosed.  There are no

14  undisclosed side deals.  Parties have acted at arm's length and

15  in good faith for the reasons stated on the record previously.

16          So I'll accept that as a proffer, unless anybody

17  wishes any further examination or wishes to have the record

18  further elaborated.  All right.

19          On the top of page 11, you have throughout, where we

20  speak of the purchased assets are sold free and clear.  I'm

21  comfortable stating free and clear of all liens, claims,

22  encumbrances, and interests.  When we add the words "leaseholds

23  and possessory rights", I get into an area that I don't

24  understand, and I'm not sure that the bankruptcy court can

25  affect an easement on property.  I don't think that's intended.

1           Section 363(f) uses the word "interest".  So I would

2    strike, throughout, the term "leaseholds and possessory

3    rights".  I don't think you're trying to divest anyone of any

4    leasehold interest or any easement or anything like that.

5    And --

6           MR. THOMAS:  I think it's appropriate, Your Honor,

7    especially since --

8           THE COURT:  -- we don't have the Seventh Circuit law

9    on the subject here, and I don't think we want it.

10          MR. THOMAS:  I think it's appropriate to strike it.

11   And we don't even have any real estate being transferred, as

12   Mr. Young --

13          THE COURT:  Okay.

14          MR. THOMAS:  -- explained.

15          THE COURT:  All right.  On page 12 -- and you're

16   welcome to object to or comment on any of my comments.

17   Paragraph T, line 2, I would strike the word "all" and insert

18   "one or more of the requirements of Section 363(f)".  And two

19   lines down, I would just strike "including any interest arising

20   under 365(h) of the Bankruptcy Code", because I don't know that

21   that means.

22          Page 13.  I don't think I can enjoin any party.  I

23   have no problem in saying they're barred.  But I think that on

24   the top of 13, the words "and in each case are enjoined" and to

25   the end of that paragraph, should be stricken.  In paragraph X

1   we have, two lines from the bottom, another "leasehold and

2   possessory rights."

3         I assume that with the revisions to the list of

4   assumed contracts, paragraph CC is correct.  Paragraph 1, I'd

5   appreciate it if you'd strike the word in the second sentence

6   "in all respects".  I don't know what that means.  Paragraph 2,

7   page 16 first line, same words.  Many of the lawyers in this

8   room have heard me --

9         MR. THOMAS:  I've heard you --

10        THE COURT:  -- do this before.

11        MR. THOMAS:  -- I've heard you.  I should have

12   remembered.  I'm sorry, Your Honor.

13        THE COURT:  Well, it depends who drafted this.

14        Paragraph 5, same thing, last three words.  Paragraph

15   6 has "leaseholds and possessory rights", as does paragraph 8.

16   And I think I would strike, again, the words "including any

17   interests arising under 365(h)".

18        And now, you're on 17 for a change -- for a new -- or

19   did I get that right?

20        MR. THOMAS:  I did say that, Your Honor.  And I'm

21   circling to find out what the -- I think there was -- I recall

22   in paragraph 7, there was an amendment to the asset purchase

23   agreement.  The second amendment to the asset purchase

24   agreement picked up the transfer as a purchased asset of sort

25   of the right to payments under the Wool Trust Fund program and

1    the licenses thereunder.

2              THE COURT:  That's already in paragraph 7.

3              MR. THOMAS:  Yes.

4              THE COURT:  In my version.

5              MR. THOMAS:  Right.  And it hadn't been initially,

6    because it -- in the original contract, it hadn't been a

7    purchased asset.

8              THE COURT:  All right.

9              MR. THOMAS:  Your Honor, on page 18, we inserted

10   paragraph 9.  The U.S. Trustee requested that we make clear

11   that the purchaser would be bound and comply with the debtors'

12   proxy policies.

13             THE COURT:  I thought I saw the U.S. Trustee's fine

14   hand in that paragraph.  Yes.

15             MR. THOMAS:  And we did it.

16             THE COURT:  And just before that, we have another

17   reference to "leasehold and possessory rights".  All right.

18   Page 19?

19             MR. THOMAS:  Your Honor, just clean-up on page 19.

20             THE COURT:  Right.  I have one clause.  I think right

21   in the middle of that page it's the line starting with the

22   words "the closing date under the APA".

23             MR. THOMAS:  I know there's an injunction --

24             THE COURT:  Yes.

25             MR. THOMAS:  -- that.  I assume we should remove --

1          THE COURT:  I would appreciate your striking just the

2    words "and permanently enjoined".

3          MR. THOMAS:  Right.

4          THE COURT:  I see how the sentence is supposed to

5    read.  I think it might read more easily if you just strike

6    "under the APA" from the two lines up from there.  But --

7    because I think the closing date is defined.  But I see now how

8    that's supposed to work.

9          Don't you need, in the sentence starting with "Similar

10   act" -- "including any claim for any tax arising under a bulk

11   sales or similar act, prior to the closing date"?  Don't we

12   need that clause?

13         MR. THOMAS:  Okay, yes.

14         THE COURT:  Paragraph -- I'm on page 20.

15         MR. THOMAS:  Yes.

16         THE COURT:  Paragraph 12 -- it's new number 12, line

17   4, I would just add the concept in there "after due demand".

18   And then I go to page 22.  Do you have any --

19         MR. THOMAS:  Nothing material, Your Honor, prior --

20         THE COURT:  Second line after the word "closing", I

21   think it would read better, rather than to have a little (ii),

22   strike the (i) and the (ii) and then say, "whether or not

23   assessed prior to the date of closing".  I think that's the --

24   that's the idea.

25         I think paragraph 18 should be deleted.  Paragraph 17,

1   I think is a repetition, but I'm not going to dwell on that,

2   except the shorter we get it the smaller the penalty will be.

3         MR. THOMAS:  Okay.

4         THE COURT:  I don't -- I think that we can -- page 24,

5   first line, we've got the word "enjoined", and I would strike

6   in the second line, "and including any alleged obligation for

7   environmental cleanup or similar liability".  If it's a claim,

8   it's a claim.  And that, I think, is sufficient protection.

9         MR. THOMAS:  And, Your Honor, we agreed with counsel

10  for the licensee on some changes to the last sentence of that

11  paragraph.

12        THE COURT:  Well, I didn't understand the last

13  sentence at all.  So --

14        MR. THOMAS:  The last sentence was supposed to be a

15  sort of default rule that in the event that there were

16  contracts that had neither been assumed nor rejected, just

17  unidentified contracts out there, that they would be deemed to

18  be assumed by the licensee.  What we've determined is, in lieu

19  of sort of the automatic assumption, we're going to revise that

20  language to provide that, in effect, in the event the debtors

21  become aware of or identify any contracts that have not been

22  put on an assumed or reject list, that we would provide the

23  licensee with notice -- written notice.  The licensee would

24  have a period of time, and then we would decide whether to

25  assume or reject.  And we would reserve rights in case there

HMX ACQUISITION CORP., ET AL.                                          62

```
 1   had been accruals.
 2           The concern was potentially unidentified contracts
 3   that were accruing administrative liabilities that we weren't
 4   aware of.
 5           THE COURT:  That makes complete sense.  That's fine.
 6           MR. THOMAS:  Okay.
 7           THE COURT:  You may want to -- and this is up to the
 8   parties; I'm not trying to dictate it at all -- give the
 9   licensee the right to -- with the consent of all interested
10   parties -- designate additional contracts for assumption.  I
11   think that's probably assumed.  If the licensee wants it.  I
12   know this has been done very quickly.  It wouldn't seem to me
13   that that could disadvantage the debtor, so long as the
14   counterparty to the contract gets notice and opportunity to be
15   heard on cure amounts or on adequate assurance or on any other
16   issue.
17           Mr. Halperin?
18           MR. HALPERIN:  Your Honor, I think that actually makes
19   a lot of sense.  Procedurally, it'll save some time rather than
20   teeing up another motion to assume each time.  So we'll work
21   with debtors' counsel on the language.
22           THE COURT:  Well, I do think -- I think eventually
23   you'd need some motion before the Court, which you could have
24   on short notice.  It's really a question of giving notice to
25   the creditors, giving notice to the counterparties.
```

HMX ACQUISITION CORP., ET AL.                                63

1           MR. HALPERIN:  Absolutely, but --

2           THE COURT:  And an opportunity to be heard.

3           MR. HALPERIN:  But the procedure you just suggested

4   says that if everybody's on board, it's just designated; we

5   don't have to come back with more motion practice just to do

6   something on consent.  I think it makes a lot of sense.

7           THE COURT:  Well, you may need an order.  I wasn't

8   suggesting we do away with any -- just that you would have the

9   right to move it and to move it quickly, on short notice.

10          MR. THOMAS:  I think that's a good suggestion, given

11  the fact that the assumed and rejected contract list seems to

12  be sort of a moving target, because we have been moving so

13  quickly.

14          THE COURT:  Anything else before page 26?

15          MR. THOMAS:  No, Your Honor.

16          THE COURT:  All right, on page 26 paragraph 26, I

17  would strike the words in the very middle of that paragraph,

18  "or restrict use of the premises which are demised by an

19  assumed contract to a specific tenant".  It seems to me, if you

20  have that right, you have it.  But I can't give it to you if

21  you don't have it.

22          In the first line of page -- also on page 26 on the

23  last line, I would add after "notice", "any party that failed

24  to object to assumption and assignment after notice, is deemed

25  to have consented".

1         Now, we get to the payment of the purchase price.  I

2   appreciate the testimony with regard to administrative

3   solvency.  Did the notice of the transaction of the sale to the

4   purchaser give notice that the Salus claim would be paid out of

5   the proceeds?

6         MR. THOMAS:  Yes, Your Honor.

7         THE COURT:  It did?

8         MR. THOMAS:  Yes.

9         THE COURT:  So that's noticed.

10         MR. THOMAS:  Yes.

11         THE COURT:  All right.  But I don't think it gave

12   notice that William Blair would be paid out of the proceeds,

13   did it?

14         MR. THOMAS:  I do not believe it did, Your Honor.

15         THE COURT:  Well, then William Blair is just going to

16   have to wait.  They put in their application like anyone else.

17   They can be heard -- I'll hear you.  But there's no basis to

18   have William Blair get paid.

19         MR. THOMAS:  Your Honor, Mr. Richards, in court on

20   behalf of William Blair, our financial -- I mean, our

21   investment banker, explains -- and I don't know if I have it

22   with me -- that the Blair engagement letter and the retention

23   order -- and it was negotiated with the U.S. Trustee's

24   Office -- contemplated that there would be payments of the

25   Blair fees as and when they were earned under the engagement

1  letter, with the express right that all those payments would be

2  subject to final fee applications and disgorgement.  And in

3  fact, in the next page --

4        THE COURT:  Well, if it says that, you'll have to show

5  it to me.

6        MR. THOMAS:  Well, Your Honor, the next page we

7  specifically -- on page 29, five lines down, we provide that

8  any amounts payable --

9        THE COURT:  Oh, I see that.  It's subject to

10 disgorgement.  But I have to see some notice to parties that

11 we're going to pay them at the closing.  Because that is not

12 usually the procedure.  But if it's provided for in their

13 engagement letter, then I'll approve it.  How much are they

14 getting?

15       MR. THOMAS:  Your Honor, we have not finally

16 reconciled the final fee, but I believe it's going to be in the

17 two-million-dollar range.

18       THE COURT:  So of the five million you're getting from

19 Salus, they get almost half of that?

20       MR. THOMAS:  Your Honor, there's actually going to be

21 8.1 million dollars --

22       THE COURT:  Yes.

23       MR. THOMAS:  -- coming to the estate.  But yes, that

24 is the -- one of the major fees.

25       THE COURT:  All right.  But that's subject to

1    disgorgement if we have an administratively insolvent estate.

2    I want that very clear.

3            MR. THOMAS:  It's actually -- Your Honor, in the order

4    it provides it's subject to disgorgement, "based upon any court

5    ruling on such fee application."

6            THE COURT:  All right.  Well, I'll be happy to look at

7    their engagement letter to verify that it gives them the right

8    to be paid out of the proceeds.

9            MR. THOMAS:  Okay, Your --

10           THE COURT:  Because that is not the usual procedure.

11           You wish to be heard?

12           MR. RICHARDS:  Your Honor, I simply wanted to confirm

13   your statement, and the order reflects it of course.  And it's

14   confirmed with the U.S. Trustee that we would, of course, be

15   filing a final fee application.  Again, Geoffrey Richards, for

16   the record.  We would be, of course, be filing a final fee

17   application, and that our fees are subject to the Court's

18   ultimate final approval of our fees with respect to that; and

19   that of course, any payment that is made is subject to, as the

20   order reflects, subsequent disgorgement or potential

21   disallowance in that regard, Your Honor.

22           And we had conferred specifically with the U.S.

23   Trustee to assure the Court and the Office of the U.S. Trustee

24   that those provisions were clear in the order as they are.

25           MR. THOMAS:  Yes, so, Your Honor, the order does

1    provide, "This order does not constitute final approval of

2    William Blair's fees and expenses.  William Blair shall be

3    required to file a final fee application pursuant to the Blair

4    order, and any fees paid at closing shall be subject to

5    disgorgement based upon any court ruling on such fee

6    application."

7              THE COURT:  And what if the Salus claim is challenged

8    by the committee?  When does the committee's challenge period

9    end?

10             MR. KUGLER:  I don't have the specific date, Your

11   Honor.  I believe another forty-five days or so.

12             THE COURT:  Or the --

13             MR. THOMAS:  I think it would be on or about January

14   21.  But I think it was sixty days from entry of the final DIP

15   order.

16             THE COURT:  And is that the committee's right, or is

17   that the right of any creditor?  I don't recall.

18             MR. THOMAS:  The committee is expressly granted

19   standing to assert any challenges against any of the Salus

20   claim, the releases, validity, priority, extent, avoidance

21   actions.

22             THE COURT:  Then Salus has to disgorge?

23             MR. ROSENTHAL:  Yes, Your Honor.  We understand the

24   rules of the game, and we would be prepared to do that if

25   there's a challenge.

1          THE COURT:  All right.  A successful challenge?

2          MR. ROSENTHAL:  A successful challenge.  Thank you,

3    Your Honor.

4          THE COURT:  Now, we're paying 150,000 dollars to

5    Salus?

6          MR. THOMAS:  Yes.  Your Honor, under the Salus credit

7    agreement, the lender is entitled to take reserves.  And they

8    are taking a reserve in the event of a challenge.  So the

9    concept here is that they will, in effect, hold 150,000

10   dollars, which will be added to their payoff.  So they'll be

11   paid off.  They will then hold 150,000 as a litigation reserve.

12   And the order provides that in the event that the challenge

13   period termination date occurs -- which is a defined term in

14   the DIP order -- the litigation reserve will be returned to the

15   purchaser -- to ABG, net of whatever actual fees and expenses

16   were incurred.  Because ABG, in effect, is paying off a higher

17   purchase price by paying off an increased Salus claim.

18         THE COURT:  And if I understand paragraph 34

19   correctly, the purchaser is paying 500,000 dollars, which is

20   deemed part of the Salus payoff, that Salus will pay over to

21   the debtors on account of the professional carve-out fee

22   reserve?

23         MR. THOMAS:  That's correct, Your Honor.  And we did

24   make some handwritten changes that are not in front of you that

25   counsel for Salus and counsel for ABG agreed upon to make this

1   a little bit more -- a little clearer, so that the cash

2   purchase price that will be paid to the estate, will be the

3   total amount of the Salus pre-petition plus post-petition claim

4   plus 5.1 million dollars plus this 150,000 dollars plus the

5   500,000.  So that's the total purchase price.

6            There is the Salus claim discount of three million

7   dollars which is embodied in the second amendment to the asset

8   purchase agreement.  So, for example, if Salus' total pre-

9   petition and post-petition claim is sixty-five million dollars

10  as of closing, the purchaser will pay sixty-five million

11  dollars to the estate, and Salus only gets sixty-two million in

12  full and final satisfaction.  And that's how the estate will

13  hold 8.1 plus the 500- referenced in paragraph 34.  Salus will

14  hold the 150- referenced in paragraph 33, subject to paying it

15  back to the purchaser upon the expiration of the challenge

16  period.

17            THE COURT:  That goes back to the purchaser?

18            MR. THOMAS:  To the purchaser, who is paying an

19  increased purchase price, due to that reserve.

20            THE COURT:  All right.  Paragraph -- how does

21  paragraph 35 work?  And what are the numbers?

22            MR. THOMAS:  Paragraph 35 is the -- Your Honor will

23  recall, we had a motion where the debtors owned certain

24  intellectual property that was used by its nondebtor Canadian

25  affiliate called Coppley.  We sold that intellectual property

1    as part of an intertwined sale.  Coppley was in its own

2    receivership.  So there was a going-concern sale through a

3    receivership.  The receiver distributed, on an interim basis,

4    2.4 million dollars to Salus to pay down Coppley's direct

5    obligation.

6              THE COURT:  And how much was that?

7              MR. THOMAS:  The direct obligation was approximately

8    3.4 million dollars.  However, Salus also has a secured claim

9    against Coppley as a guarantor of the debtors' obligation.  But

10   there's about an extra million dollars or so remaining in the

11   Canadian receivership.  And all of Salus' right, title, and

12   interest, as a secured creditor in that receivership

13   proceeding, will be transferred to the purchaser as part of the

14   payoff of the Salus debt.

15             So the purchaser conceivably -- we've been trying --

16   we've all been trying as hard as possible to get the money out

17   of the Canadian receivership prior to closing, and it just

18   doesn't appear like it's going to happen.  Everyone had

19   projected that that money would have come in and paid down the

20   Salus claim.  It didn't happen.  Therefore the purchaser is

21   paying more.  And it is buying the right to proceed in the

22   Canadian receivership action and collect everything that was

23   owed to Salus.

24             THE COURT:  All right.  Any other changes that you

25   have up to page 30?

1          MR. THOMAS:  No, Your Honor.

2          THE COURT:  All right.  Paragraph 36:  why are we

3    providing for releases?  We have a release of Salus.  I don't

4    know if it's a release in the DIP order, but it is certainly a

5    representation.  And except for the reservation of rights that

6    appears in there, I usually take out the word "release".  But

7    why are other parties getting releases in this particular

8    order?

9          MR. THOMAS:  Your Honor, this -- there are no releases

10   in paragraph 36 to anyone other than Salus.  What -- Salus

11   received a release in the final DIP order, and what they're

12   doing in paragraph A, they received a release from the debtors.

13   They are --

14         THE COURT:  No.  I ordinarily in DIP orders, take out

15   the word "release".  They get a stipulation as to the

16   nonavoidability, validity, enforceability of their debt.  But I

17   ordinarily -- we can take a look at it -- take out the word

18   "release", because I don't know what that means when the debtor

19   has, through the committee, a challenge period.

20         MR. THOMAS:  Your Honor, in this DIP order -- and I

21   have it in these papers; I'll try to find it -- there actually

22   is, in the final DIP order, the debtors granting Salus a

23   complete release of all claims and causes of action subject to

24   the committee's challenge period.

25         THE COURT:  Well, I cert -- I wasn't careful enough.

1  It's as simple as that.

2              MR. THOMAS:  It's in there.  I --

3              THE COURT:  Well, let's look.

4              MR. THOMAS:  Okay.

5              THE COURT:  You can look and you can show me.

6              MR. THOMAS:  Your Honor, if I may approach?

7              THE COURT:  Yes.

8              MR. THOMAS:  Docket number 168 is the, in effect final

9  DIP financing order that was entered by the Court on November

10 21.  Paragraph 20 is the release we're talking about.  And to

11 tie it into this sale order, what Salus is seeking is that in

12 addition to the debtors providing this release, subject to the

13 committee's challenge, that William Blair, the committee, and

14 the purchaser also release Salus from any claims that they

15 might have against Salus.

16             THE COURT:  The committee can't do that.  The

17 committee still has the challenge period, doesn't it?

18             MR. THOMAS:  Yes.  But it does say that release is

19 subject to the challenge period in (b) in paragraph 36.

20             THE COURT:  But I don't understand why we don't stay

21 with what we have in the DIP order.  It is what it is.

22             MR. ROSENTHAL:  Your Honor, Jeffrey Rosenthal on

23 behalf of Salus Capital.  We are releasing our liens and

24 releasing our --

25             THE COURT:  Of course you are.  You have to.  You have

1   no choice.

2           MR. ROSENTHAL:  Well, I have a choice, that you know,

3   I'm accepting money in return for the release of my liens.  And

4   I will -- I had indemnification provisions --

5           THE COURT:  And your indemnification clause

6   undoubtedly says whether or not you're paid off in full, the

7   indemnification rights continue.

8           MR. ROSENTHAL:  They do, Your Honor.  But I have a

9   lien to secure those indemnification rights that I'm giving up.

10          THE COURT:  And you routinely give it up when you get

11  paid off.  Otherwise the title company won't transfer title,

12  and there's a standoff.

13          MR. ROSENTHAL:  Well, there's no title company

14  involved here, Your Honor.

15          THE COURT:  I know there isn't.

16          MR. ROSENTHAL:  It's a bill of sale.  But --

17          THE COURT:  There's a bill of sale.

18          MR. ROSENTHAL:  -- in this case, we are releasing all

19  of our liens --

20          THE COURT:  Of course you are.

21          MR. ROSENTHAL:  -- and in return -- and giving up our

22  secured indemnification.  So in return, we would expect that

23  people would release us --

24          THE COURT:  Who is "people"?

25          MR. ROSENTHAL:  -- in order for them to have the

1  procee -- in order to have the proceeds.  Those people are

2  getting paid --

3          THE COURT:  Well, the purchaser -- the purchaser can

4  do what it wants.  William Blair can do what it wants.  If they

5  want to release you, they can release you.  The committee, I

6  don't think the committee has any other -- any other claims.

7  The debtors may.  But if the -- let me see the language in the

8  DIP order.

9          Well, this one got past me.  All right.  There won't

10  be another one.

11          MR. ROSENTHAL:  Noted.

12          THE COURT:  Okay.

13          MR. THOMAS:  Your Honor, the committee, though, still

14  reserves its rights.  I mean, the challenge period is there.

15  So the release doesn't vitiate the committee's right to

16  investigate and challenge.

17          THE COURT:  All right.  Paragraph 37 is repetitious, I

18  think.  But I'll leave that to you to look at.  Paragraph 39 is

19  much too broad in terms of giving the parties the right to

20  amend.  You can easily restrict this and also provide that any

21  amendments should be filed on the docket.

22          Paragraph 40, you want me to approve these terms?

23          MR. THOMAS:  Your Honor, we are seeking the approval.

24  It was the -- and we acknowledge, however, that certain of

25  these terms would only be implemented pursuant to a plan, which

1   means they're only -- they're approved subject to being

2   implemented.

3             THE COURT:  Right.  Can we add those words?

4             MR. THOMAS:  Certainly, Your Honor.

5             THE COURT:  Subject to a plan or other appropriate

6   formalities -- or I think you can find a better word than

7   "formalities".

8             MR. THOMAS:  We can do that, Your Honor.

9             THE COURT:  All right.  And you had some changes to

10  Exhibit D.

11            MR. THOMAS:  Yes, Your Honor.  May I approach?  I

12  think --

13            THE COURT:  All right.  Thank you.  As long as all

14  parties have had a chance to see them.  Thank you.

15            MR. THOMAS:  Your Honor, the Exhibit D, the principal

16  issue in paragraph B is to make it clear that the seat that's

17  held for the benefit of the creditors is subject to and expires

18  upon, in effect, the payment in full of the claims of the

19  constituency that is entitled to that seat.  So when the -- if

20  and when the committee or its successor is paid in full, it no

21  longer will have the right to a seat.

22            There's some agreed-upon limitations as to who may

23  subsequently hold the committee's seats.  There is the

24  agreement by the committees that they will support certain

25  releases in a plan, which will be subject to voting and court

1  approval.  And there's, in effect, the concept that the holders

2  of allowed claims do not have distribution rights in

3  perpetuity.  They obtain the rights to distribution of profits

4  up and to the allowed amount of their claims.

5         And Mr. Kennedy -- that does not apply -- Your Honor,

6  we spoke of the ten percent profit participation units that

7  would be available to all the workers, the rank and file,

8  including the union members.  That is -- that doesn't expire.

9  There is not a cap on that, as it were.

10         THE COURT:  All right.

11         MR. HALPERIN:  Neither that nor to -- there are three

12  buckets:  management, workers and the unsecured creditors.  The

13  management and the workers was something that Mr. Williams had

14  contemplated originally, and that's going to go on.  It's only

15  with respect to creditors, and that's capped to the amount of

16  the debt.

17         THE COURT:  All right.  And I see you changed the

18  present release by the committee and union of Mr. Williams to

19  they'll support a release in a plan.

20         MR. THOMAS:  Yes, Your Honor.  I mean, the

21  contemplation is that the release will all be --

22         THE COURT:  And you say "until such time the committee

23  and its members agree that they will neither investigate, seek

24  to investigate or pursue any claims against them, to the extent

25  such claims exist."  That's a little ambiguous.

1           Wouldn't it be better to say "until such time the

2    committee and its members represent that they do not believe

3    that any such claims exist"?

4           MR. KUGLER:  Your Honor, that would be acceptable to

5    the committee.

6           THE COURT:  Mr. Halperin?

7           MR. HALPERIN:  Thank you, Your Honor.

8           THE COURT:  All right.  Well, that certainly clears

9    the record.

10           MR. THOMAS:  We would make that change, Your Honor.

11           THE COURT:  Well, I --

12           MR. THOMAS:  Your Honor, I -- one other point.  The

13    parties there in the second amendment to the asset purchase

14    agreement, the concept of a transition services agreement and

15    the parties reaching an agreement on a transition services

16    agreement was agreed upon.  That document is not finalized.

17    And so if and when the transition services agreement is

18    finalized and executed, we will be filing it with the Court.

19           THE COURT:  All right.

20           MR. THOMAS:  People are willing to go forward and get

21    the sale order approved, move to closing without that being

22    finalized right now.

23           THE COURT:  When do you expect to close?

24           MR. THOMAS:  The closing is expected to occur on

25    Friday, December 21st.  We are eager -- everyone's eager.

1   Everyone's working hard to do closing as soon as possible.

2   It's prior to Christmas.  It'll be a good Christmas present.

3   And it's also really critical that these assets move into a

4   well capitalized, appropriate steward that can infuse some much

5   needed money into the system so that the factories can start

6   getting stocked with materials, as Mr. Kennedy mentioned

7   earlier.  It's critical that a closing occur as soon as

8   possible.

9            THE COURT:  All right.

10           MR. THOMAS:  So, Your Honor, I would just -- because

11  this has been a process and the order continually changes, I

12  would request that counsel for the committee confirm that the

13  sale order, as we've discussed and as the changes have been

14  reviewed, is acceptable to the committee?

15           MR. KUGLER:  That's true and accurate, Your Honor.

16  There's some changes we discussed before that we didn't cover

17  right now, but that -- as long as those discussions are

18  incorporated into it, that's absolutely accurate.

19           THE COURT:  All right.

20           MR. THOMAS:  And, Your Honor, I would request that

21  counsel for Salus confirm that the sale order is acceptable?

22           MR. ROSENTHAL:  Confirmed, Your Honor.

23           MR. THOMAS:  Your Honor, likewise counsel for the

24  licensee?

25           MR. HALPERIN:  We'd like to take a final look at the

1   final version, but yes, I believe it's acceptable.  Everything

2   we've heard is acceptable.

3            MR. THOMAS:  And counsel for ABG, the buyer --

4            THE COURT:  We can call you the purchaser now, and

5   we'll leave --

6            MR. CHESLEY:  To the purchaser, it is acceptable, Your

7   Honor.

8            THE COURT:  -- off the stalking-horse term.

9            MR. CHESLEY:  And we appreciate all of your courtesy

10  and time.

11           THE COURT:  No, you don't have to do that.  But all

12  right, then, I'll approve the sale of substantially all the

13  assets of the estate, under the circumstances find that the

14  debtor has a sound business reason for entering into the sale,

15  and thank all of the lawyers and other professionals who have

16  obviously worked extremely hard to try to get this company

17  fixed and off to a good start under very difficult

18  circumstances in terms of the timing involved.

19           So I thank you all for your very obvious

20  professionalism in the representation of your respective

21  clients.

22           MR. THOMAS:  Thank you, Your Honor.

23           THE COURT:  All right, you'll --

24           MR. THOMAS:  We have two -- I think we have two --

25           THE COURT:  -- e-mail me then tomorrow a revised

1   copy --

2           MR. THOMAS:  We will --

3           THE COURT:  -- of the order.

4           MR. THOMAS:  -- with all the exhibits.  Your Honor, we

5   have two other matters on the agenda.

6           MR. YOUNG:  Thank you, Your Honor.  Agenda item number

7   32 is a motion for a general bar date to be set in these cases.

8           THE COURT:  You don't -- you don't need a motion for

9   that.  As long as the committee's seen it, and has signed off

10  on it, all you need to do is hand it up and I'll compare it

11  against our form.  And if you slavishly --

12          MR. YOUNG:  We used your form.

13          THE COURT:  -- follow our form, you won't get into any

14  trouble at all.

15          MR. YOUNG:  We used your form and followed General

16  Order M-386, Your Honor.  So we will submit that to Your Honor.

17          THE COURT:  The purpose of that form is to save people

18  time and effort.

19          MR. YOUNG:  It did.

20          THE COURT:  It also saves the Court the need to read

21  them.  No, we read them.

22          MR. YOUNG:  Sure, Your Honor.  Epiq will be receiving

23  claims, so as to take that burden off the Court as well, and

24  off the clerk's office.

25          Your Honor, the only other item up is item number 33.

1   It's a motion for rejection of certain employment agreements.

2   Your Honor, these rejections are so as to ensure that the

3   estate doesn't incur any administrative expense claims on

4   account of employment contracts.  If we could, Your Honor,

5   we'll submit to you electronically, a version of this order

6   which will attach a schedule of those contracts we're seeking

7   to reject.  We're going to remove a couple from that schedule

8   that will be assumed by the purchaser.

9           THE COURT:  And the --

10          MR. YOUNG:  That was served on all the counterparties.

11          THE COURT:  -- the employees have received notice?

12          MR. YOUNG:  They have, Your Honor.  It went out by

13  overnight mail on December 4th.

14          THE COURT:  And does anyone wish to be heard on this

15  particular motion?

16          All right, then I'll grant your motion.

17          MR. YOUNG:  Thank you, Your Honor.

18          THE COURT:  Thank you again.

19          MR. THOMAS:  Thank you, Your Honor.

20          THE COURT:  Good night.

21          IN UNISON:  Thank you, Your Honor.

22       (Whereupon these proceedings were concluded at 5:04 PM)

23

24

25

1

2                              I N D E X

3

4   WITNESS                EXAMINATION BY       PAGE

5   Mr. O'Hara            Mr. Thomas            23

6   Mr. O'Hara            Mr. Khodorovsky       32

7

8                              RULINGS

9                                          Page        Line

10  Creditors' Committee's application to employ  11    5

11  Leonard, Street and Deinard, P.A. is

12  approved.

13  Sale order is approved.                   79        12

14  Debtors' authorizing rejection of certain  81       16

15  employment agreements granted.

16

17

18

19

20

21

22

23

24

25

1

2                           C E R T I F I C A T I O N

3

4    I, Penina Wolicki, certify that the foregoing transcript is a

5    true and accurate record of the proceedings.

6

7

8

9

10   _____

11   PENINA WOLICKI

12   AAERT Certified Electronic Transcriber CET**D-569

13

14   eScribers

15   700 West 192nd Street, Suite #607

16   New York, NY 10040

17

18   Date:  February 25, 2013

19

20

21

22

23

24

25